No. 25-14171

# In the United States Court of Appeals for the Eleventh Circuit

PRESTON DAMSKY, A Law student at the University of Florida Levin College of Law,

*Plaintiff-Appellee,*

v.

DEAN OF STUDENTS OF THE UNIVERSITY OF FLORIDA,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 1:25-cv-00275-AW-MAF

## DEFENDANT-APPELLANT'S EMERGENCY
## MOTION FOR STAY OF INJUNCTION PENDING APPEAL
### *INTERIM RULING REQUESTED BY DECEMBER 3, 2025*

Brande S. Smith
 *Senior Counsel*
OFFICE OF GENERAL COUNSEL
UNIVERSITY OF FLORIDA
300 SW 13th Street
123 Tigert Hall
Gainesville, FL 32611-3125
(352) 392-1358
brande@ufl.edu

H. Christopher Bartolomucci
Justin A. Miller
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com

*Counsel for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3, Defendant-Appellant Dean of Students of the University of Florida, identifies all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case:

1.  ACLU Foundation-New York

2.  American Civil Liberties Union

3.  Bartolomucci, H. Christopher

4.  Damsky, Preston

5.  Dean of Students of the University of Florida

6.  Fitzpatrick, Martin A.

7.  Miller, Justin A.

8.  Sabatini, Anthony F.

9.  SABATINI LAW FIRM PA'

10. SCHAERR JAFFE LLP

11. Smith, Brande S.

12. Summerlin, Chris

13. Sykes, Emerson J.

14. University of Florida

15.  Winsor, Allen C.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Defendant-Appellant states that no publicly traded company or corporation has an interest in the outcome of this appeal, and no non-governmental corporation is a party to this appeal.

Respectfully submitted,

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci

*Counsel for Defendant-Appellant*

Dated: December 2, 2025

## INTRODUCTION

Defendant-Appellant Chris Summerlin, in his official capacity as Dean of Students of the University of Florida (together, the "University"), moves for a stay pending appeal of the district court's Order, Doc. 38 (Ex. A), granting a preliminary injunction. *See* Fed. R. App. P. 8(a)(2). In the Order, the district court directed the University to return Plaintiff Preston Damsky to normal standing as a law student at the University. On Saturday, the district court denied the University's motion for a stay pending appeal but granted a partial stay until December 3, 2025, so that the University could move this Court for a stay pending appeal. Doc. 47 (Ex. B). The only relief that is requested by this Wednesday, December 3rd, is that the Order be administratively stayed until the Court resolves this motion.

If this Court ultimately declines to grant a stay pending appeal, the University requests, in the alternative, a modification permitting Damsky's remote enrollment and participation while maintaining the exclusion of Damsky from physically visiting campus during the pendency of the appeal. This would maintain the status quo that has been in effect since this past April 2025.

Damsky's expulsion followed his persistent pattern of disruptive behavior since he began attending law school at the University, including calling for extralegal violence to preserve the United States as a White nation-state. Last semester, Damsky's antagonistic behavior culminated in threats that significantly disrupted the University's law school during finals, significantly harming students during a crucial time in their studies. Damsky posted on his X account that "My position on Jews is simple: … Jews must be abolished by any means necessary." Doc. 1 ¶23 (Ex. C). Professor Lyrissa Lidsky, a member of the Law School faculty who is Jewish, asked if he were calling for the murder of her family. *Id.* ¶¶28-29. In response, Damsky *equivocated* and invoked the notion of genocide, sparking widespread alarm. Now as finals begin *this* semester, the district court has ordered the University to readmit Damsky, threatening to again upend campus during finals for the second semester in a row.

## STATEMENT OF THE CASE

### A.    Damsky's Seminar Papers

"In the Fall 2024 semester, Damsky wrote two seminar papers which were the subject of controversy at UF Law[.]" *Id.* ¶7. Damsky's

papers argued that "the United States was founded as a race-based nation state" for the white race and must be preserved as such. *Id*. The first paper, titled "American Restoration: An Article 5 Proposal," stated:

> [W]e should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle.

Doc. 17-2 at 3-7 (Ex. E).

> The second paper, titled "National Constitutionalism," stated:

> The Supreme Court and inferior federal courts have the power to arrest the dispossession of White America. … If the People are not granted relief from the government—which includes the judiciary—then, if they are to survive as masters in the land of their ancestors, they must exercise "their revolutionary right to dismember or overthrow" the government.[] And that will be a process which no deskbound jurist can gleefully look forward to; for it will be a controversy decided not by the careful balance of Justitia's scales, but by the gruesome slashing of her sword.

*Id.* at 8-12 (footnote omitted).

### B. Damsky's Posts

On March 21, 2025, Damsky posted on his X account that "My position on Jews is simple: … Jews must be abolished by any means

necessary." Doc. 1 ¶23. On April 1, 2025, he and Professor Lidsky exchanged messages about his post. *Id.* ¶¶28-29. His original post and their subsequent exchanges appear below. *See also* Doc. 17-3 (Ex. F).





**C. Damsky is Suspended**

On April 2, 2025, UF informed Damsky that, based on reports that he had disrupted UF Law's academic operations, he was being placed on interim suspension and excluded from campus. Doc. 37-3 at 4-6 (Ex. D).[1] Damsky appealed his interim suspension, and UF denied it. *Id.* at 10-12.

On May 29, 2025, UF informed Damsky he was being charged with violating the Code by engaging in Disruptive Conduct and Harassment. *Id.* at 13-16. A student conduct hearing on the charges was set for July 28, 2025.

---

[1] Doc. 17-1 was placed under seal, *see* Doc. 36. The public version, filed here as an exhibit, is Doc. 37-3.

### D. The Student Conduct Hearing

At the hearing, witnesses informed the University Official Board ("UOB") that Damsky's post was understood as a threat by students, faculty, and staff at UF Law, and that the post massively disrupted the law school's operations.

UF Law Dean Merritt McAlister told the UOB that she had "spent significant time over the last two years fielding complaints about" Damsky from other students. *Id.* at 31. Although the Dean had to that point defended Damsky's right to express unpopular views, in March his confrontational behavior was "different" and escalated to the point that it "crossed a line." *Id.* Dean McAlister told the UOB that Damsky "made unacceptable threats against our Jewish faculty, students, and staff, and those threats predictably created a substantial and material disruption to the operation of the law school." *Id.* The law student who first told her about the post "was shaking with tears in his eyes and emotion in his voice" and said "he was afraid to be at a law school" with Damsky. *Id.* at 32. News of Damsky's post "spread like wildfire" through UF Law, which has "a large and engaged Jewish community[.]" *Id.*

A faculty member told the Dean that he was afraid for the "safety of his family, himself, and his students." *Id.* "Students were afraid to study on campus as we headed into finals." *Id.* "A staff member asked for her name and picture to be taken off the website because she had a Jewish surname, and she ultimately quit her job several weeks later." *Id.*

In the wake of Damsky's post, "business as usual at the law school ground to a halt. All that anyone was doing or talking about was Mr. Damsky and his X posts." *Id.* at 33. The Dean "received a request to post a police officer outside of a classroom because Mr. Damsky was enrolled in the class, which had Jewish students. We had a police officer who had to attend a Jewish Law Students Association event out of fear that Mr. Damsky might show up." *Id.* "[O]ne professor cancel[led] class out of stress from the situation[.]" *Id.*

Dean McAlister stated that "[t]his was not the first time Mr. Damsky had called for violence. When he did so in the fall in the context of a seminar paper, I concluded that the statements in that context were not threatening because they were written in an academic paper and not put out on X to terrorize a community that he knew was looking." *Id.* at 34. But Damsky's post on X was different, in part because he understood

when he posted that "some members of our community perceived him as a threat." *Id.* "At a town hall in January, at least two students expressed to me their palpable fear of Mr. Damsky. One said she scanned the exits when he was in a room. Another avoided taking classes with him out of fear of what he might do." *Id.* "Damsky was aware of these comments and he discussed them with Dean Shaw[.]" *Id.*

The Dean noted that, in Damsky's exchange with Professor Lidsky, *see* Doc. 17-3, he had an opportunity to explain that he was not threatening violence, but he did not do so. Instead, "Damsky equivocated in his response and invoked the concept of genocide." Doc. 37-3 at 35. "At that point, the meaning of his words became clear. He was threatening the Jewish people on our campus. He was calling for and supportive of genocide by, 'Any means necessary.'" *Id.* "I felt in that moment that we were on notice, that there was some real chance that someone could take action against our community and that terrified me." *Id.* at 39.

The next witness was Senior Assistant Dean of Students Janice Shaw. She told the UOB that, in Fall 2024, she received "complaints from students about a paper Preston wrote that several students reported they interpreted as having a call for violence." *Id.* at 92. Following the

townhall in January 2025, Dean Shaw met with Damsky. "During that meeting, I asked Preston if he was aware that students were talking about him at the recent town hall, and that they were afraid of him." *Id*. "And based on that direct conversation, Preston was made aware that students feared him and they thought he might do something that would negatively impact their safety." *Id*. at 93.

After Damsky tweeted out his post, "several students came into my office crying about the fear they felt." *Id*. at 94. One "student was uncontrollably crying in my office about the fear and anger she felt about that the fact that she might be attacked at school and that Preston wanted her or her friends to suffer physical harm." *Id*. "In written complaints, another student said they feared that his words would become actions. And one wrote that she did not feel safe walking the hall at UF or attending Jewish Law Student Association events or even being by herself." *Id*.

Professor Lidsky spoke next. She stated that, after learning of Damsky's post, she "decided to engage in my own counter speech to try to discern [his] intent[.]" *Id*. at 118. She gave him "a chance to step back from the edge" but instead "he responded by deflecting[.]" *Id*. at 119. "In

the next couple of days … at least 15 students came to my office expressing fear for my safety and concern that Mr. Damsky might come to the law school armed. Some students asked me if I thought he had a gun. Some students said that because they feared I was a target, they were afraid to attend my class." *Id.* at 119-20. Lidsky and her husband "slept with a baseball bat beside the bed for the next couple of weeks." *Id.* at 120. And "the toll of trying to reassure my students that they were safe and that I was safe together with the worry that I might have exposed my family to some sort of danger led me to cancel my class the following Monday." *Id.* at 122. Professor Lidsky noted that "shortly after Mr. Damsky was trespassed off campus, a white supremacist at FSU shot and killed innocent victims." *Id.*

Professor Christopher Hampson told the UOB that in October 2024 he received a draft of Mr. Damsky's seminar paper "American Restoration." *Id.* at 158. One of Professor Hampson's students told him that he and several of his classmates were concerned that the paper ended on what they understood to be a call for violence. *Id.* at 158-59. Professor Hampson stated that, in the same semester, Damsky had

included a call to violence in another paper, "National Constitutionalism." *Id.* at 159.

"On April 1st, four law professors emailed the faculty about Mr. Damsky's tweet, noting the pattern of escalation against his previous calls for violence." *Id.* at 161. "The student community was deeply alarmed by this point. I learned that students were concerned for their personal safety and were actively avoiding registering for classes if Mr. Damsky was in them. I also know that two faculty members, both women of color, were trying to figure out whether they could safely come to campus at all and whether they should move all their classes online." *Id.*

Professor Zachary Kaufman, the Jewish Law Students Association's faculty advisor, told the UOB that Damsky "has sowed terror and anguish among Jewish members, students, staff, and faculty of our community, and he has massively disrupted our law school's academic community within our law school's walls and beyond, in the day-to-day lives of our students, staff, and faculty." *Id.* at 179-80.

"Awareness and discussion of [Damsky's] post spread through our law school community like wildfire. Many members of our law school community, Jews and non-Jews alike, interpreted Mr. Damsky's message

to be a concrete, credible call for genocidal violence against Jews, including Jews in our law school community, as well as their families." *Id.* at 180. "Mr. Damsky's post caused many Jews in our law school community to feel immense fear and anxiety. And he wrote those posts on social media during the final month of the semester when students wanted and for their grades and careers needed to focus on their studies." *Id.* at 181. "Some students were so concerned about the potential need for self-defense against Mr. Damsky that they carried pepper spray and escorted each other to and from their cars in our law school parking lot. Several students cried from fear of Mr. Damsky and what he might do." *Id.* at 182. "Many students' studying was disrupted by participating in hours-long conversations with their parents and peers about Mr. Damsky, what he might do, how they could protect themselves, and what the administration at the law school could or should do to protect them." *Id.* at 182-83. "Some students skipped academic events, missed classes, or were late to classes because they were focused on attending town halls or participating in conversations with each other or with faculty or administrators about their safety." *Id.* at 183.

"In direct response to Mr. Damsky's social media posts, the law school administration arranged for heightened security on campus, including cameras in the faculty parking lot and more frequent police patrols." *Id.* at 183-84. On April 4th, the Dean "announced via email that Mr. Damsky had been trespassed from campus, that police patrols and event security had recently increased, and that starting on April 7th, the law school would change its security protocols from having all doors unlocked during business hours to having most of them locked and accessible only through ID card access." *Id.* at 186. "[M]any Jewish students expressed difficulty in studying for and taking exams. They stated that their studying was disrupted by their sincerely and reasonably held fear that Mr. Damsky would stage or incite an attack against Jews at our law school and perhaps in our wider university. Several students believe that the disruption Mr. Damsky caused prevented them from achieving their full academic potential and that their grades and career prospects, upon which grades in law school are so dependent, thus suffered." *Id.* at 186-87.

Damsky showed no contrition at the hearing. *E.g., id.* at 326-40.

Following the hearing, on August 8, 2025, Dean Summerlin informed Damsky that the UOB had recommended that he be found responsible for Disruptive Conduct and Harassment in violation of the Code and had proposed expulsion as a sanction. Dean Summerlin accepted the UOB's recommendations. *Id.* at 455-59. Damsky appealed his expulsion. Doc. 1 ¶53.

During that administrative appeal, Damsky remained enrolled and attended classes remotely. On October 9, 2025, a three-member Appeal Panel convened by UF denied Damsky's appeal. *See* Doc. 37-3 at 460-64. Following the denial of his administrative appeal, Damsky's enrollment and remote participation in classes ended.

### E. Proceedings in the District Court

On September 14, 2025, Damsky filed his Complaint. Two weeks later, he filed a motion for preliminary injunction. Doc. 6. The University then moved to dismiss Damsky's Complaint. Doc. 11. The district court granted the motion to dismiss regarding Damsky's damages claims but otherwise denied it. Doc. 45. The parties argued the motion for preliminary injunction on October 29th. Doc. 32. (transcript attached as Ex. G).

On November 24, 2025, the district court granted Damsky's motion for a preliminary injunction and directed the University to return Damsky to normal standing no later than December 1, 2025, conditioned on a $2,500 bond. Doc. 38. The Court found no evidentiary hearing was necessary and relied on affidavits and the administrative record. *Id.* at 2. Damsky paid the bond. Doc. 40.

The University moved the district court to stay its injunction pending appeal, or in the alternative, to modify its injunction to permit Damsky's remote enrollment and participation while maintaining the exclusion of Damsky from physically visiting campus during the pendency of the appeal. Doc. 46 (Ex. H). The district court granted a stay of the injunction through this Wednesday, December 3, 2025, so that the University could move this Court for a stay. Doc. 47. The district court otherwise denied the motion for stay. *Id.*

The University has appealed the district court's Order granting a preliminary injunction. Notice of Appeal, Doc. 41. And it now moves this Court for a stay pending appeal.

# ARGUMENT

The Order should be stayed until resolution of the pending appeal, given the substantial merits questions the Order raises, and especially given the University's and its community's fears of the extralegal violence that Damsky has advocated. A stay pending appeal turns on: (1) the movant's likelihood of success on the merits; (2) irreparable injury to the movant; (3) substantial injury to other parties from a stay; and (4) where the public interest lies. When the government is the party opposing (or seeking to alter) an injunction, the third and fourth factors merge with the public interest. *Florida v. HHS*, 19 F.4th 1271, 1293 (11th Cir. 2021).

Under binding precedent, for "motions for stay pending appeal the movant need not always show a 'probability' of success on the merits[.]" *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981). Instead, a motion can be "granted upon a lesser showing of a substantial case on the merits when the balance of the equities identified in factors 2, 3, and 4 weighs heavily in favor of granting the stay." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986) (cleaned up).

These factors favor a stay of the Order, or a modification to allow Damsky to enroll but prevent him from physically visiting campus.

## I.     The University is Likely to Prevail on the Merits.

At the threshold, the University is likely to show that Damsky's First Amendment claim fails on the merits for two reasons. First, threats of violence by a student directed toward a school are not protected under any circumstances, and Damsky's original post declaring that "Jews must be abolished by any means necessary" and his subsequent exchange with Professor Lidsky were reasonably perceived by UF Law's students, faculty, staff, and Dean, and other UF officials as a threat, especially when considered in the context of his long pattern of advocating extralegal violence. Second, even if Damsky's posts were not threats, student speech that disrupts the learning environment at school is not protected, and Damsky's speech caused material and substantial disruption at UF Law. The Order fails to take these concerns seriously and should be reversed.

### A.     Schools May and Must Take Threatened Extralegal Violence Seriously.

The University is likely to prevail on showing that Damsky's posts were true threats. The Supreme Court has made clear that "[t]he First

Amendment does not protect violence." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Nor does the First Amendment protect threats, a "historically unprotected category of communication." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). "True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection." *Id*. at 72.

"True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id*. at 74 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). "The existence of a threat depends not on the mental state of the author, but on what the statement conveys to the person on the other end." *Counterman*, 600 U.S. at 74 (cleaned up). The focus is on the person receiving the threat because "a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Black*, 538 U.S. at 360 (cleaned up).

The record shows that Damsky's posts were reasonably regarded as a threat of violence by Dean McAlister and the University community, who viewed them in the context of Damsky's calls for extralegal violence.

*See supra* pages 6-13. Damsky had met with the Dean, and was on notice that his behavior was causing fear among his classmates. Yet he "consciously disregarded a substantial risk that his communications would be viewed as threatening violence" by the UF Law community. *Counterman*, 600 U.S. at 69. "Preston knew that students were afraid of him and he continued to fan the flames of fear through his tweet and his response to Professor Lidsky." Doc. 37-3 at 95. He thus caused material and substantial disruption at UF Law and for that reason, too, his speech was not protected. *See* Part I.B *infra*.

Even if Damsky's posts do not qualify as a "true threat," school authorities reasonably construed it as threatening violence toward a protected group in the school community, triggering the school-safety exception recognized as a "grave and unique" threat category in the educational setting. *See Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 980-81, 983-84 & n.5 (11th Cir. 2007).

In such situations, "threats of an attack on a school and its students *must* be taken seriously." *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 771 (5th Cir. 2007). "School administrators must be permitted to react quickly and decisively to address a threat of physical violence against

their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance." *Id.* at 772.

Here, UF officials, including Dean McAlister and Dean Summerlin, acted promptly and responsibly to protect the safety of the UF Law community in the face of "speech reasonably construed as a threat of school violence." *Boim*, 494 F.3d at 984. Deference to their judgment about what was needed in the moment is appropriate. *See Ala. Student Party v. Student Gov't Ass'n Univ. of Ala.*, 867 F.2d 1344, 1347 (11th Cir. 1989); *Bishop v. Aronov,* 926 F.2d 1066, 1075 (11th Cir. 1991) ("Federal judges should not be ersatz deans or educators.").

The Order acknowledged deference "as a general matter," but conducted a *de novo* interpretive assessment and declined to credit the school's reasonable safety determinations notwithstanding evidence of widespread fear, significant operational responses (police presence, locked doors), and a trespass order contemporaneous with safety concerns.

The district court equated the deference due the University for assessing potential threats of extralegal and school violence with

interpreting whether a message advocated for illegal drug use, as in *Morse v. Frederick*, 551 U.S. 393 (2007). Doc. 38 at 23-24 (citing *Morse*, 551 U.S. at 401-03). But these situations are not remotely similar. The consequences of a school making a wrong call on the former are fatal. And such decisions are made under time constraints and pressure that are not present in situations like those in *Morse*.

**B. Damsky's Threatening Speech Significant Disrupted the University.**

Student speech, like Damsky's, that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others," is "not immunized" by the First Amendment. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509, 513 (1969). School authorities have a right and a duty to take action when they "reasonably … forecast substantial disruption of or material interference with school activities" or when "disturbances or disorders on the school premises in fact occurred." *Id.* at 514.

These principles apply in the higher education setting. In *Healy v. James*, 408 U.S. 169 (1972), the Court recognized that "a college has a legitimate interest in preventing disruption on the campus," *id.* at 184, and that student speech "activities need not be tolerated where they

infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education," *id*. at 189. *Healy* recognized that, "[i]n the context of the 'special characteristics of the school environment," a school's power to "prohibit 'lawless action' is not limited to acts of a criminal nature," but includes "actions which 'materially and substantially disrupt the work and discipline of the school." *Id*. (quoting *Tinker*, 393 U.S. at 506, 513). And in *Doe v. Valencia College*, this Court applied *Tinker* and held that, because Valencia "reasonably concluded" that a student's conduct interfered with the rights of another student, "Valencia was free to regulate it under *Tinker* without impinging on … First Amendment rights." 903 F.3d 1220, 1229-31, 1230 (11th Cir. 2018).

The Order concluded that the University's *Tinker* argument would fail absent a sufficient school connection. Doc. 38 at 24. That connection exists, at minimum, from Damsky's equivocation when he responded to a UF Law professor regarding whether he was advocating for the murder of her family.

The direct, immediate, and predictable impact on campus operations and participants—including professors and students—makes

the posts reasonably school-directed in effect, consistent with the recognition that off-campus threats aimed at school actors may be regulated. The administrative record showed faculty and students reported fear for physical safety tied to Damsky's rhetoric, prompting heightened security and policing. That nexus suffices under the relevant standards. *See Tinker*, 393 U.S. at 509; *Boim*, 494 F.3d at 983-84 & n.5.

## II.     The University Will Suffer Irreparable Harm Absent a Stay.

The University faces immediate safety, security, and operational harms from compelled in-person reinstatement of a student whose rhetoric precipitated campus-wide fear, police deployments, locked facilities, and emergency measures. This Court has recognized that schools have an "undisputably compelling interest in acting quickly to prevent violence on school property, especially during regular school hours." *Boim*, 494 F.3d at 984; *see also Bloedorn v. Grube*, 631 F.3d 1218, 1238 (11th Cir. 2011) ("The University … has a significant interest in ensuring safety and order on campus[.]"). Being forced to reverse those measures mid-appeal imposes non-compensable harms to public safety and to the University's mission. These harms are irreparable because

they implicate safety and institutional autonomy interests that cannot be remedied post-appeal.

## III. The Balance of Equities and the Public Interest Favor a Stay.

"The last two requirements for a preliminary injunction involve a balancing of the equities between the parties and the public. Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest." *Florida*, 19 F.4th at 1293. The district court's finding of irreparable harm to Damsky rests on the merits of his claims. Because that conclusion depends on the underlying merits rulings, a substantial question on appeal weighs in favor of a stay to preserve appellate review and prevent irreversible safety and operational consequences during the appeal.

The Order acknowledged the University's interest in maintaining order but discounted it based on the First Amendment merits conclusion. Doc. 38 at 28; *see also Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 188 (2021) ("[S]chools have a special interest in regulating speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others." (cleaned up)); *Bloedorn*, 631

F.3d at 1238 ("The University … has a significant interest in ensuring safety and order on campus[.]").

During appeal, the equities favor preventing potential harms to students and faculty from in-person reinstatement. Absent a stay, the University will be forced to undertake immediate and substantial security measures and risk community disruption while appellate review proceeds. Granting a stay will support the public's compelling interest in campus safety and orderly operations, particularly in response to widely reported fears and the need for heightened security measures previously implemented by the University. And if Damsky ultimately prevails, he will be able to resume his studies with no effect to him beyond a delay in completing his education. This delay is not an irreparable harm. *See Van Arsdel v. Tex. A&M Univ.*, 628 F.2d 344, 346 (5th Cir. 1980) (vacating preliminary injunction that reinstated plaintiff as a tenured professor because "reinstatement after trial, coupled with back pay, would suffice to redress [his] alleged wrong"); *Faculty Senate Fla. Int'l Univ. v. Winn*, 477 F.Supp.2d 1198, 1208 (S.D. Fla. 2007) (relying on "particularly instructive" *Van Arsdel* decision in finding "it is unlikely that delay in completing [academic] research or obtaining a degree is irreparable

harm"). The balance of harms and the public interest favor a stay of the Order.

## IV. Alternatively, the Injunction Should Be Modified to Allow Remote Enrollment With No Physical Presence.

Even if a complete stay is denied, the Court should modify the preliminary injunction to permit Damsky's immediate reinstatement solely through remote enrollment and participation, conditioned on a prohibition against his physical presence on any University campus or facility for the duration of the appeal. The University previously allowed Damsky to remain enrolled and complete a semester remotely after imposing an interim suspension, demonstrating feasibility of remote academic accommodation without physical presence. Given the record of student and faculty fear and the University's security responses (police presence, locked doors, trespass), a no-physical-presence condition is a narrowly tailored modification that accommodates Damsky's requested academic relief while mitigating safety and operational risks. This alternative aligns the equities and public interest with practical campus safety needs during appellate proceedings.

**V.    In Any Event, the Injunction Should Be Stayed Pending Resolution of this Motion.**

The Order should be stayed pending resolution of this motion. It is too late for Damsky to attend any on-campus classes or prepare for finals this semester. Classes ended on November 19, 2025, and finals begin this upcoming Wednesday, December 3, 2025. *See 2025–2026 Academic Calendar*, UF Levin Coll. of Law, law.ufl.edu/academics/academic-calendar/ (last visited Nov. 29, 2025).

Damsky is thus too late to attend any classes. And allowing him on campus as finals begin would likely cause another substantial disruption, similar to the one that occurred during finals last semester. *See* Doc. 37-3 at 32 (Tr. 14:19-20) ("Students were afraid to study on campus as we headed into finals."); *id.* at 82 (Tr. 64:21-24) ("My job is to protect the community as best I can and to respond to what I thought was both a serious disruption at a really inopportune time as we headed into finals….").

As for next semester, the University's Compressed Course Week does not begin until January 12, 2026, with normal classes not starting until January 20th. Accordingly, the University asks that the Order be stayed at least until this Court resolves this motion.

## CONCLUSION

For these reasons, the district court's Order should be stayed pending appeal, or alternatively, the preliminary injunction should be modified to allow Damsky to enroll but prevent him from physically visiting campus. In any event, the University asks that the Order be stayed at least until this Court resolves this motion.

December 2, 2025

Respectfully submitted,

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci
Justin A. Miller
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com
jmiller@schaerr-jaffe.com

Brande S. Smith
  *Senior Counsel*
OFFICE OF GENERAL COUNSEL
UNIVERSITY OF FLORIDA
300 SW 13th Street
123 Tigert Hall
Gainesville, FL 32611-3125
(352) 392-1358
brande@ufl.edu

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

The foregoing document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 5,168 words.

This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci

Dated: December 2, 2025

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was served on all counsel of record electronically by this Court's CM/ECF system.

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci

Dated: December 2, 2025