# EXHIBIT G

```
 1                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF FLORIDA
 2                     GAINESVILLE DIVISION
                 Case No:  1:25-CV-00275-AW-MAF
 3

 4     PRESTON DAMSKY, a law student
       at the University of Florida
 5     Levin College of Law,

 6          Plaintiff,                  Gainesville, Florida
                                        October 29, 2025
 7       v.                             2:00 - 3:06 p.m.
                                        Pages 1-52
 8     CHRIS SUMMERLIN, in his
       official capacity as the Dean
 9     of Students of the University
       of Florida,
10
            Defendant.
11     _____

12       TRANSCRIPT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
                BEFORE THE HONORABLE ALLEN C. WINSOR
13                CHIEF UNITED STATES DISTRICT JUDGE

14     APPEARANCES:
       For the Plaintiff:       Sabatini Law Firm, P.A.
15                              By:  Anthony F. Sabatini, Esq.
                                1601 East First Avenue
16                              Mount Dora, Florida 32757

17     For the Defendant:       Schaerr Jaffe, LLP
                                By:  H. Christopher Bartolomucci, Esq.
18                              1717 K Street NW
                                Suite 900
19                              Washington, DC 20006

20                              University of Florida
                                Office of General Counsel
21                              By:  Brande Schwartz Smith, Esq.
                                PO Box 113125
22                              Gainesville, Florida 32611

23     Reported by:            Dawn M. Savino, RPR, CRR
                                Official United States Court Reporter
24                              111 North Adams Street
                                Tallahassee, Florida 32301
25                              (850) 521-3674
                                Dawn_Savino@flnd.uscourts.gov
```

**PROCEEDINGS RECORDED BY FEDERAL OFFICIAL COURT STENOGRAPHER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

| | | |
|---|---|---|
| 2:00 | 1 | (Court called to order) |
| 2:00 | 2 | THE COURT:  Good afternoon, everyone.  Have a seat. |
| 2:00 | 3 | We are here in Damsky versus Summerlin, it's case |
| 2:00 | 4 | 1:25-cv-275.  We're here on the motion for preliminary |
| 2:00 | 5 | injunction. |
| 2:00 | 6 | We have Mr. Sabatini for the plaintiff? |
| 2:00 | 7 | MR. SABATINI:  Yes, Your Honor.  Anthony Sabatini for |
| 2:00 | 8 | the plaintiff. |
| 2:00 | 9 | THE COURT:  Good afternoon to you. |
| 2:00 | 10 | And Mr. Bartolomucci and Ms. Smith? |
| 2:00 | 11 | MR. BARTOLOMUCCI:  Yes, Your Honor. |
| 2:00 | 12 | THE COURT:  Good afternoon to you as well. |
| 2:00 | 13 | MS. SMITH:  Good afternoon. |
| 2:00 | 14 | THE COURT:  So I have reviewed the papers and the |
| 2:00 | 15 | cases that were cited, and I have some questions for both |
| 2:01 | 16 | sides. |
| 2:01 | 17 | But we'll start with you, Mr. Sabatini, and I'll give |
| 2:01 | 18 | you rebuttal as well. |
| 2:01 | 19 | MR. SABATINI:  Yes, Your Honor.  Would you like me to |
| 2:01 | 20 | present from -- |
| 2:01 | 21 | THE COURT:  Yeah, please. |
| 2:01 | 22 | MR. SABATINI:  Good morning, Your Honor.  May it |
| 2:01 | 23 | please the Court. |
| 2:01 | 24 | The preliminary injunction should be granted first and |
| 2:01 | 25 | foremost because there's a substantial likelihood of victory on |

| | | |
|---|---|---|
| 2:01 | 1 | the legal argument, Your Honor.  And I would start with, I |
| 2:01 | 2 | think, the single most important thing to make clear in this |
| 2:01 | 3 | case which is that Mr. Damsky's statements made on Twitter, |
| 2:01 | 4 | which is today's public square, it's quite literally the |
| 2:01 | 5 | version of the public square for the 21st Century, Your Honor, |
| 2:01 | 6 | especially, as of literally in the last presidential election, |
| 2:01 | 7 | we saw that play out in a real way, were not literal |
| 2:01 | 8 | statements.  These were not targeted statements.  These were |
| 2:01 | 9 | not aimed statements.  They're not statements meant to be sent |
| 2:01 | 10 | in a threatening way.  In summary, Your Honor, they were not a |
| 2:02 | 11 | true threat.  And I'll talk a little bit about the syntax and |
| 2:02 | 12 | the deliberate way that they were structured which was easily |
| 2:02 | 13 | identifiable by any Twitter user today, most easily being |
| 2:02 | 14 | understood in the short moniker "trolling."  It was basically |
| 2:02 | 15 | trolling, Your Honor. |
| 2:02 | 16 | First let me just say, Mr. Damsky has a whopping -- |
| 2:02 | 17 | had a whopping 25 followers on Twitter at the time that the |
| 2:02 | 18 | post was made.  I think the timeline concerning the publishing |
| 2:02 | 19 | of the words is very important to establish very early. |
| 2:02 | 20 | Mr. Damsky, and his 25 followers, most who were |
| 2:02 | 21 | not on his accounts -- as far as he knew, nobody from the law |
| 2:02 | 22 | school was even following him.  He had zero knowledge of any |
| 2:02 | 23 | person, quite literally, within the vicinity of Gainesville |
| 2:02 | 24 | following him on Twitter, you know, of the 25 accounts |
| 2:02 | 25 | following him. |

2:02  1          When he made the post it was in early March of this

2:02  2    year.  The first reply to the post was quite literally a week

2:02  3    later, Your Honor.

2:02  4          And not to get into the details of Twitter world, but

2:03  5    it's very normal to tag or post at somebody when you're using

2:03  6    Twitter.  So usually you would tag somebody that you disagree

2:03  7    with if you're trying to send an aimed or targeted statement

2:03  8    towards a person.  Mr. Damsky did not do that.  He made a post

2:03  9    while he was sitting at a gym off campus about his political

2:03  10   views.  And what he was doing was he was mimicking views that

2:03  11   he found to be incorrect, which were the views of the Harvard

2:03  12   professor who espoused a very popular and influential theory on

2:03  13   destroying anti-whiteness, which is a social construct in his

2:03  14   view.  So he was adopting and mimicking the views of wanting to

2:03  15   eliminate a social construct while off campus, Your Honor.

2:03  16         The tweet went out.  It was a week later that somebody

2:03  17   actually viewed the tweet.  That was the first time, the facts

2:03  18   below us in this court will show.  Nobody saw this tweet for a

2:03  19   week.

2:03  20         And when the tweet was first saw, it was sent to the

2:03  21   dean of the law school, who then interpreted it in one way, and

2:04  22   then a law professor at the university reached out with a

2:04  23   combative question.  It was an account that was not following

2:04  24   Mr. Damsky.  So I think it's very important to keep the two

2:04  25   tweets separate since quite literally they have no overlapping

**PROCEEDINGS RECORDED BY FEDERAL OFFICIAL COURT STENOGRAPHER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

| | | |
|---|---|---|
| 2:04 | 1 | time at all.  I mean, it's literally a week later. |
| 2:04 | 2 | This is very dissimilar than what you see in a threat |
| 2:04 | 3 | with some of the cases cited where you have this alacrity and |
| 2:04 | 4 | back and forth and an aimness and a targetness. |
| 2:04 | 5 | THE COURT:  If there were though, I mean, if there |
| 2:04 | 6 | were a true threat under the law, you're not disputing that |
| 2:04 | 7 | they could remove him from school for that, even if it were off |
| 2:04 | 8 | campus and even if it were not targeted to someone at the law |
| 2:04 | 9 | school.  I mean, if he just made a true threat to somebody else |
| 2:04 | 10 | completely divorced from the law school, they could still |
| 2:04 | 11 | discipline him for that, correct? |
| 2:04 | 12 | MR. SABATINI:  Yes, Your Honor.  That is our position. |
| 2:04 | 13 | THE COURT:  So you can't win if it were a true threat. |
| 2:04 | 14 | MR. SABATINI:  I think it's possible, Your Honor.  The |
| 2:04 | 15 | way I have my argument structured today was to see if -- |
| 2:04 | 16 | obviously trying to get the Court to comply -- you know, agree |
| 2:05 | 17 | that it was not a true threat.  It was not aimed at anybody. |
| 2:05 | 18 | THE COURT:  No, I understand that argument.  But I'm |
| 2:05 | 19 | just saying if -- I understand the University's position to be |
| 2:05 | 20 | twofold.  One, it was a true threat so they win.  But if it |
| 2:05 | 21 | weren't a true threat, then we apply Tinker and we find, in |
| 2:05 | 22 | their view, that it's disruptive and then they win for that |
| 2:05 | 23 | separate and independent reason. |
| 2:05 | 24 | MR. SABATINI:  That is their argument, Your Honor. |
| 2:05 | 25 | THE COURT:  Okay.  So you understand it the same way. |

| 2:05 | 1 | There's a little bit of overlap because when they're talking |
| 2:05 | 2 | about disruption, they're talking about how it was a threat. |
| 2:05 | 3 | And I think if it were a true threat, and you've got plenty of |
| 2:05 | 4 | good arguments as to why it would not be a true threat as that |
| 2:05 | 5 | term is used in First Amendment law, but if it were a true |
| 2:05 | 6 | threat I don't see how you could win. |
| 2:05 | 7 | MR. SABATINI:  I think that's a correct legal |
| 2:05 | 8 | analysis, Your Honor.  I think if it's seen as a true threat, I |
| 2:05 | 9 | don't presently see a way of UF being able to -- you know, of |
| 2:06 | 10 | us winning the case if that was seen as a true threat. |
| 2:06 | 11 | I do disagree with the legal analysis, which I'll get |
| 2:06 | 12 | to, that disruption versus -- substantial disruption is the |
| 2:06 | 13 | applicable standard. |
| 2:06 | 14 | THE COURT:  Well, that's what I was going to ask |
| 2:06 | 15 | because it seems like you accept Tinker as applicable and just |
| 2:06 | 16 | say it doesn't fit here.  But generally speaking, if there were |
| 2:06 | 17 | -- I don't want to get you off of whatever sequence you were |
| 2:06 | 18 | going to follow in your argument, but you are not suggesting |
| 2:06 | 19 | that Tinker is just inapplicable here because it was off campus |
| 2:06 | 20 | or because it was a university setting, correct? |
| 2:06 | 21 | MR. SABATINI:  Well, I will say this, Your Honor:  At |
| 2:06 | 22 | the time we made the brief, my understanding was the true |
| 2:06 | 23 | threat argument was going to be UF's main argument.  And then |
| 2:06 | 24 | seeing the reply, I probably would spend a little bit more time |
| 2:06 | 25 | sort of responding, probably spend a little more time on this |

| | | |
|---|---|---|
| 2:06 | 1 | idea that <u>Mahanoy</u> implicitly took away <u>Tinker</u>, because it makes |
| 2:06 | 2 | literally no sense for a high school girl, who didn't make the |
| 2:06 | 3 | cheerleading team, to curse and have all this sort of crass, |
| 2:06 | 4 | truly disruptive -- I mean, cause a commotion on the campus in |
| 2:07 | 5 | a real way speech, but not a political position, not a |
| 2:07 | 6 | political statement which, of course, did create, you know, a |
| 2:07 | 7 | reaction. |
| 2:07 | 8 | But with sophisticated, highly intelligent graduate |
| 2:07 | 9 | students who are intimately familiar with the view that he is |
| 2:07 | 10 | already espousing, you can scroll on Twitter right now and see |
| 2:07 | 11 | all types of very similar views, I mean, literally all the time |
| 2:07 | 12 | on social media, especially since it was purchased by Elon |
| 2:07 | 13 | Musk. |
| 2:07 | 14 | These are not unfamiliar views, Your Honor.  And to |
| 2:07 | 15 | see them as a threat, honestly, is in many way to ignore the |
| 2:07 | 16 | voluminous expressions that are very similar on both sides of |
| 2:07 | 17 | the political spectrum.  You're seeing it all over the place in |
| 2:07 | 18 | society today.  I'm not saying that's a good thing, but I'm |
| 2:07 | 19 | presenting that these are views that are not just -- you know, |
| 2:07 | 20 | somebody texting you saying *I'm going to come injure you, I'm* |
| 2:07 | 21 | *going to come get you.*  It's expressing a political viewpoint |
| 2:07 | 22 | based on Identitarianism, which is something we're seeing in |
| 2:08 | 23 | politics today.  It's just happening right now.  It's erupting. |
| 2:08 | 24 | It's, you know, a version of a type of populism that's |
| 2:08 | 25 | emerging, and so it's not a shock to anybody.  And again, it's |

| | | |
|---|---|---|
| 2:08 | 1 | not aimed at anyone. |
| 2:08 | 2 | But I want to just really give a close read of the |
| 2:08 | 3 | tweet, because I think some of the prose, which I think we can |
| 2:08 | 4 | all agree Mr. Damsky wasn't making recklessly, he was making |
| 2:08 | 5 | intelligently and thoughtfully here, was meant for a certain |
| 2:08 | 6 | effect, again, for his very limited readership of |
| 2:08 | 7 | similar-minded people.  People of a similar political mindset. |
| 2:08 | 8 | He begins the tweet with the phrase *my position*, |
| 2:08 | 9 | which, of course, connotes an academic, abstract, |
| 2:08 | 10 | philosophical, pseudo-academic position.  It's a position. |
| 2:08 | 11 | This is my position.  I mean, the way that Noel Ignatiev, or |
| 2:08 | 12 | some ivory tower professor might, you know, point out or depict |
| 2:08 | 13 | a position that he holds temporarily.  He uses words like |
| 2:08 | 14 | *whatever*; he uses words like *meant*, which is, again, |
| 2:08 | 15 | speculative language.  Whatever it is that he actually meant, I |
| 2:09 | 16 | have -- I mean, I would connote -- I would argue that he's |
| 2:09 | 17 | basically saying I hold a similar view. |
| 2:09 | 18 | I don't have -- and it's important to point at the |
| 2:09 | 19 | words he doesn't use.  He doesn't say "at the Jews" or:  I'm |
| 2:09 | 20 | going to kill a Jew" or "I'm going to get a Jew."  He says |
| 2:09 | 21 | "this is what should be done with, with Jews."  Which, I mean, |
| 2:09 | 22 | that phrase that -- I'm trying to think of the word.  That |
| 2:09 | 23 | article width, again, depicts far more abstractness than is |
| 2:09 | 24 | argued by UF in its responses. |
| 2:09 | 25 | THE COURT:  But right now I want to make sure I |

**PROCEEDINGS RECORDED BY FEDERAL OFFICIAL COURT STENOGRAPHER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

2:09  1    understand what you're talking about.  You're just making a

2:09  2    this-is-not-a-true-threat argument.

2:09  3         MR. SABATINI:  I might be beating a dead horse, but I

2:09  4    really want to go into the particulars of --

2:09  5         THE COURT:  I didn't mean to cut you off.  I just want

2:09  6    to make sure it wasn't bleeding over into the disruption,

2:09  7    because you could have -- it's a whole different issue.  I view

2:09  8    the true threat issue as completely independent of the

2:10  9    disruption issue.

2:10  10        MR. SABATINI:  I definitely do, Your Honor.  And if

2:10  11   the Court doesn't find it fruitful to analyze the language

2:10  12   more, then I'm happy to switch to the disruption element.

2:10  13        THE COURT:  I didn't want to preclude that, I just

2:10  14   want to make sure I was understanding what your point was.

2:10  15        MR. SABATINI:  Again, I think that basically

2:10  16   summarizes it.  This tweet was made off campus on a very

2:10  17   controversial political topic that's emerging in the country

2:10  18   today on both sides of the political aisle, and it was aimed at

2:10  19   an extremely limited following off campus with no -- he had no

2:10  20   followers.  It wasn't said on the campus, it wasn't said

2:10  21   towards somebody.

2:10  22        You know, if he would have said something like this,

2:10  23   let's say he walked up to somebody at their car on the campus

2:10  24   and said it to them.  I mean, maybe you're nearing now closer a

2:10  25   threat.  But certainly off campus, not named, not tagged, just

| | | |
|---|---|---|
| 2:10 | 1 | keeps it so far from a true threat that based on the other case |
| 2:10 | 2 | law -- I mean, if you look at some of these other cases on |
| 2:11 | 3 | threats, they're always directive.  They're always very, very |
| 2:11 | 4 | direct. |
| 2:11 | 5 | They have, you know -- I'm going to read sort of some |
| 2:11 | 6 | of the case law what a threat actually is.  It's a likelihood |
| 2:11 | 7 | of being able to take place.  It's somebody who's saying |
| 2:11 | 8 | they're going to do something.  A substantial commitment to do |
| 2:11 | 9 | it.  I'm going to do this.  I'm going to make a decision.  It's |
| 2:11 | 10 | aimed at somebody.  It's a realistic threat. |
| 2:11 | 11 | THE COURT:  Well, it doesn't have to be aimed at |
| 2:11 | 12 | somebody, and it doesn't have to be something that they're |
| 2:11 | 13 | going to or capable of carrying out.  But, I mean -- and it |
| 2:11 | 14 | could certainly be on Twitter.  There's plenty of criminal |
| 2:11 | 15 | prosecutions for true threats on Twitter, and it doesn't have |
| 2:11 | 16 | to identify a certain person.  I think some of your other |
| 2:11 | 17 | arguments are better about what it says or doesn't say.  But if |
| 2:11 | 18 | someone said, you know, I'm going to kill some Jews, and just |
| 2:11 | 19 | not targeting a particular person, that could be a true threat. |
| 2:11 | 20 | Don't you agree with that? |
| 2:11 | 21 | MR. SABATINI:  It's potential.  But again, it's |
| 2:11 | 22 | totally context-driven.  Totally context-driven.  And ever |
| 2:11 | 23 | since Counterman, obviously there has to be some finding of a |
| 2:12 | 24 | subjective mental state of recklessness. |
| 2:12 | 25 | THE COURT:  That's true in Counterman for criminal |

2:12  1    prosecutions.  Those are one of the questions I had for both

2:12  2    sides.  Would that same subjective intent requirement apply in

2:12  3    a situation like this?

2:12  4              MR. SABATINI:  I see no distinction in the law, Your

2:12  5    Honor.  I haven't seen that analysis limited in any specific

2:12  6    way.  I think recklessness, of course, is a mens rea that's

2:12  7    used in both, you know, civil and criminal law and so -- for

2:12  8    them to spell it out.  But not expressly limited in that case

2:12  9    means it would apply to both, Your Honor.

2:12  10             THE COURT:  Okay.

2:12  11             MR. SABATINI:  And certainly the deliberate way it was

2:12  12   crafted is certainly not -- it doesn't show a recklessness.

2:12  13             With that said, I'll pause on the true threat

2:12  14   analysis.  I think it will come up in the analysis of the

2:12  15   disruption, substantial disruption.

2:12  16             But I would argue first we agree with the ACLU on

2:12  17   this, it's not the correct standard and that's because of

2:12  18   Mahanoy.  You know, the Eleventh Circuit only once used Tinker,

2:13  19   didn't say you have to use it, it did use it.  It was an

2:13  20   analysis it used.  And, of course, it was regarding extremely

2:13  21   targeted, extremely harassing, sexually-natured, pretty nasty

2:13  22   text messages sent to a person's cellphone after quasi-stalking

2:13  23   them for a period of time for the length of an entire night.  I

2:13  24   think it is unprotected speech.  It's unprotected speech, it

2:13  25   wasn't political, and so Tinker was a helpful analysis in that.

| | | |
|---|---|---|
| 2:13 | 1 | THE COURT: They used <u>Tinker</u> to find that it was |
| 2:13 | 2 | unprotected, right? I mean, I guess we do have the case. |
| 2:13 | 3 | You're talking about <u>Doe versus Valencia College</u>, correct? |
| 2:13 | 4 | MR. SABATINI: That's correct, Your Honor. Yes. |
| 2:13 | 5 | THE COURT: And it did apply <u>Tinker</u> in a non-K12 |
| 2:13 | 6 | context, in a college context, and a student discipline |
| 2:13 | 7 | context. Are you saying -- and you said they didn't say you |
| 2:13 | 8 | had to but, I mean, is your argument that <u>Tinker</u> now doesn't |
| 2:13 | 9 | apply in -- well, that <u>Tinker</u> is limited to the K12 context and |
| 2:14 | 10 | if so, what do we do with <u>Doe</u>. I mean, you wouldn't say that |
| 2:14 | 11 | was dicta, would you? |
| 2:14 | 12 | MR. SABATINI: I would say that <u>Doe</u> has been greatly, |
| 2:14 | 13 | logically -- I would say -- I mean, it hasn't been expressed. |
| 2:14 | 14 | THE COURT: But it has to be, right? I mean, for <u>Doe</u> |
| 2:14 | 15 | not to be binding, for whatever it does hold, and maybe you've |
| 2:14 | 16 | got an argument it doesn't hold that <u>Tinker</u> applies, it |
| 2:14 | 17 | certainly applied <u>Tinker</u>; but to say a Supreme Court case |
| 2:14 | 18 | undoes a circuit court case, it has to be pretty clear to where |
| 2:14 | 19 | they couldn't coexist at all. That's what the Eleventh Circuit |
| 2:14 | 20 | law is. |
| 2:14 | 21 | MR. SABATINI: I would argue it is somewhat clear. |
| 2:14 | 22 | Because to give the high school cheerleader, who's cursing |
| 2:14 | 23 | offline, more protection than the sophisticated graduate |
| 2:14 | 24 | student who is involved in the preeminent law school in the |
| 2:14 | 25 | state where political debates are happening on campus every |

| | | |
|---|---|---|
| 2:14 | 1 | single day, for me it would be too narrow of a reading of |
| 2:14 | 2 | <u>Mahanoy</u>.  I mean, it has to be read of something okay, we got |
| 2:14 | 3 | <u>Tinker</u> wrong off campus.  It's not the off-campus case. |
| 2:14 | 4 | THE COURT:  Well, it doesn't even say that.  It just |
| 2:15 | 5 | says you look at it differently.  That the interest the school |
| 2:15 | 6 | has is diminished, right? |
| 2:15 | 7 | MR. SABATINI:  That the interest that the school -- |
| 2:15 | 8 | THE COURT:  The interest the school has in regulating |
| 2:15 | 9 | speech is diminished when it's off campus, not that you just |
| 2:15 | 10 | don't care about this school when it's off campus. |
| 2:15 | 11 | MR. SABATINI:  To an extent, Your Honor.  But I would |
| 2:15 | 12 | say that it actually created a new public interest that schools |
| 2:15 | 13 | must seek to further because in the sort of the end of the |
| 2:15 | 14 | case, and the ACLU brought this statement up, it laid on sort |
| 2:15 | 15 | of a new duty to schools.  It says a school has an interest in |
| 2:15 | 16 | protecting unpopular expression especially when the expression |
| 2:15 | 17 | takes place off campus because America's public schools are the |
| 2:15 | 18 | nurseries of democracy.  Now, of course, I'm not suggesting UF |
| 2:15 | 19 | has to promote his views, but UF does, after <u>Mahanoy</u> have -- |
| 2:15 | 20 | because they say "school."  They don't say "K through 12," they |
| 2:15 | 21 | say "schools."  Educational institutions have a duty to protect |
| 2:15 | 22 | and allow this speech to be viewed because if they really want |
| 2:15 | 23 | the rest of the students at UF to know it's wrong, you can't |
| 2:15 | 24 | just delete it.  You can't just eliminate it.  You have to see |
| 2:16 | 25 | it and you have to prove it wrong or right, right?  Prove it |

| | | |
|---|---|---|
| 2:16 | 1 | wrong.  How is it wrong.  Logically, in the nursery of |
| 2:16 | 2 | democracy, prove it wrong. |
| 2:16 | 3 | And what UF seeks to do here today is to actually |
| 2:16 | 4 | really eliminate the speech.  Why?  Because it doesn't have a |
| 2:16 | 5 | space, it doesn't allow a student at the preeminent university |
| 2:16 | 6 | of our state to have it.  To have it.  Even off campus you |
| 2:16 | 7 | can't have it.  So that's protected political speech, Your |
| 2:16 | 8 | Honor.  It was not meant as a threat, and that is what |
| 2:16 | 9 | Mr. Damsky believes, it's his political belief.  And in the |
| 2:16 | 10 | nursery of democracy, for students to be exposed to it, the |
| 2:16 | 11 | preliminary injunction would have to be granted. |
| 2:16 | 12 | But I would argue, going back to the case law, Your |
| 2:16 | 13 | Honor, that Mahanoy implied -- you know, limited the holding of |
| 2:16 | 14 | Doe.  Again, I don't think Doe goes as far as they're going to |
| 2:16 | 15 | argue it does.  I think UF is going to argue Doe is a bigger, |
| 2:16 | 16 | more stringent holding than it does. |
| 2:16 | 17 | THE COURT:  I thought your argument about Doe would be |
| 2:17 | 18 | there they were dealing with person-to-person harassment that |
| 2:17 | 19 | wasn't even really a speech issue.  I mean, he was being |
| 2:17 | 20 | punished for texting this woman 200 times after she said "stop |
| 2:17 | 21 | texting me," which is different than just for his view. |
| 2:17 | 22 | MR. SABATINI:  I think that's also correct, Your |
| 2:17 | 23 | Honor.  But to the extent that Tinker could be used as a |
| 2:17 | 24 | principle, I think even that it's been reduced.  I don't think |
| 2:17 | 25 | it's the appropriate standard at this point post-Mahanoy, Your |

| | | |
|---|---|---|
| 2:17 | 1 | Honor. |
| 2:17 | 2 | THE COURT: What is the standard then? I mean, would |
| 2:17 | 3 | you say that unless something is a true threat or incitement, |
| 2:17 | 4 | which they're not alleging that, I don't think, that anything |
| 2:17 | 5 | goes? I mean, is that -- |
| 2:17 | 6 | MR. SABATINI: Your Honor, I think the door is open to |
| 2:17 | 7 | the idea that not just college, but graduate campuses, |
| 2:17 | 8 | University of Florida Law School. If that public institution |
| 2:18 | 9 | can't have free speech, truly free speech, even speech for the |
| 2:18 | 10 | speech that we hate, you know, to quote the famous case, then I |
| 2:18 | 11 | really, seriously don't know what educational institution in |
| 2:18 | 12 | this state could allow an attendee to have a similar viewpoint. |
| 2:18 | 13 | So I think the door is open to the idea that it's anything but. |
| 2:18 | 14 | THE COURT: What do you mean "the door is open"? If |
| 2:18 | 15 | you're writing the order that says you win, it would say this |
| 2:18 | 16 | is not a true threat for these reasons. And as to the other |
| 2:18 | 17 | part of your argument it would say what? It would just say |
| 2:18 | 18 | Tinker doesn't apply now and so that there's no part B to |
| 2:18 | 19 | discuss? Or would you say here's how that university could |
| 2:18 | 20 | have justified it, but they didn't for these reasons. |
| 2:18 | 21 | MR. SABATINI: I would suggest a more narrow ruling or |
| 2:18 | 22 | order which basically states that the statement actually was |
| 2:18 | 23 | purely just political language. Frustrated political language |
| 2:18 | 24 | concerning a political topic in American today, and it's very |
| 2:18 | 25 | unpopular. |

| | | |
|---|---|---|
| 2:18 | 1 | THE COURT:  That's not something the parties have |
| 2:19 | 2 | really argued whether it was political or not, and take the -- |
| 2:19 | 3 | you're calling it <u>Mahanoy</u>.  I'm not sure that's how I was |
| 2:19 | 4 | pronouncing it in my head. |
| 2:19 | 5 | MR. SABATINI:  Well, I tried to get the right |
| 2:19 | 6 | pronunciation.  I heard <u>Mahanoy</u>, almost like MAHA, like RFK |
| 2:19 | 7 | MAHA I'm sure we've seen in the news.  So that's -- sorry if |
| 2:19 | 8 | I'm doing that wrong, Your Honor. |
| 2:19 | 9 | THE COURT:  Well, I don't know if you are or not.  But |
| 2:19 | 10 | at any rate, that case they said it's not political, it's just, |
| 2:19 | 11 | you know, it's just some high school girl saying stuff, and |
| 2:19 | 12 | they still prevailed. |
| 2:19 | 13 | I guess I'm not seeing how it helps or hurts your side |
| 2:19 | 14 | if you call it political, and no one is really talking about |
| 2:19 | 15 | that.  And I guess your position would be the same if it |
| 2:19 | 16 | weren't political.  I mean, if it weren't political speech, it |
| 2:19 | 17 | were just -- you started off saying it was trolling, which is a |
| 2:19 | 18 | little different than offering a political view. |
| 2:19 | 19 | MR. SABATINI:  I wouldn't characterize it as similarly |
| 2:19 | 20 | trolling, I would characterize it as political expression.  But |
| 2:19 | 21 | what I would also say, it's identifiable to a young person who |
| 2:19 | 22 | is a chronic user of Twitter, which many people are today on |
| 2:20 | 23 | campus, is a sort of poking in the eye or a trolling-type move. |
| 2:20 | 24 | *Hey, I don't like this view, I'm going to use this view against* |
| 2:20 | 25 | *you. You seem to like this theorist at UF who has this view,* |

| | | |
|---|---|---|
| 2:20 | 1 | *what if it was applied in this way.* That's sort of, for lack |
| 2:20 | 2 | of a better word, a clever way of undermining a view of which |
| 2:20 | 3 | you disagree. That's how I mean. And some would see that as |
| 2:20 | 4 | pure trolling. Not in a reckless way, not in way to try to |
| 2:20 | 5 | scare someone, it was meant in a way -- it was supposed to be a |
| 2:20 | 6 | intellectually crafty way of undermining a different view by |
| 2:20 | 7 | seeing how they should be treated similarly and, of course, |
| 2:20 | 8 | they're not. They're just simply not based on, you know, |
| 2:20 | 9 | political opinions. |
| 2:20 | 10 | But, no. To answer your question, Your Honor, no, I |
| 2:20 | 11 | think the Court clearly has discretion to say if a cheerleader |
| 2:20 | 12 | has the ability to curse and use angry, crass, profanic |
| 2:20 | 13 | language and symbols and gestures off campus, then a law |
| 2:20 | 14 | student at the preeminent law school in this state, the free |
| 2:20 | 15 | state of Florida, I would say definitely should have the |
| 2:21 | 16 | ability to express his views off campus. And I would say that |
| 2:21 | 17 | is the read of the holding. |
| 2:21 | 18 | But I brought it up political arguments, Your Honor, |
| 2:21 | 19 | because obviously there historically have been many cases, |
| 2:21 | 20 | including <u>Tinker</u>, that do protect more purely political speech. |
| 2:21 | 21 | I mean, obviously in <u>Tinker</u> you had the Vietnam armband, purely |
| 2:21 | 22 | a political statement. And maybe that's one of the reasons |
| 2:21 | 23 | that sort of pushed the court to go as far as they did and |
| 2:21 | 24 | begin these line of cases. Political speech is, I think, more |
| 2:21 | 25 | protected. I think it is the thing -- viewpoint discrimination |

**PROCEEDINGS RECORDED BY FEDERAL OFFICIAL COURT STENOGRAPHER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

| | | |
|---|---|---|
| 2:21 | 1 | obviously is totally objectionable.  But when it comes to a |
| 2:21 | 2 | political topic, a controversial political topic, it is |
| 2:21 | 3 | singularly protected more than average speech in many ways. |
| 2:21 | 4 | And I note that in the code of conduct, both the |
| 2:21 | 5 | subsections on harassment and discriminatory language both end |
| 2:21 | 6 | with a quote, I think it's the exact mimicry, it's the same |
| 2:21 | 7 | sentence in both.  It says:  Any language protected by the |
| 2:21 | 8 | First Amendment is not included by these policies. |
| 2:21 | 9 | THE COURT:  The policies -- I mean, both sides talk |
| 2:22 | 10 | about the policy, they have a lot in their brief about it.  But |
| 2:22 | 11 | the policy doesn't even matter here at all, right?  The |
| 2:22 | 12 | University policy.  You're saying if the policy allowed the |
| 2:22 | 13 | expulsion, then the policy is unconstitutional.  You're saying |
| 2:22 | 14 | the action is unconstitutional. |
| 2:22 | 15 | MR. SABATINI:  I believe the expulsion was |
| 2:22 | 16 | unconstitutional. |
| 2:22 | 17 | THE COURT:  And if the expulsion was inconsistent with |
| 2:22 | 18 | the policy, that's just not a federal law matter.  I guess I'm |
| 2:22 | 19 | not seeing where the policy fits in here at all. |
| 2:22 | 20 | MR. SABATINI:  I would simply say this to the Court, |
| 2:22 | 21 | and we hope it doesn't, but if the Court adopted a substantial |
| 2:22 | 22 | disruption standard and said that even this off-campus speech |
| 2:22 | 23 | caused this enormous disruption, the citations, both in the |
| 2:22 | 24 | hearing and in the expulsion letter to those two sections of |
| 2:22 | 25 | the student code of conduct could be used as factual evidence. |

| | | |
|---|---|---|
| 2:22 | 1 | Well, look, you're aware of the code, we have this code, you |
| 2:22 | 2 | can't do this, you caused a disruption, the code put you on |
| 2:22 | 3 | notice.  I mean, if that's the argument, a factual argument |
| 2:22 | 4 | they're making, I seek to counter that, Your Honor.  That's the |
| 2:22 | 5 | purpose for bringing it up. |
| 2:22 | 6 | THE COURT:  Okay.  But, I mean, if there were a policy |
| 2:22 | 7 | that said the following conduct is disruptive, but it wasn't |
| 2:23 | 8 | disruptive, that wouldn't excuse a constitutional violation. |
| 2:23 | 9 | MR. SABATINI:  Correct.  It would be void. |
| 2:23 | 10 | THE COURT:  Okay.  All right.  Anything else? |
| 2:23 | 11 | MR. SABATINI:  No, Your Honor. |
| 2:23 | 12 | THE COURT:  Okay.  Like I said, I'll give you |
| 2:23 | 13 | rebuttal. |
| 2:23 | 14 | MR. SABATINI:  Thank you, Your Honor. |
| 2:23 | 15 | THE COURT:  Yes, sir. |
| 2:23 | 16 | MR. BARTOLOMUCCI:  May it please the Court.  Chris |
| 2:23 | 17 | Bartolomucci for the defendant. |
| 2:23 | 18 | Your Honor's correct that we make two main arguments. |
| 2:23 | 19 | One is the true threat argument, and the other is grounded in |
| 2:23 | 20 | Tinker. |
| 2:23 | 21 | But I want to actually call this a Tinker plus case, |
| 2:23 | 22 | because we have not just a material and substantial disruption, |
| 2:23 | 23 | but a threat that caused a material and substantial disruption. |
| 2:23 | 24 | And I think that puts it into a somewhat different category and |
| 2:23 | 25 | should be governed by cases like the Eleventh Circuit's |

| 2:23 | 1 | decision in <u>Boim</u>.  I'm not sure if I'm pronouncing that |
| 2:24 | 2 | correctly.  But <u>Boim</u> was a case in which the Eleventh Circuit |
| 2:24 | 3 | said that school authorities have the power to take action |
| 2:24 | 4 | based on student speech that is reasonably seen as a threat of |
| 2:24 | 5 | violence.  And the court was building upon <u>Morse versus</u> |
| 2:24 | 6 | <u>Frederick</u> where the Supreme Court said a high school principal |
| 2:24 | 7 | may take action on speech reasonably seen as promoting illegal |
| 2:24 | 8 | drug use. |
| 2:24 | 9 | THE COURT:  On school property.  At a school event.  I |
| 2:24 | 10 | mean, the court made clear that was a school event, and then |
| 2:24 | 11 | <u>Boim</u>, if we're pronouncing that correctly, it talked about it |
| 2:24 | 12 | was on school property during the school day. |
| 2:24 | 13 | And so I understand those cases.  Those are both K12 |
| 2:24 | 14 | cases too.  But what makes this a school case?  I mean, here |
| 2:24 | 15 | you make one point in the brief that he had the sort of |
| 2:24 | 16 | follow-up to the follow-up of the professor, and so that made |
| 2:24 | 17 | it a school case.  But that was, again, initiated by the |
| 2:25 | 18 | professor, that response. |
| 2:25 | 19 | What I'm not seeing in any of these cases is a |
| 2:25 | 20 | situation where someone is, separate from his school context, |
| 2:25 | 21 | whether it's as a K12 or college, having some speech that then |
| 2:25 | 22 | the court finds to be disruptive at the school.  I understand |
| 2:25 | 23 | your factual argument that as a factual matter people were very |
| 2:25 | 24 | upset about this and it caused some problems at the school, but |
| 2:25 | 25 | I'm not seeing any cases where someone says something away from |

```
2:25   1   the school but just happens to be a student.

2:25   2           And so, you know, you heard me talking to your

2:25   3   colleague about the, I guess we'll call it Mahanoy, I don't

2:25   4   know how you pronounce it, but that case where they were

2:25   5   talking about how the school's interest is diminished, and they

2:25   6   talk about what they're looking at is the school's character as

2:25   7   a school.  And what I'm struggling to understand is how UF's

2:25   8   situation, its character as a school or law school, makes it

2:26   9   any different than any other state agency or state actor that

2:26  10   would want to discipline somebody for making speech that they

2:26  11   found to be harmful or disruptive.

2:26  12           MR. BARTOLOMUCCI:  I'd like to make two arguments,

2:26  13   Your Honor.  One is a legal argument and one is more of a

2:26  14   factual argument.

2:26  15           Legally, both the Eleventh Circuit and the Supreme

2:26  16   Court have made perfectly clear that off-campus speech is not,

2:26  17   you know, beyond a school's regulatory power.

2:26  18           THE COURT:  100% agree.  But when it does that, it

2:26  19   ties it back to the school somehow.  And here, the way you've

2:26  20   tied it to the school is to say people at the school found out

2:26  21   about it, were very upset about it, and that's really it.

2:26  22           MR. BARTOLOMUCCI:  No, it's more than that, Your

2:26  23   Honor.  Because what makes it more than that is when he engaged

2:26  24   with Professor Lidsky.

2:26  25           So he makes the original post.  He says Jews must be
```

| | | |
|---|---|---|
| 2:26 | 1 | *abolished by any means necessary*.  And then that makes it to |
| 2:27 | 2 | campus.  And then a Jewish law professor, you know, comes onto |
| 2:27 | 3 | the tweet and says *are you saying you would murder me and my* |
| 2:27 | 4 | *family?* |
| 2:27 | 5 | So at that point, Damsky knows that the eyes of the |
| 2:27 | 6 | law school community are on him, and he's speaking to a member |
| 2:27 | 7 | of the faculty.  And what would any normal person do?  They |
| 2:27 | 8 | would say oh no, professor.  You've got me all wrong.  I'm not |
| 2:27 | 9 | threatening you or your family.  I'm not threatening anyone. |
| 2:27 | 10 | But that's not what Damsky does.  He actually doubles |
| 2:27 | 11 | down and makes things worse for himself.  You know, instead of |
| 2:27 | 12 | answering her question directly, he poses questions of his own |
| 2:27 | 13 | and starts talking about Jewish genocide and saying that well, |
| 2:27 | 14 | you know, white genocide would be worse than that.  So at that |
| 2:27 | 15 | point, it's targeted at the law school because he's talking to |
| 2:27 | 16 | a law school professor. |
| 2:27 | 17 | THE COURT:  It's targeted at the law school?  So your |
| 2:27 | 18 | legal argument would be different if instead of Professor |
| 2:27 | 19 | Lidsky, it would be some professor at some law school in a |
| 2:28 | 20 | different part of the country?  Some non-law school professor? |
| 2:28 | 21 | The point is all this comes to the UF Dean, and she |
| 2:28 | 22 | sees it all.  So you're saying you would not have a case, or |
| 2:28 | 23 | the legal analysis would be different if you take out Professor |
| 2:28 | 24 | Lidsky and replace her with another person who is not a UF law |
| 2:28 | 25 | professor? |

**PROCEEDINGS RECORDED BY FEDERAL OFFICIAL COURT STENOGRAPHER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

| | | |
|---|---|---|
| 2:28 | 1 | MR. BARTOLOMUCCI:  Well, definitely our case would be |
| 2:28 | 2 | weaker.  And it's an important fact that he spoke directly to a |
| 2:28 | 3 | UF law professor, and he must have known at that point that the |
| 2:28 | 4 | law school community is aware of the original tweet.  And |
| 2:28 | 5 | instead of disclaiming the notion that he's making a threat, I |
| 2:28 | 6 | think his response confirmed it, and at least allows for a |
| 2:28 | 7 | reasonable perception that what he said was a threat aimed at |
| 2:28 | 8 | the law school. |
| 2:28 | 9 | THE COURT:  And are you saying -- when you're saying |
| 2:28 | 10 | "threat" in this context, are you talking about a true threat |
| 2:28 | 11 | as the First Amendment defines it?  Or is this your argument |
| 2:28 | 12 | about what you call <u>Tinker</u> plus? |
| 2:28 | 13 | MR. BARTOLOMUCCI:  Yeah.  I'm saying this was a <u>Boim</u> |
| 2:29 | 14 | <u>Tinker</u> plus threat.  It was reasonably perceived as a threat. |
| 2:29 | 15 | Now, the true threat analysis doesn't have to be |
| 2:29 | 16 | connected to a school in any way. |
| 2:29 | 17 | THE COURT:  That's correct.  And Mr. Sabatini |
| 2:29 | 18 | acknowledges that, and I think all agree if it were a true |
| 2:29 | 19 | threat you win, and we're not even considering <u>Tinker</u>.  There's |
| 2:29 | 20 | no need to.  And even if it were a true threat having nothing |
| 2:29 | 21 | to do with the law school, if he just e-mailed a neighbor and |
| 2:29 | 22 | said *I'm going to kill you* and UF found out about it, they |
| 2:29 | 23 | could say that's not going to work for us, you're out of the |
| 2:29 | 24 | law school.  Everybody agrees with that, I think. |
| 2:29 | 25 | MR. BARTOLOMUCCI:  Yeah.  I frankly think the easier |

| | | |
|---|---|---|
| 2:29 | 1 | way to decide this case is under <u>Boim</u> because there the court |
| 2:29 | 2 | held if it's reasonably seen as a threat, then the school has |
| 2:29 | 3 | authority.  And so the only issues are, you know, the |
| 2:29 | 4 | off-campus speech issue, and the university-level speech issue. |
| 2:29 | 5 | THE COURT:  Well, before we get there -- and I agree |
| 2:30 | 6 | with you that that would be easier in some ways from UF's |
| 2:30 | 7 | perspective.  I do think your true threat argument is a very |
| 2:30 | 8 | difficult one, and I wanted to just see if we could focus on |
| 2:30 | 9 | just that argument, recognizing that they're two separate |
| 2:30 | 10 | arguments, and recognizing that the threat in a more general |
| 2:30 | 11 | way, not necessarily a true threat for First Amendment |
| 2:30 | 12 | purposes, can come into what you're calling the <u>Tinker</u> plus |
| 2:30 | 13 | argument. |
| 2:30 | 14 | But in terms of a true threat, do you have anything |
| 2:30 | 15 | that would be anywhere close to this.  I mean, the Supreme |
| 2:30 | 16 | Court has said you can advocate for unlawful activities as long |
| 2:30 | 17 | as you're not inciting.  You're not making an incitement |
| 2:30 | 18 | argument, correct? |
| 2:30 | 19 | MR. BARTOLOMUCCI:  We're not.  But I think a very |
| 2:30 | 20 | straightforward application of <u>Counterman</u> gets you to the |
| 2:30 | 21 | conclusion that this is a true threat, you know, for two |
| 2:30 | 22 | reasons.  You know, the first part of the analysis is, you |
| 2:30 | 23 | know, was it regarded by the listeners as a true threat.  You |
| 2:30 | 24 | don't ask, you know, did the speaker intend to make a threat. |
| 2:31 | 25 | It's from the objective vantage point of the person who |

| | | |
|---|---|---|
| 2:31 | 1 | receives the threatening speech.  So I think for the same |
| 2:31 | 2 | reasons that under Boim it's reasonably regarded as a threat, |
| 2:31 | 3 | the first part of Counterman is satisfied. |
| 2:31 | 4 | THE COURT:  No, no.  Boim is not a true threat case. |
| 2:31 | 5 | MR. BARTOLOMUCCI:  It's not a true threat case. |
| 2:31 | 6 | THE COURT:  I'm just focused on the true threat.  If |
| 2:31 | 7 | the only issue here is was this a true threat, Boim is just a |
| 2:31 | 8 | nonstarter, period. |
| 2:31 | 9 | MR. BARTOLOMUCCI:  I understand.  But I'm saying that |
| 2:31 | 10 | the argument under Boim that I was making, you know, lines up |
| 2:31 | 11 | under the first part of Counterman.  And the second part of |
| 2:31 | 12 | Counterman is mens rea.  You're right, Counterman is a criminal |
| 2:31 | 13 | case, so it's not entirely clear to me whether we have to show |
| 2:31 | 14 | mens rea for a true threat, you know, outside of the criminal |
| 2:31 | 15 | context.  But if we do, I think we can.  All we have to show is |
| 2:31 | 16 | recklessness, and you've got recklessness based on his |
| 2:31 | 17 | follow-up exchange with Professor Lidsky. |
| 2:31 | 18 | THE COURT:  Wait a minute.  That gets to the other |
| 2:32 | 19 | problem with your true threat thing is you're never really |
| 2:32 | 20 | particular about what the threat is.  So, for example, if the |
| 2:32 | 21 | true threat is his initial tweet, which I read parts of your |
| 2:32 | 22 | paper to suggest it is, then it's already complete before he |
| 2:32 | 23 | interacts with Professor Lidsky. |
| 2:32 | 24 | If it's the interaction with Professor Lidsky, then |
| 2:32 | 25 | you've got, I think, sort of a different set of issues and then |

| | | |
|---|---|---|
| 2:32 | 1 | both sides are talking about the context that matters, and |
| 2:32 | 2 | you're saying well, a person shouldn't have to go look up this |
| 2:32 | 3 | deceased professor to understand what he meant.  But then you |
| 2:32 | 4 | do say part of the context is these other papers he's written, |
| 2:32 | 5 | which people reading Twitter wouldn't necessarily know. |
| 2:32 | 6 | And so both sides are making different points about |
| 2:32 | 7 | the context and, I mean, at the end of the day to show a true |
| 2:32 | 8 | threat you have to show a serious expression of an intent to |
| 2:32 | 9 | commit an act of unlawful violence to a particular individual |
| 2:33 | 10 | or group of individuals.  You agree that's the standard, right? |
| 2:33 | 11 | MR. BARTOLOMUCCI:  I do. |
| 2:33 | 12 | THE COURT:  And so advocating for some unlawful |
| 2:33 | 13 | activity, even if you view this way, is not the same way as |
| 2:33 | 14 | saying this is a serious expression of an intent to commit an |
| 2:33 | 15 | act of unlawful violence. |
| 2:33 | 16 | MR. BARTOLOMUCCI:  I think we've got it, Your Honor, |
| 2:33 | 17 | because the original tweet says -- |
| 2:33 | 18 | THE COURT:  When do you have it?  Is it with the |
| 2:33 | 19 | original tweet, or it is with the combination of the tweets, or |
| 2:33 | 20 | is it with the tweets plus the papers he wrote?  You're not |
| 2:33 | 21 | taking the position that his, I guess you call them academic |
| 2:33 | 22 | papers, you're not taking the position that those are true |
| 2:33 | 23 | threats, correct? |
| 2:33 | 24 | MR. BARTOLOMUCCI:  No. |
| 2:33 | 25 | THE COURT:  So the only true threat is the first |

2:33    1    tweet, the second tweet or the combination of the two, correct?

2:33    2    MR. BARTOLOMUCCI:  The original tweet plus the

2:33    3    exchange with Professor Lidsky.  That, to us, is what

2:33    4    constitutes the true threat.  I mean, the original tweet says

2:33    5    Jews must be abolished by any means necessary.  I mean, okay,

2:33    6    if it was just that, this would be a weaker case.  But Lidsky

2:34    7    asks him *are you saying you would murder me and my family*?  And

2:34    8    he doesn't say no.  So that's the point at which it becomes a

2:34    9    true threat because Lidsky and the other people --

2:34    10   THE COURT:  Because he didn't say no?  What if he

2:34    11   didn't respond to it?

2:34    12   MR. BARTOLOMUCCI:  Well, that would be a different

2:34    13   case.

2:34    14   THE COURT:  What if he said I decline to answer your

2:34    15   question?

2:34    16   MR. BARTOLOMUCCI:  Well, that's not what happened.

2:34    17   THE COURT:  I know that's not what happened, but in

2:34    18   these cases that you're citing where there are true threats,

2:34    19   and the cases that exist where there are true threats, which is

2:34    20   a very narrow concept, true threats, the cases all say here's

2:34    21   what the language was.  Here's what was said.  It says it in

2:34    22   Counterman.  It says it in all of these.  And as I read your

2:34    23   brief it just says well, he understands this, he knows people

2:34    24   are upset over here, he wrote this paper a year ago.  You cite

2:34    25   in your brief the dean's statements at the disciplinary hearing

| | | |
|---|---|---|
| 2:34 | 1 | that this isn't the first time he's made hateful comments. |
| 2:34 | 2 | He's said things all along, and so he's kind of a person we've |
| 2:35 | 3 | had our eye on, and this sort of put it over the edge. |
| 2:35 | 4 | And yes, the context can matter, but I guess I would |
| 2:35 | 5 | expect you to be able to answer the question of the first tweet |
| 2:35 | 6 | was or was not a serious expression of an intent by Mr. Damsky |
| 2:35 | 7 | to commit serious acts of violence. |
| 2:35 | 8 | MR. BARTOLOMUCCI:  Well, I view it that way, but I |
| 2:35 | 9 | don't have to rest on just the first tweet, because I've also |
| 2:35 | 10 | got the follow-up exchange with Professor Lidsky.  So I think |
| 2:35 | 11 | we get to view that exchange as one threat.  And I think that |
| 2:35 | 12 | by the time that Professor Lidsky asks him *are you saying you* |
| 2:35 | 13 | *would murder me and my family*, and then he tap dances and he |
| 2:35 | 14 | says well, you know, white genocide would be worse than Jewish |
| 2:35 | 15 | genocide.  So I think when you look at that answer to her |
| 2:35 | 16 | question, you know, in light of the tweet that he has just made |
| 2:35 | 17 | about abolishing Jews by any means necessary, I think you take |
| 2:35 | 18 | that all together, and I think that is a true threat.  That's |
| 2:35 | 19 | our submission to the Court. |
| 2:36 | 20 | THE COURT:  Okay.  What's your best case from a |
| 2:36 | 21 | circuit court or the Supreme Court that would support that? |
| 2:36 | 22 | What's the closest to something like this, recognizing that |
| 2:36 | 23 | these are all different.  And I know you're not going to find |
| 2:36 | 24 | something specific exactly like this, but what would be the |
| 2:36 | 25 | best one where there was a defense to say well, this is not |

| | | |
|---|---|---|
| 2:36 | 1 | actually threatening violence, it's just my view, or something |
| 2:36 | 2 | like that. |
| 2:36 | 3 | MR. BARTOLOMUCCI:  Well, we cited -- well, of course |
| 2:36 | 4 | Counterman is important to our argument, but we also cited a |
| 2:36 | 5 | couple of district court cases.  One was the case involving the |
| 2:36 | 6 | statement that, you know, we will repel them with every caliber |
| 2:36 | 7 | available.  And then there was another case -- |
| 2:36 | 8 | THE COURT:  That's the Daniel Baker case. |
| 2:36 | 9 | MR. BARTOLOMUCCI:  Baker.  And then the other one I |
| 2:36 | 10 | think is called Ramos. |
| 2:36 | 11 | Now, these cases aren't very similar factually, Your |
| 2:36 | 12 | Honor.  I admit that.  But I think that the general principles |
| 2:36 | 13 | outlined in Counterman apply here. |
| 2:37 | 14 | And look, all these true threat cases are going to be |
| 2:37 | 15 | very fact specific, so I can't produce a case that's on all |
| 2:37 | 16 | fours with this one.  But I think a fair reading of Counterman |
| 2:37 | 17 | gets you there. |
| 2:37 | 18 | And look, what we're asking today, are they likely to |
| 2:37 | 19 | succeed on their First Amendment case.  And so I guess my |
| 2:37 | 20 | submission is we're likely to prevail on the true threat |
| 2:37 | 21 | argument, you know, plus the Tinker analysis. |
| 2:37 | 22 | THE COURT:  Okay. |
| 2:37 | 23 | MR. BARTOLOMUCCI:  But if Your Honor would like me to, |
| 2:37 | 24 | I can address the off-campus issue or the -- |
| 2:37 | 25 | THE COURT:  Sure. |

| | | |
|---|---|---|
| 2:37 | 1 | MR. BARTOLOMUCCI:  Okay.  So legally, starting with |
| 2:37 | 2 | _Tinker_ itself, _Tinker_ said that the First Amendment does not |
| 2:37 | 3 | protect disruptive conduct in class or out of it.  So _Tinker_ |
| 2:37 | 4 | itself, which started this whole line, recognized that, you |
| 2:37 | 5 | know, the disruptive speech might occur outside the classroom. |
| 2:37 | 6 | _Doe versus Valencia College_ squarely rejected an |
| 2:38 | 7 | argument that this was off-campus speech during a summer break. |
| 2:38 | 8 | So I think that's really the showstopper on this. |
| 2:38 | 9 | But on top of that, _Mahanoy Area_ was careful to note |
| 2:38 | 10 | in Justice Bryer's opinion that a school may regulate |
| 2:38 | 11 | off-campus, quote, threats aimed at teachers or other students, |
| 2:38 | 12 | end quote.  That's from 594 US at 188. |
| 2:38 | 13 | So I think we've crossed the bridge that, you know, it |
| 2:38 | 14 | matters if the speech is on campus or off campus, but there's |
| 2:38 | 15 | no per se rule that well, if it's off campus the school can't |
| 2:38 | 16 | do anything about it. |
| 2:38 | 17 | THE COURT:  Well, I think everyone agrees with that |
| 2:38 | 18 | statement.  But what _Mahanoy_ does say is that the school's |
| 2:38 | 19 | interest is diminished.  And that gets back to my question |
| 2:38 | 20 | about what makes this a school case other than the fact that he |
| 2:38 | 21 | happened to be a law student.  So if the state were acting in |
| 2:39 | 22 | some other context where _Tinker_ definitely wouldn't apply, |
| 2:39 | 23 | suppose they said we're going to deny you a barber license |
| 2:39 | 24 | because of your activities here, and it wasn't a true threat, |
| 2:39 | 25 | why would the analysis be any different there. |

| | | |
|---|---|---|
| 2:39 | 1 | MR. BARTOLOMUCCI:  Well again, my answer on that is |
| 2:39 | 2 | not only is he a law student, which is certainly true, but then |
| 2:39 | 3 | he has a direct exchange with a Jewish member of the law school |
| 2:39 | 4 | faculty.  And that makes this an on-campus case, in my view. |
| 2:39 | 5 | He's directly engaging with a member of the faculty and sort of |
| 2:39 | 6 | dodging the question *are you talking about murdering me and my* |
| 2:39 | 7 | *family*.  So that's a communication that's going to the law |
| 2:39 | 8 | school community and had significant disruptive effects on the |
| 2:39 | 9 | community. |
| 2:39 | 10 | THE COURT:  Does it matter that she initiated the |
| 2:39 | 11 | contact there?  I mean, in the <u>Valencia College</u> case, you have |
| 2:39 | 12 | somebody reaching out to another student, depriving that |
| 2:40 | 13 | student of her rights in a very different way.  But here, he |
| 2:40 | 14 | makes the statement on Twitter or X and without -- and you |
| 2:40 | 15 | agree the statement, when he first made it, was not targeted to |
| 2:40 | 16 | the University at all.  Do you agree with that? |
| 2:40 | 17 | MR. BARTOLOMUCCI:  Well again, he's a law student. |
| 2:40 | 18 | But, you know, I don't have to rely on just the first post, so |
| 2:40 | 19 | I'm not going to.  My argument is the post plus the follow-up |
| 2:40 | 20 | exchange.  And I would say he initiated, because he put the |
| 2:40 | 21 | first post on public-facing social media.  You know, things can |
| 2:40 | 22 | go viral. |
| 2:40 | 23 | THE COURT:  They can, but you're not saying -- I mean, |
| 2:40 | 24 | this gets to, I think, what was one of the concerns in <u>Mahanoy</u> |
| 2:40 | 25 | is if you say the school can regulate everything that happens |

| | | |
|---|---|---|
| 2:40 | 1 | at school and everything that happens not at school, then all |
| 2:40 | 2 | of a sudden the school is regulating everything because |
| 2:40 | 3 | everything is either at school or not at school. And one of |
| 2:41 | 4 | the things they said there was, you know, the school's interest |
| 2:41 | 5 | was a little bit separated. |
| 2:41 | 6 | And so for you to say that he is targeting the school |
| 2:41 | 7 | because he's putting it on a public-facing platform, then that |
| 2:41 | 8 | would mean that anything he says is regulated. |
| 2:41 | 9 | And I'll tell you the problem I have with the |
| 2:41 | 10 | disruption argument is this, and this is not -- this doesn't |
| 2:41 | 11 | mean you lose. But as I'm hearing you say well, he put |
| 2:41 | 12 | something on public, you are a law student, you know people are |
| 2:41 | 13 | going to read it, you know people are going to be upset, you're |
| 2:41 | 14 | on notice; there's a lot of opinions that people could put on |
| 2:41 | 15 | Twitter that would be very upsetting to a lot of students, |
| 2:41 | 16 | including -- and not opinions that are very different than |
| 2:41 | 17 | these here that he's advocating. |
| 2:41 | 18 | MR. BARTOLOMUCCI: Your Honor, just to clarify my |
| 2:41 | 19 | answer, I'm not relying solely upon the fact that it was |
| 2:41 | 20 | public-facing; I'm relying on the fact that he put something on |
| 2:41 | 21 | public-facing social media, and not surprisingly, I think, a |
| 2:42 | 22 | member of the law school community, Professor Lidsky, hopped on |
| 2:42 | 23 | that discussion. |
| 2:42 | 24 | THE COURT: Voluntarily. |
| 2:42 | 25 | MR. BARTOLOMUCCI: Yes, she did. And she took the |

| | | |
|---|---|---|
| 2:42 | 1 | conversation further, and he was willing to continue the |
| 2:42 | 2 | conversation.  So all of that is a string of events that make |
| 2:42 | 3 | this look different than other kinds of purely off-campus |
| 2:42 | 4 | speech.  It's not like the University is acting because of |
| 2:42 | 5 | something he said to a buddy, you know, in a bar on the |
| 2:42 | 6 | outskirts of Gainesville. |
| 2:42 | 7 | THE COURT:  But you're not saying the University would |
| 2:42 | 8 | not have acted if Professor Lidsky had not been involved, are |
| 2:42 | 9 | you?  I mean, I know you said before it would be a different |
| 2:42 | 10 | analysis, but I mean, is there any reason to think that the |
| 2:42 | 11 | University would have taken a different action if Professor |
| 2:42 | 12 | Lidsky had been a professor at some other school? |
| 2:42 | 13 | MR. BARTOLOMUCCI:  Well, I don't know, Your Honor. |
| 2:42 | 14 | You're asking me to speculate on a counter-factual world.  I |
| 2:42 | 15 | prefer to rest on the record I've got which is original post |
| 2:42 | 16 | plus the exchange with Lidsky. |
| 2:43 | 17 | And I think the Lidsky piece of this is crucial |
| 2:43 | 18 | because that's what brings it to the UF law community.  At that |
| 2:43 | 19 | point -- |
| 2:43 | 20 | THE COURT:  You think that if she had been a professor |
| 2:43 | 21 | at University of Georgia and had the same exchange and the same |
| 2:43 | 22 | people would have brought the same messages to the dean of UF's |
| 2:43 | 23 | law school, the students wouldn't have reacted in the same way, |
| 2:43 | 24 | and you wouldn't have had all the same sort of disruptive |
| 2:43 | 25 | aspects that you're relying on in your brief? |

| | | |
|---|---|---|
| 2:43 | 1 | MR. BARTOLOMUCCI:  It might have had that effect, Your |
| 2:43 | 2 | Honor, but I can't say what would have happened in that |
| 2:43 | 3 | situation.  But, you know, we do know that he was speaking to a |
| 2:43 | 4 | member of the faculty of the law school he attends.  And I |
| 2:43 | 5 | think -- |
| 2:43 | 6 | THE COURT:  She didn't view it as a threat, correct? |
| 2:43 | 7 | MR. BARTOLOMUCCI:  Well, Your Honor, the record shows |
| 2:43 | 8 | that she slept with a baseball bat for some time.  She and her |
| 2:43 | 9 | husband slept with a baseball bat after this happened. |
| 2:43 | 10 | THE COURT:  Didn't she say she didn't view it as a |
| 2:43 | 11 | threat, and she did that only after other people were |
| 2:44 | 12 | expressing their own concerns about other things, not about |
| 2:44 | 13 | this tweet specifically, but about the whole universe of |
| 2:44 | 14 | things? |
| 2:44 | 15 | MR. BARTOLOMUCCI:  Well, I think her testimony was she |
| 2:44 | 16 | didn't initially feel it was a threat, though other people did. |
| 2:44 | 17 | And that, you know, having lived through it for a time, then |
| 2:44 | 18 | she did become afraid, and that's why she had the baseball bat. |
| 2:44 | 19 | But, of course, you know, the question isn't just did |
| 2:44 | 20 | Lidsky view this as a threat.  You know, in my judgment the |
| 2:44 | 21 | question is, you know, was it reasonably regarded as a threat |
| 2:44 | 22 | by, you know, the relevant actors at the law school. |
| 2:44 | 23 | THE COURT:  And that's an objective standard, right? |
| 2:44 | 24 | MR. BARTOLOMUCCI:  That's an objective standard.  And |
| 2:44 | 25 | look, you had all the relevant decision makers at the |

**PROCEEDINGS RECORDED BY FEDERAL OFFICIAL COURT STENOGRAPHER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

| | | |
|---|---|---|
| 2:44 | 1 | University thought this was threatening.  That's Dean |
| 2:44 | 2 | McAlister.  It's the three members of the university officials |
| 2:44 | 3 | board.  It's Dean Summerlin who accepted their recommendation. |
| 2:44 | 4 | And then it's also the three members of the appeals panel who |
| 2:45 | 5 | upheld it.  So all the relevant actors, I think, you know, |
| 2:45 | 6 | decided that this was threatening. |
| 2:45 | 7 | THE COURT:  Again, we're not talking about true |
| 2:45 | 8 | threats now, right? |
| 2:45 | 9 | MR. BARTOLOMUCCI:  No.  We're in _Tinker_ land.  But it |
| 2:45 | 10 | was, you know, widely viewed as a threat, it was widely |
| 2:45 | 11 | disruptive.  I mean, our brief catalogues the types of |
| 2:45 | 12 | disruption.  You know, students skipping class.  Students |
| 2:45 | 13 | deciding not to register in classes Mr. Damsky was in. |
| 2:45 | 14 | Heightened security on campus.  Professor Lidsky cancelled a |
| 2:45 | 15 | class.  I think there was a staff member who quit her job. |
| 2:45 | 16 | Dean McAlister's testimony was that business as usual at the |
| 2:45 | 17 | law school ground to a halt.  All that anyone was doing or |
| 2:45 | 18 | talking about was Mr. Damsky and his X post. |
| 2:45 | 19 | So I think the case for disruption is very strong.  I |
| 2:46 | 20 | don't really think it's been rebutted by Mr. Damsky.  So even |
| 2:46 | 21 | under _Tinker_ with no plus, I think we've got a case for |
| 2:46 | 22 | material and substantial disruption. |
| 2:46 | 23 | THE COURT:  But again, what is the school's |
| 2:46 | 24 | connection?  Suppose this were a state agency and he were an |
| 2:46 | 25 | employee, he worked in the cafeteria or something like that, |

| | | |
|---|---|---|
| 2:46 | 1 | and makes these same tweets, and engages with another person |
| 2:46 | 2 | who works at the same state agency, and all the other employees |
| 2:46 | 3 | are scared to come to work.  Why would the outcome be any |
| 2:46 | 4 | different here because this is a school than there.  In all |
| 2:46 | 5 | these other cases, and in Mahanoy they talk about the school's |
| 2:46 | 6 | interest, they talk about the characteristics of a school that |
| 2:46 | 7 | makes it a different analysis.  And what is it about -- what is |
| 2:46 | 8 | the character of the UF Law School that would make it different |
| 2:46 | 9 | from some other state? |
| 2:46 | 10 |          MR. BARTOLOMUCCI:  The reason, Your Honor, is, you |
| 2:46 | 11 | know, not -- well, first there's the history of school |
| 2:46 | 12 | shootings in this country which, terrible.  But it's also -- |
| 2:47 | 13 | it's a captive audience theory.  You know, students are on a |
| 2:47 | 14 | schedule.  You know when they're going to go to class, there's |
| 2:47 | 15 | a large group of them, they're in sort of a contained area, and |
| 2:47 | 16 | you're worried about someone who may be violent who has access |
| 2:47 | 17 | to the school.  Who is a member of the student body. |
| 2:47 | 18 |          THE COURT:  Right.  But wouldn't that all be true, |
| 2:47 | 19 | back to my hypothetical, about just some other state agency. |
| 2:47 | 20 | You'd say the same thing. |
| 2:47 | 21 |          MR. BARTOLOMUCCI:  I see that, Your Honor.  But, you |
| 2:47 | 22 | know, that's a bridge that the courts haven't crossed, and you |
| 2:47 | 23 | don't have to cross that bridge in this case.  We've got a lot |
| 2:47 | 24 | of -- |
| 2:47 | 25 |          THE COURT:  No, but they do.  I mean, that's the whole |

| | | |
|---|---|---|
| 2:47 | 1 | point of <u>Tinker</u> is to say look, we can't apply the regular |
| 2:47 | 2 | First Amendment principles in the school setting because |
| 2:47 | 3 | schools have this special interest that requires a different |
| 2:47 | 4 | standard.  And so we have <u>Tinker</u>, and then you go along and you |
| 2:47 | 5 | fast forward to very recently.  And in <u>Mahanoy</u> they say yes, |
| 2:47 | 6 | the schools have this special interest, but it's diminished |
| 2:47 | 7 | when you're talking about something that happens on Facebook or |
| 2:48 | 8 | Twitter outside of the school, and that's why these girls in |
| 2:48 | 9 | that case had a First Amendment right to do it. |
| 2:48 | 10 | And so I would think here, you know, if this were |
| 2:48 | 11 | something he said in class, and people couldn't, you know, |
| 2:48 | 12 | handle it, then that would be a different analysis.  And you |
| 2:48 | 13 | say well look, we're in this school setting, it's disruptive to |
| 2:48 | 14 | the classroom situation. |
| 2:48 | 15 | It seems like you're saying when someone makes a |
| 2:48 | 16 | public statement outside of school and people are very upset |
| 2:48 | 17 | about it at school, that is the disruption that's sufficient to |
| 2:48 | 18 | justify regulating that speech. |
| 2:48 | 19 | MR. BARTOLOMUCCI:  Well, there's a little bit more |
| 2:48 | 20 | factual context here, and those are the seminar papers from the |
| 2:48 | 21 | fall semester.  So he wrote two seminar papers that are fairly |
| 2:48 | 22 | read as including, you know, calls for violence.  And these are |
| 2:48 | 23 | papers written for the UF Law School.  Students knew about |
| 2:49 | 24 | this, and so not long after that you get the post about |
| 2:49 | 25 | abolishing Jews, and I think it's very natural to connect that |

2:49  1    statement to the law school when it comes from a member of the

2:49  2    law school community.  He's already talked about violence in

2:49  3    law school coursework.  And then he has the exchange with

2:49  4    Lidsky.  You know, I think he put that string together and it's

2:49  5    fair to say okay, you know, if there's a threat here, it was

2:49  6    targeted at the law school community and in particular, the

2:49  7    Jews at the law school community.

2:49  8          Now, the seminar papers themselves, you know, were not

2:49  9    -- because they were abstract and were not viewed in and of

2:49  10   themselves as threats sufficient to take any sort of action.

2:49  11   But I think that's relevant context, it comes before the speech

2:49  12   at issue, the conduct at issue.  And I think when all those

2:50  13   facts are combined, the whole course of conduct between the two

2:50  14   seminar papers, the by any means necessary post, and then the

2:50  15   exchange with Lidsky, I think you put that all together and the

2:50  16   Court could -- is likely to conclude, I would say, that either

2:50  17   this is a true threat and maybe -- and defeats a First

2:50  18   Amendment argument for that reason, or it's a sufficient

2:50  19   invocation of the Tinker or Boim doctrine.

2:50  20         THE COURT:  Okay.  Thank you.

2:50  21         I had a couple of questions on different topics.

2:50  22         One, procedurally the final agency action or the final

2:50  23   University decision was very recent, and I think in your paper

2:50  24   you said they have an opportunity to file a cert petition at

2:50  25   the DCA.  And if I'm remembering right, the letter that

| | | |
|---|---|---|
| 2:50 | 1 | notified him of the final decision gave that rights language |
| 2:51 | 2 | and it said he had 30 days or something like that; is that |
| 2:51 | 3 | right? |
| 2:51 | 4 | MR. BARTOLOMUCCI:  That's correct, Your Honor.  And |
| 2:51 | 5 | that period has not expired yet. |
| 2:51 | 6 | THE COURT:  Okay.  Right.  Because it was 30 days from |
| 2:51 | 7 | October 9th or something like that. |
| 2:51 | 8 | MR. BARTOLOMUCCI:  Correct. |
| 2:51 | 9 | THE COURT:  Is there a petition filed? |
| 2:51 | 10 | MR. BARTOLOMUCCI:  Not to my knowledge. |
| 2:51 | 11 | THE COURT:  Okay.  And I don't know if you've |
| 2:51 | 12 | considered how or whether Younger Abstention might apply, but |
| 2:51 | 13 | if I'm understanding right they would have the -- they, the |
| 2:51 | 14 | plaintiff, Mr. Damsky, would have the ability to make First |
| 2:51 | 15 | Amendment arguments at the DCA.  Is that your understanding? |
| 2:51 | 16 | MR. BARTOLOMUCCI:  Well, my understanding of that |
| 2:51 | 17 | process, and I've never handled such a case, but my |
| 2:51 | 18 | understanding is it's kind of a review of agency actions.  So |
| 2:51 | 19 | it would be sort of an arbitrary and capricious-type review. |
| 2:51 | 20 | But I think he would be permitted to argue his First Amendment |
| 2:51 | 21 | points to the state court.  Please don't hold me to that, but I |
| 2:51 | 22 | think he could. |
| 2:51 | 23 | THE COURT:  And if that is the case, would there be a |
| 2:52 | 24 | basis to or a reason to abstain in this case? |
| 2:52 | 25 | MR. BARTOLOMUCCI:  Pending the decision of the state |

| | | |
|---|---|---|
| 2:52 | 1 | court? |
| 2:52 | 2 | THE COURT:  Yes.  I considered whether -- I wanted to |
| 2:52 | 3 | ask that question about where we are procedurally, and I don't |
| 2:52 | 4 | know the answer to this, but I did want to ask the parties' |
| 2:52 | 5 | views on Younger Abstention.  And if you have a view, you can |
| 2:52 | 6 | share it.  I don't mean to put you on the spot, and if you want |
| 2:52 | 7 | some time to think about it or people can file things after the |
| 2:52 | 8 | hearing too. |
| 2:52 | 9 | MR. BARTOLOMUCCI:  Yeah.  That's certainly not |
| 2:52 | 10 | something I've thought about, especially since he hasn't gone |
| 2:52 | 11 | to state court.  I think the Court would be well within its |
| 2:52 | 12 | discretion to stay a decision on this motion, you know, pending |
| 2:52 | 13 | the outcome of any state proceeding if there is one.  You know, |
| 2:52 | 14 | perhaps my friend on the other side will tell the Court what |
| 2:52 | 15 | their plans are if they have them on that issue. |
| 2:52 | 16 | THE COURT:  Okay.  And then separate from that, you'd |
| 2:52 | 17 | made an argument about irreparable harm and cited a Fifth |
| 2:53 | 18 | Circuit case where a professor was found to not have shown |
| 2:53 | 19 | irreparable harm after some sort of termination because he or |
| 2:53 | 20 | she could get back pay and reinstated at the end of it.  I'm |
| 2:53 | 21 | wondering how that interacts here with sort of other cases that |
| 2:53 | 22 | talk about deprivation of First Amendment rights.  You said |
| 2:53 | 23 | he's not chilled, but he is suffering a harm based on what he |
| 2:53 | 24 | would say is his First Amendment expression.  And so I wondered |
| 2:53 | 25 | if you could talk a little bit more about the irreparable harm |

| | | |
|---|---|---|
| 2:53 | 1 | thing which, of course, is a moot point if you're right on the |
| 2:53 | 2 | likelihood of the success on the merits prong. |
| 2:53 | 3 | MR. BARTOLOMUCCI:  Right.  So I think we've got two |
| 2:53 | 4 | main points to make here.  His injury, or one aspect of his |
| 2:53 | 5 | injury, is what we would call delayed education.  And there's a |
| 2:53 | 6 | lot of case law, you know, none of it from -- well, I guess the |
| 2:53 | 7 | Southern District of Florida case touches on this.  But most of |
| 2:54 | 8 | the case law is from other jurisdictions outside of the |
| 2:54 | 9 | Eleventh Circuit.  But these cases say delayed education is not |
| 2:54 | 10 | an irreparable harm for preliminary injunction purposes because |
| 2:54 | 11 | in theory you can be compensated for that.  I got my law |
| 2:54 | 12 | degree, you know, a year late so, you know, I lost a year of |
| 2:54 | 13 | labor as a lawyer.  And you can figure out what the cost is for |
| 2:54 | 14 | that. |
| 2:54 | 15 | THE COURT:  You're not asserting -- I mean, there's |
| 2:54 | 16 | not been any assertion of Eleventh Amendment immunity in this |
| 2:54 | 17 | case, correct? |
| 2:54 | 18 | MR. BARTOLOMUCCI:  No, Your Honor. |
| 2:54 | 19 | THE COURT:  So you're saying he would be entitled to |
| 2:54 | 20 | damages at the end of this from the state? |
| 2:54 | 21 | MR. BARTOLOMUCCI:  Well actually, Your Honor, let me |
| 2:54 | 22 | take that back.  In our motion to dismiss we argued that |
| 2:54 | 23 | because he sued Defendant Summerlin only in his official |
| 2:54 | 24 | capacity, there is Eleventh Amendment immunity. |
| 2:54 | 25 | Now, he could have brought a different claim.  He |

| | | |
|---|---|---|
| 2:54 | 1 | could have sued Dean Summerlin in his personal capacity, and |
| 2:54 | 2 | that would have given rise to a claim for damages. He didn't |
| 2:54 | 3 | do that but, you know, I think the question here is is it |
| 2:55 | 4 | irreparable harm when there's a way in which it might be |
| 2:55 | 5 | remedied by money damages. |
| 2:55 | 6 | THE COURT: It would have to be in this case, right? |
| 2:55 | 7 | I'm not sure you can say he could get money damages later, |
| 2:55 | 8 | therefore there's no irreparable harm and also say he's not |
| 2:55 | 9 | entitled to money damages because of the Eleventh Amendment. |
| 2:55 | 10 | And by the way, I think you're right about the Eleventh |
| 2:55 | 11 | Amendment. I had not noted that you had asserted that. |
| 2:55 | 12 | MR. BARTOLOMUCCI: Well likewise, Your Honor, I don't |
| 2:55 | 13 | think he can say I've got irreparable harm because I decided |
| 2:55 | 14 | not to sue for money damages. |
| 2:55 | 15 | THE COURT: He has sued for money damages, and you've |
| 2:55 | 16 | said he's not entitled to them and you asserted a defense based |
| 2:55 | 17 | on immunity. |
| 2:55 | 18 | MR. BARTOLOMUCCI: Because of the capacity in which he |
| 2:55 | 19 | sued the defendant. He could have sued the defendant in a way |
| 2:55 | 20 | -- subject to qualified immunity, he might have recovered money |
| 2:55 | 21 | damages. But he chose to bring a different type of suit. |
| 2:55 | 22 | But I want to also touch on the second point about |
| 2:55 | 23 | lack of irreparable harm, and that is that under -- I think |
| 2:56 | 24 | it's under Segal, he's got to show that his speech has either |
| 2:56 | 25 | been prevented or chilled, and he can show neither of those |

**PROCEEDINGS RECORDED BY FEDERAL OFFICIAL COURT STENOGRAPHER**
**TRANSCRIPT PRODUCED BY COMPUTER—AIDED TRANSCRIPTION**

| | | |
|---|---|---|
| 2:56 | 1 | things.  He clearly has continued to post and express his |
| 2:56 | 2 | views.  We provided the Court with a sample of his recent |
| 2:56 | 3 | posts.  The original post was never taken down.  In fact, he |
| 2:56 | 4 | re-tweeted it, and one of his posts have said *I have not been* |
| 2:56 | 5 | *silenced and I will not be silenced*.  So I don't see how he can |
| 2:56 | 6 | carry his burden of showing that his speech has been chilled or |
| 2:56 | 7 | prevented.  So there's that argument. |
| 2:56 | 8 | There's the delayed-education-is-not-irreparable-harm |
| 2:56 | 9 | argument, and obviously the Court could decide this case just |
| 2:56 | 10 | on irreparable harm or lack thereof alone if the other issues, |
| 2:56 | 11 | you know, appear to be too thorny at this stage. |
| 2:56 | 12 | THE COURT:  Right.  Okay.  You'd said the brief -- |
| 2:56 | 13 | there was another issue with his delay in bringing the case. |
| 2:56 | 14 | But if the decision just became final in October, that's |
| 2:57 | 15 | probably not a strong argument, right? |
| 2:57 | 16 | MR. BARTOLOMUCCI:  Well, he wanted a preliminary |
| 2:57 | 17 | injunction as to two things.  One was the interim suspension, |
| 2:57 | 18 | and second was the expulsion.  So we argue that well, you were |
| 2:57 | 19 | too late to challenge the interim suspension because he waited |
| 2:57 | 20 | five or six months. |
| 2:57 | 21 | THE COURT:  Well, it's over now. |
| 2:57 | 22 | MR. BARTOLOMUCCI:  In any event it's moot.  And we're |
| 2:57 | 23 | not making that argument as to the expulsion. |
| 2:57 | 24 | THE COURT:  Okay.  And I know there was a timing issue |
| 2:57 | 25 | in -- I guess he filed the lawsuit right before the expulsion |

| | | |
|---|---|---|
| 2:57 | 1 | appeal was finalized or whatnot. Okay. So your argument that |
| 2:57 | 2 | he waited too long to sue just went to the interim suspension |
| 2:57 | 3 | which is moot now. |
| 2:57 | 4 | MR. BARTOLOMUCCI: That's correct, Your Honor. |
| 2:57 | 5 | THE COURT: All right. I got it. |
| 2:57 | 6 | Well, thank you very much. Do you have anything more |
| 2:57 | 7 | that you want to cover, Mr. Bartolomucci? |
| 2:57 | 8 | MR. BARTOLOMUCCI: Your Honor, I just want to make a |
| 2:57 | 9 | final plea that, you know, a school like the University of |
| 2:57 | 10 | Florida, you know, has to have power to take action when it |
| 2:58 | 11 | gets student speech that it reasonably views as a threat. If |
| 2:58 | 12 | the University doesn't take action and then something terrible |
| 2:58 | 13 | happens, that's a situation that's just intolerable. So we |
| 2:58 | 14 | urge the Court to deny their preliminary injunction at this |
| 2:58 | 15 | stage. |
| 2:58 | 16 | THE COURT: Thank you very much. |
| 2:58 | 17 | Mr. Sabatini? I wonder if you could address the |
| 2:58 | 18 | Younger Abstention and also irreparable harm that you just |
| 2:58 | 19 | heard about, and then you can also respond to anything else |
| 2:58 | 20 | that you'd like. |
| 2:58 | 21 | MR. SABATINI: Well first, we would say, Your Honor, |
| 2:58 | 22 | just at the present stage, you know, whether he does have the |
| 2:58 | 23 | potential to go to state court, just the four facts of the |
| 2:58 | 24 | preliminary injunction, right now he is at irreparable harm. |
| 2:58 | 25 | We have a case that shows just being kept off campus, right? |

| | | |
|---|---|---|
| 2:58 | 1 | Denial of a plaintiff's ability to physically attend class |
| 2:58 | 2 | constitutes sufficient grounds for irreparable harm.  Alejandro |
| 2:58 | 3 | versus Palm Beach State College. |
| 2:58 | 4 | THE COURT:  That's separate from the abstention issue, |
| 2:58 | 5 | though.  If there's an ongoing state proceeding where you can |
| 2:59 | 6 | raise the same issues, sometimes abstention would be proper |
| 2:59 | 7 | under Younger.  And so the other side says they're not sure if |
| 2:59 | 8 | you're going to pursue state court.  Maybe there's not an |
| 2:59 | 9 | ongoing proceeding, I don't know.  But, I mean, is it your plan |
| 2:59 | 10 | to file a cert petition at the DCA? |
| 2:59 | 11 | MR. SABATINI:  It was our plan to stay in federal |
| 2:59 | 12 | court, Your Honor.  And if preliminary injunction is granted |
| 2:59 | 13 | and we get to a final order, he goes back to class and the case |
| 2:59 | 14 | is over.  That's the plan, I mean, to be completely frank.  As |
| 2:59 | 15 | a student who's obviously still -- I mean, he's trying to |
| 2:59 | 16 | attend class right now. |
| 2:59 | 17 | THE COURT:  Can we talk about the practical aspect of |
| 2:59 | 18 | things?  And this relates to their irreparable harm thing. |
| 2:59 | 19 | If you show up at -- if I were to grant the |
| 2:59 | 20 | preliminary injunction today -- and this is not a ruling.  I'm |
| 2:59 | 21 | trying to understand the arguments on the harm.  And he begins |
| 2:59 | 22 | class three quarters of the way through a semester, how does |
| 2:59 | 23 | that work as a practical matter? |
| 2:59 | 24 | MR. SABATINI:  He actually has been viewing the |
| 2:59 | 25 | classes on an online module.  I guess there's access to that, |

| | | |
|---|---|---|
| 2:59 | 1 | all the way up until, I think, two weeks go, or soon before |
| 3:00 | 2 | that, when the expulsion became finalized. |
| 3:00 | 3 | THE COURT:  So he was enrolled and watching them on |
| 3:00 | 4 | YouTube or something? |
| 3:00 | 5 | MR. SABATINI:  I don't know how to describe it quite |
| 3:00 | 6 | specifically, Your Honor.  I think it was basically available |
| 3:00 | 7 | to him as a student who had access to certain platforms.  I |
| 3:00 | 8 | don't think it was as an enrolled student.  Perhaps he was |
| 3:00 | 9 | still enrolled at the time.  I think legally he was enrolled. |
| 3:00 | 10 | THE COURT:  But it was not an official arrangement |
| 3:00 | 11 | with the University. |
| 3:00 | 12 | MR. SABATINI:  That's exactly right, Your Honor. |
| 3:00 | 13 | THE COURT:  He wasn't enrolled in classes, he just was |
| 3:00 | 14 | saying these are the classes maybe I would enroll in? |
| 3:00 | 15 | MR. SABATINI:  That's correct, Your Honor. |
| 3:00 | 16 | THE COURT:  Okay.  So your request would be to be |
| 3:00 | 17 | immediately reinstated and take exams for classes that he's not |
| 3:00 | 18 | been enrolled in? |
| 3:00 | 19 | MR. SABATINI:  Correct.  And UF does offer programs |
| 3:00 | 20 | for students who have emergencies and need to take tests at |
| 3:00 | 21 | different times, veterans, people with disabilities, et cetera. |
| 3:00 | 22 | And so I think obviously they could easily accommodate |
| 3:00 | 23 | something of that similar nature. |
| 3:00 | 24 | With that said, if you have any other questions I'll |
| 3:00 | 25 | just say a few rebuttal comments.  But I'd rather answer your |

| | | |
|---|---|---|
| 3:00 | 1 | questions, Your Honor. |
| 3:00 | 2 | THE COURT:  I did not mean to limit you at all. |
| 3:00 | 3 | MR. SABATINI:  No, no.  I'd rather answer your |
| 3:00 | 4 | questions and leave it at that.  But I do have just a few if |
| 3:01 | 5 | they're of interest to the Court. |
| 3:01 | 6 | THE COURT:  Yeah, please. |
| 3:01 | 7 | MR. SABATINI:  Just on the exchange with Professor |
| 3:01 | 8 | Lidsky.  She is a First Amendment professor.  That exchange was |
| 3:01 | 9 | a week later.  And I think the line of cases, when it comes to |
| 3:01 | 10 | threats, definitely suggest that you could look at the literal |
| 3:01 | 11 | words or the actual real meaning.  And I would suggest to this |
| 3:01 | 12 | Court that Professor Lidsky's exchange was more than just *do* |
| 3:01 | 13 | *you really want to kill me*.  I don't think it was a true |
| 3:01 | 14 | literal statement.  I think it was really an implication of *how* |
| 3:01 | 15 | *dare you have a view like this, how disgusting of you, I think* |
| 3:01 | 16 | *your views are objectionable.  This is wild*. |
| 3:01 | 17 | Now, I think she obviously was asking to see if he |
| 3:01 | 18 | would go as far as to violate the law by making a direct |
| 3:01 | 19 | threat.  And because she's a sophisticated First Amendment law |
| 3:01 | 20 | professor, and because he's a top-notch student in a top elite |
| 3:01 | 21 | campus, I think him deliberately saying to her *well, what about* |
| 3:01 | 22 | *this?  I think this genocide is bad*, is quite literally a *no*. |
| 3:01 | 23 | You can't read it other than *no, I don't want to murder you*. |
| 3:01 | 24 | What he's saying is *well, you think this about white people.* |
| 3:02 | 25 | *You know, if this is true of white people, why can't I say this* |

3:02  1    *about another group?* It's a no.  It's a denial.  I mean, it's

3:02  2    not literal, but it's what any reasonable person would see the

3:02  3    exchange as.  A political, volatile, sort of angry exchange and

3:02  4    you know, *how dare you.  Well, how about you?  You haven't*

3:02  5    *condemned this guy.*  I mean, that's really how that exchange is

3:02  6    construed to a reasonable person.  It's not an extension of a

3:02  7    threat.

3:02  8         And then I would just say I think it's very important

3:02  9    to note from the record as it came before the Court, you know,

3:02  10   in terms of the hearing, Mr. Damsky definitely -- he reacted,

3:02  11   to a certain extent, of a sort of a version of a heckler's

3:02  12   veto.  He wrote this long tweet that was couched in academic

3:02  13   prose.  But what was it that spread?  What was it that was

3:02  14   repeated?  Respectfully, my colleague here today said it.  You

3:02  15   know, I like him very much, but he said it again.  He deduced

3:02  16   it just to the one part.  I mean, it was a long tweet, it's

3:02  17   constantly reduced to the one part, because they know that

3:02  18   honestly that's going to create more of an emotive reaction to

3:03  19   the students on campus.  Not here today.  I'm not saying he did

3:03  20   that.  But other students were taking the tweet, they were

3:03  21   reducing it to one part of the tweet.  Because if you cap -- if

3:03  22   you sort of, you know, limit it just to that one clause of the

3:03  23   tweet, clearly it has a different effect.  Clearly it has a

3:03  24   more severe effect.  And when that happened on campus, I think

3:03  25   there was a reaction among students, because it was different

| | | |
|---|---|---|
| 3:03 | 1 | than what he said.  And so it's sort of a heckler's veto-type |
| 3:03 | 2 | environment erupted where they said *oh, my goodness, can you* |
| 3:03 | 3 | *believe he said this*?  And he was surprised to learn of it. |
| 3:03 | 4 | He was unknown on campus.  He had some friends.  He |
| 3:03 | 5 | was friends with the professors, he's still friends with some |
| 3:03 | 6 | professors.  But he was unknown on campus before all of this |
| 3:03 | 7 | happened. |
| 3:03 | 8 | His academic papers were essentially leaked.  He had |
| 3:03 | 9 | no knowledge of them being sent to other students. |
| 3:03 | 10 | He didn't know who Professor Lidsky was.  He never |
| 3:03 | 11 | took her class.  She found him.  I think that might have been |
| 3:03 | 12 | one of the first times he saw her name, other than possibly on |
| 3:03 | 13 | a syllabus somewhere on the website.  And so that exchange was |
| 3:04 | 14 | certainly not a direct threat.  And, of course, he was |
| 3:04 | 15 | reacting, and he did it in a way that I would say that any |
| 3:04 | 16 | reasonable person would say is a denial.  It was a denial.  *Do* |
| 3:04 | 17 | *you want to kill me?  No.  But why don't you condemn white* |
| 3:04 | 18 | *genocide*.  It's impossible, I think, for a reasonable person to |
| 3:04 | 19 | not see a "no" on the campus.  I mean, sorry.  In that |
| 3:04 | 20 | reaction. |
| 3:04 | 21 | And the one thing on the academic papers, which I |
| 3:04 | 22 | don't want to bore the Court with, but I would just suggest |
| 3:04 | 23 | that if they were read, they're not prescriptive, they're |
| 3:04 | 24 | descriptive.  They're depictions of potential acts of violence |
| 3:04 | 25 | I believe were suggested of what would happen if the legal |

| | | |
|---|---|---|
| 3:04 | 1 | system broke down.  That's a reasonable reading of the papers. |
| 3:04 | 2 | If the system of governance in America breaks down, tribalism |
| 3:04 | 3 | will emerge.  It's not saying we need tribalism and violence in |
| 3:04 | 4 | the streets in addition to the legal system.  I think he's |
| 3:04 | 5 | saying that's the result.  I mean, obviously I think they're |
| 3:04 | 6 | totally protected, but in the abstract.  But to the extent that |
| 3:04 | 7 | they could be used to bolster other statements he made, they're |
| 3:04 | 8 | descriptive of how he thinks the systems work based on history. |
| 3:04 | 9 | Your Honor, if there's any other questions, we're |
| 3:04 | 10 | happy to answer.  Thank you, Your Honor. |
| 3:05 | 11 | MR. BARTOLOMUCCI:  Your Honor, could I have 15 seconds |
| 3:05 | 12 | to correct a factual matter? |
| 3:05 | 13 | THE COURT:  Sure. |
| 3:05 | 14 | MR. BARTOLOMUCCI:  Just to clarify what happened this |
| 3:05 | 15 | semester, until October 9th when the appeals panel upheld the |
| 3:05 | 16 | expulsion, Mr. Damsky was still enrolled in the law school, was |
| 3:05 | 17 | still enrolled in his classes, and was being provided remote |
| 3:05 | 18 | access to his classes by the University. |
| 3:05 | 19 | THE COURT:  Okay.  Is that the same arrangement he had |
| 3:05 | 20 | at the end of last semester? |
| 3:05 | 21 | MR. BARTOLOMUCCI:  I believe it is, Your Honor. |
| 3:05 | 22 | THE COURT:  Okay.  All right.  So you're just -- I |
| 3:05 | 23 | understand. |
| 3:05 | 24 | Do you have any disagreement with that, Mr. Sabatini? |
| 3:05 | 25 | MR. SABATINI:  No.  I think that's a more accurate |

3:05   1    description, Your Honor.

3:05   2        THE COURT:  So he was not physically present on campus

3:05   3    in the fall.

3:05   4        MR. BARTOLOMUCCI:  Correct.

3:05   5        THE COURT:  But his -- I guess the expulsion didn't go

3:05   6    into effect until the appeal was complete?

3:05   7        MR. BARTOLOMUCCI:  That's right.  After October 9th.

3:05   8        THE COURT:  Other than the physical exclusion from

3:05   9    campus.  So he was enrolled in classes, he was taking them,

3:06  10    just remotely.

3:06  11        MR. BARTOLOMUCCI:  That's correct.  Until after

3:06  12    October 9th.

3:06  13        THE COURT:  And then after October 9th they turned off

3:06  14    the access.

3:06  15        MR. BARTOLOMUCCI:  That's right.

3:06  16        THE COURT:  Okay.  All right.  Thank you for that

3:06  17    clarification.  And I don't know that any of that matters.  I

3:06  18    was just thinking about how that would fit in the context with

3:06  19    some of your arguments, Mr. Bartolomucci, about irreparable

3:06  20    harm and picking up later.  So thank you both for that.

3:06  21        I want to thank both sides for the argument.  I

3:06  22    thought the briefing was helpful.  I do have a better

3:06  23    understanding of what the arguments are.

3:06  24        And I'm not going to rule right now.  I will rule

3:06  25    hopefully relatively soon.  It's not going to be in the next

| | | |
|---|---|---|
| 3:06 | 1 | couple of days or anything like that.  I've got a number of |
| 3:06 | 2 | things I want to look at and consider.  But I do appreciate the |
| 3:06 | 3 | argument on both sides. |
| 3:06 | 4 | So that's all for today.  I hope everyone has a nice |
| 3:06 | 5 | afternoon. |
| 3:06 | 6 | Court's adjourned. |
| 3:06 | 7 | COURTROOM DEPUTY:  All rise. |
| 3:06 | 8 | (PROCEEDINGS CONCLUDED) |
| 3:06 | 9 | |

```
3:06   10              C E R T I F I C A T E
              I certify that the foregoing is a correct transcript
3:06   11   from the record of the proceedings in the above-entitled
            matter.  Any redaction of personal data identifiers pursuant to
3:06   12   the Judicial Conference Policy on Privacy is noted within the
            transcript.
3:06   13
            12-1-2025                    /s/ Dawn M. Savino, R.P.R., C.R.R.
3:06   14   Date                         DAWN M. SAVINO, R.P.R., C.R.R.
```