In the

# United States Court of Appeals

### For the Eleventh Circuit

———————————————

No. 25-14171

———————————————

PRESTON DAMSKY,

    A Law student at the University of Florida Levin College of Law,

*Plaintiff-Appellee,*

*versus*

CHRIS SUMMERLIN,

    In his official capacity as the Dean of Students of the
University of Florida,

*Defendant-Appellant.*

———————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 1:25-cv-00275-AW-MAF

———————————————

Before NEWSOM, BRANCH, and LAGOA, Circuit Judges.

BRANCH, Circuit Judge:

    The University of Florida ("UF") expelled Preston Damsky, a law student, for posts he made on X (formerly Twitter), including one post that stated, "Jews must be abolished by any means

necessary." Damsky then sued Chris Summerlin, UF's Dean of Students, arguing that UF violated his First Amendment rights. UF now appeals the district court's order granting Damsky a preliminary injunction and requiring UF to reinstate him as a student. We find that UF is likely to succeed on the merits because Damsky's speech was likely not protected by the First Amendment. UF was allowed to regulate Damsky's speech because, particularly when read in context, his statements were reasonably interpreted as a call for extralegal violence that caused a serious disruption to other students' educational experiences and the school's ability to provide its services. Accordingly, we grant UF's motion for a stay of the district court's injunction pending appeal.

## I.    Background[1]

In 2024, Damsky wrote two seminar papers as part of his coursework at UF's Levin College of Law ("UF Law") in which he argued that the United States was founded as a race-based nation state and that our Constitution will survive only if we share a commitment to racial nationalism. One of Damsky's papers warned that "White America" faced a "demographic assault" and stated that if the judiciary does not remedy that issue, then overthrowing the government may be necessary if "they are to survive as masters in the land of their ancestors." In another paper Damsky argued that "[t]he hour is late, but we are not yet so

---

[1] The relevant facts in this section are derived from affidavits sworn by UF faculty members that included copies of communications between UF and Damsky and a transcript of Damsky's disciplinary hearing.

outnumbered and so neutered that we cannot seize back what is rightfully ours." Because Damsky submitted a draft of his work as part of a peer review process, other students obtained copies of his writing. Some of Damsky's classmates began raising safety concerns to UF and began avoiding Damsky when possible. A classmate later testified at a disciplinary hearing that when he asked Damsky what he meant to argue in his papers, Damsky confirmed that his writing made "a call for extralegal violence" or "a call for contemporary racial violence." At the time, the interim dean of UF Law decided not to take any disciplinary action against Damsky and concluded that any statements he made in his academic work were protected by the First Amendment.

A few months later, Damsky made a public post on X that stated, "My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews. Jews must be abolished by any means necessary." A Jewish UF Law professor publicly responded to Damsky from her X account asking "Are you saying you would murder me and my family? Is that your position?" Damsky replied, again publicly, "Did Ignatiev want Whites murdered? If so, were his words as objectionable as mine? If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites." The exchange ended with the professor responding to Damsky "I notice you didn't say no, but instead resorted to a whataboutism . . . Yes, his words are despicable, but you implicitly admit yours are, too."

In response to Damsky's posts, the interim dean took various measures to ensure campus safety including "increas[ing] police patrols and cameras and instituting increased security measures prior to final exams." Faculty, students, and staff also reacted to Damsky's speech:

> [S]ome students skipped class or were late to class and did not feel safe disclosing the reason for their lateness or missing class. Some students skipped academic activities, some students left campus, one law school staff member, who had asked to have her photograph taken down from the law school's website because of her Jewish surname, resigned, community members feared going to events on campus, and some students were spooked by loud sounds in the classroom.

Following this exchange on X, UF placed Damsky on an interim suspension and denied him access to campus. While he was suspended, Damsky was enrolled in classes and permitted to attend school remotely. After a disciplinary hearing, UF expelled Damsky.

Damsky sued, alleging that UF violated his First Amendment rights by expelling him for protected speech.[2] Damsky moved for a preliminary injunction, which the district court granted. That injunction required UF to return Damsky to normal standing with the university. We now consider UF's

---

[2] While this case was pending at the district court, Damsky appealed his expulsion within UF's disciplinary process. That appeal was denied.

motion to stay the district court's preliminary injunction pending appeal.

## II.    Discussion

In determining whether to grant a stay, we ask "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019).  The first two factors "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

### A.   UF is likely to succeed on the merits

UF argues that Damsky's posts were not protected by the First Amendment because they were true threats and they disrupted the learning environment at UF Law.  In response, Damsky argues that it is not clear that *Tinker*,[3] which allows schools to regulate disruptive speech, applies in the university setting and that his posts were "off campus speech that had nothing to do with [UF]."  UF has a substantial likelihood of succeeding on the merits because Damsky's X posts disrupted UF's learning environment and thus were subject to school regulation, so we need not address whether his posts constituted true threats.

---

[3] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).

The First Amendment does not protect student speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others."[4] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509, 513 (1969). Applying *Tinker*, we have held that there "is no First Amendment right allowing a student to knowingly make comments, whether oral or written, that reasonably could be perceived as a threat of school violence, whether general or specific, while on school property during the school day."[5] *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007). Whether the speaker intended to cause a material disruption is irrelevant; instead, courts ask whether a reasonable interpretation of the speech caused a material disruption of classwork or substantial disorder. *See Morse v. Frederick*, 551 U.S. 393, 401 (2007) (determining that a school's prediction of how student speech "would be interpreted by those viewing it" was "a reasonable one" when faced with the parties' competing interpretations); *Boim*, 494 F.3d at 985 (assessing in a *Tinker* analysis

---

[4] While Supreme Court precedent does not clearly indicate whether *Tinker* applies in the university setting, this Court, in a published decision, has applied *Tinker* in the higher education context. *See Doe v. Valencia Coll.*, 903 F.3d 1220, 1229–31 (11th Cir. 2018). The dissent "think[s] it counts double" that Damsky is a graduate student. But when we applied *Tinker* in the university setting in *Valencia College* we did not apply a different standard than we apply in the primary school context. *Id.*

[5] As we will describe below, the fact that Damsky's speech was not made on school property during the school day does not alter our conclusion.

whether student speech "could reasonably be construed" as a threat of physical violence).

UF is likely to show that Damsky's posts "materially disrupt[ed] classwork" for two reasons. First, UF students, faculty, and staff could reasonably interpret Damsky's posts as threatening violence on UF's campus, which sparked community safety concerns.[6] Second, the UF community could reasonably interpret Damsky's posts as promoting extralegal violence, and schools can regulate at least some speech that calls for illegal conduct.

We begin with UF's argument that Damsky's posts threatened violence that caused safety concerns at UF. Damsky posted on X that his "position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews. Jews must be abolished by any means necessary." A reasonable reader could understand Damsky's post and its use of the word "abolish" to mean that Jews must be murdered. *See Abolish*, Oxford English Dictionary (online ed.), https://www.oed.com/dictionary/abolish_v?tab=meaning_and_use#7662366 (defining abolish as "[t]o put an end to, do away with (an institution, custom, or practice); to eradicate, destroy (something prevalent); to annul or make void"). That understanding is bolstered by Damsky's

---

[6] The dissent notes that Damsky's posts have other plausible interpretations. We do not claim that the *only* reasonable interpretation of Damsky's speech is that it threatened violence, nor is that what our caselaw requires for UF to regulate Damsky's speech.

statement that "Jews must be abolished *by any means necessary*." (emphasis added). "[A]ny means necessary" can reasonably be interpreted to include violent measures.[7]

While Damsky created some ambiguity by conditioning the meaning of his "position on Jews" on the intentions of a Harvard professor, a reasonable reader, particularly members of the UF community who were aware of Damsky's prior statements and

---

[7] The dissent argues that Damsky's posts were political speech, which is at the "core" of First Amendment protection. But Damsky's posts, which are reasonably interpreted as advocating for extralegal violence against a minority group, are readily distinguishable from what courts have considered political speech. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 44–45 (1976) (discussing core political speech in the context of expenditures on political campaigns); *Meyer v. Grant*, 486 U.S. 414, 421–22 (holding that circulating initiative petitions to have a new law placed on a general election ballot was core political speech). However, the cases the dissent relies on involve far different speech from that at issue here: *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 377 (1997) ("leafletting and commenting on matters of public concern" in the context of protesting access to abortion services); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346–47 (1995) (explaining that core political speech is not limited to discussions of political candidates and also includes handing out leaflets related to a school tax referendum); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 47 (1988) (discussing speech about a "nationally known minister who has been active as a commentator on politics and public affairs"); *Connick v. Myers*, 461 U.S. 138, 140–41 (1983) (discussing a government employee's speech about potential changes to the government office she worked in); *Roth v. United States*, 354 U.S. 476, 484 (1957) (not discussing core political speech). Thus, we do not afford Damsky's speech, which was reasonably interpreted as advocating violence, any additional protections on the basis that it also touches on matters of political concern.

actions, could still understand his post as a call for violence.[8]  For example, before the X posts that led to his expulsion, Damsky disseminated an essay to his classmates that he later confirmed was "a call for extralegal violence" and "a call for contemporary racial violence."  Additionally, when a Jewish UF Law professor replied to Damsky's post and asked if he meant that he "would murder [her] and [her] family," Damsky did not say no, which left open the reasonable interpretation that he did want to kill her and her family.  Instead, he conditioned his position that Jews must be murdered on whether a Harvard professor wanted white people to be murdered.  The UF professor "knew [Damsky] had already lost a job as a prosecutor based on his extreme views, which would make a reasonable person reluctant to double down in this way."  Damsky's response to the professor reasonably indicated to her that "he cared more about furthering white supremacy than he cared about his future career and he also seemed to want to create

---

[8] We can look to relevant context and prior events, not just the student speech itself, to determine how members of the UF community would reasonably interpret Damsky's posts.  *See Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246, 1249 (11th Cir. 2003) (holding that, under *Tinker*, a school was permitted to suspend students who violated school instructions not to display a Confederate flag on campus and considering "racial tensions existing at the school" and "fights which appeared to be racially based" at the school in the months leading up to the relevant events).

The dissent points out that UF determined that some of Damsky's prior statements that provide context to his posts are themselves protected speech.  Correct.  And so UF did not discipline Damsky for those prior statements.  But those past statements are relevant because they inform how UF and its community would reasonably interpret his current X posts.

ambiguity about whether he would actually carry out violence towards [the Jewish professor] and [her] family." Further, in his X reply to the UF professor, Damsky affirmatively brought up genocide and stated that "[i]f [the previously mentioned Harvard professor] sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites." Explicitly invoking genocide in connection with his statement that "Jews *must* be abolished" confirms the reasonableness of an interpretation that Damsky was advocating for violence.[9]  (emphasis added).

Several other contextual facts support a reading of Damsky's post as a call for violence against Jews that could materialize on UF's campus. First, UF Law staff members reported Damsky's aggressive behavior. When he was inadvertently locked out of a UF building, Damsky began "banging, kicking, yanking the glass door and yelling, 'Let me in the F-ing door,'" to the point that multiple UF Law employees were "uncomfortable and afraid" and "concerned about [their] safety because [Damsky] seemed enraged." Second, a news outlet quoted an interview with Damsky where he said that it would not be wrong to refer to him as a Nazi. Third, another student reported that Damsky tweeted that his

---

[9] Genocide means "[t]o deliberately and systematically exterminate (an ethnic group, national group, etc.)" *Genocide*, Oxford English Dictionary (online ed.), https://www.oed.com/dictionary/genocide_v?tab=meaning_and_use#138 0182060.

"support for Palestine was simply a means to an end."[10]   So Damsky's X posts, particularly when read within the context of his other writings, statements, and actions, are reasonably understood as a credible call for violence.

Now we turn to the second reason that Damsky's posts are likely not protected speech—they promoted extralegal violence. Applying *Tinker*, the Supreme Court has held that under the First Amendment a school may "restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Morse*, 551 U.S. at 403.  The Court emphasized that "[t]he special characteristics of the school environment, and the governmental interest in stopping student drug abuse . . . allow schools to restrict student expression that they reasonably regard as promoting illegal drug use." *Id.* at 408.  Like the school in *Morse*, UF is permitted to punish Damsky because, as discussed above, he made statements that were reasonably viewed as promoting illegal activity (murdering Jews).   *Morse* and this case involve speech reasonably interpreted as promoting different illegal actions but the special characteristics of the school environment and the strong governmental interest in stopping violence on campuses likely warrant the same outcome we reached in *Morse.*

Beyond claiming that his speech was not reasonably interpreted as a threat, Damsky argues that his posts were "off

---

[10] The people residing in territories operated by the Palestine Liberation Organization in Gaza and the West Bank have been in a longstanding violent conflict with Israel, a Jewish state.

campus speech that had nothing to do with [UF]." The fact that Damsky's speech occurred online instead of on campus does not mean that UF cannot regulate the speech, particularly because there was a connection between his posts and UF. The Supreme Court has said that "the special characteristics that give schools additional license to regulate student speech [do not] always disappear when a school regulates speech that takes place off campus." *Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 188 (2021). While "courts must be more skeptical of a school's efforts to regulate off-campus speech," "[t]he school's regulatory interests remain significant in some off-campus circumstances." *Id.* at 188, 190. The Supreme Court declined to decide "whether or how ordinary First Amendment standards must give way off campus to a school's special need to prevent, *e.g.*, substantial disruption of learning-related activities or the protection of those who make up a school community." *Id.* at 189. To summarize, the fact that Damsky's posts were made online, not on campus, may mean UF's ability to regulate that speech is "diminished," *id.* at 190, but "*Tinker* does not foreclose a school from regulating all off-campus conduct," *Doe v. Valencia Coll.*, 903 F.3d 1220, 1231 (11th Cir. 2018).

It is true that the Supreme Court in *Mahanoy* held that a school violated a student's First Amendment rights by punishing her for off-campus online speech. While Damsky also engaged in off-campus online speech, *Mahanoy* is nonetheless distinguishable. The *Mahanoy* Court considered the fact that the student's speech "did not identify the school in her posts or target any member of the school community with vulgar or abusive language." *Id.* at 191.

By contrast, Damsky's posts were sufficiently connected to UF. Damsky knew "at the time of making the statements on X that some members of [the UF] community perceived him as a threat," and that community members viewed his tweets. In addition, Damsky's speech involved a direct conversation with a UF law professor. Finally, his speech could be reasonably perceived as targeting members of the school community. There is a "large and engaged Jewish community" at UF and the professor Damsky exchanged posts with was Jewish. So, his statement that "Jews must be abolished by any means necessary" necessarily encompassed members of the UF community.

Yet another distinction is that the Court in *Mahanoy* considered the student's First Amendment interests and the school's interest in avoiding the potential disruption that speech would cause and found that there was "no evidence" of a substantial disruption. *Mahanoy Area Sch. Dist.*, 594 U.S. at 190–93. Here, however, there is strong evidence that Damsky's speech created a substantial disruption of the school's activities. And the disruption in this case—a credible fear of targeted violence—is one of the most severe disruptions imaginable.

We recognize that Damsky's First Amendment interests are greater off campus than if his speech was made on campus. Thus, we are "more skeptical of [UF's] efforts to regulate [Damsky's] off-campus speech," but because Damsky's speech created a substantial disruption, "[UF's] regulatory interests remain

significant," and we conclude that UF is likely to succeed on the merits. *See id.* at 188, 190.

## B. *The other factors favor granting a stay*

We turn now to the remaining three factors, which support UF's motion for a stay. First, we address irreparable harm. UF will face irreparable harm absent a stay because reinstating Damsky will create a safety and security risk that will disrupt other students' educational experiences—a non-compensable harm that cannot be remedied post-appeal. *See Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). As we described above, before UF expelled Damsky, his posts materially disturbed some students' ability to study on campus, attend certain academic events, and focus on their course work without the distraction of taking various safety precautions to protect themselves from Damsky. Absent a stay, those disruptions would likely continue and prevent UF from carrying out its educational objective.

Damsky resists the conclusion that UF will suffer irreparable harm absent a stay because UF states only "generalized, speculative fears" that do not justify the need for immediate safety and security measures. But as we explained above, it is reasonable to interpret Damsky's posts as a call to murder Jews, including his Jewish classmates and the Jewish UF Law professor he responded to.

Turning to the next factor, we must address whether issuance of the stay will substantially injure Damsky. Unlike UF, if Damsky ultimately prevails, his harm—a delay in completing his

legal education and obtaining a professional degree—can be remedied monetarily. *See Van Arsdel v. Tex. A&M Univ.*, 628 F.2d 344, 346 (5th Cir. 1980)[11] (vacating preliminary injunction that reinstated plaintiff as a tenured professor because "reinstatement . . . coupled with back pay, would suffice to redress [his] alleged wrong"). At most, Damsky's harm will disrupt his education while his appeal is pending.

While Damsky will face harm if we grant the stay, that harm is less severe than the harm UF would face if Damsky is reinstated. Absent a stay, UF will need to take immediate and substantial security precautions to protect its students, faculty, and others on campus, burdens which weigh heavily in favor of granting a stay. *See Bloedorn v. Grube,* 631 F.3d 1218, 1238 (11th Cir. 2011) ("The University . . . has a significant interest in ensuring safety and order on campus . . . ."). If Damsky is reinstated, there is a high likelihood that UF and its students will suffer the serious impact of continued disruptions to its educational environment. *See id.* (stating that there is "no doubt that a university's interest in protecting the educational experience of its students is a significant one"); *Mahanoy Area Sch. Dist.*, 594 U.S. at 188 ("[S]chools have a special interest in regulating speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others."

---

[11] *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that all decisions from the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981, are "binding as precedent in the Eleventh Circuit").

(quotations omitted)).    Thus, the balance of harms counsels granting a stay.

Turning to the final factor, the public interest weighs heavily in favor of granting a stay.  There is a strong public interest in avoiding disruptions to UF students' education and mitigating the threat of violence on campus.

### III.    Conclusion

UF has made a strong showing that it is likely to succeed on the merits, it will be irreparably harmed absent a stay, and the balance of harms and the public interest favor granting a stay.  *See Nken*, 556 U.S. at 434.  Accordingly, UF's motion for a stay of the district court's preliminary injunction pending appeal is **GRANTED**.

NEWSOM, Circuit Judge, dissenting:

Based on a post that Preston Damsky published on his personal "X" account,[1] the University of Florida ("University" or "UF") expelled him from its law school, just a semester shy of his expected graduation.  Damsky sued on the ground that his expulsion violated the First Amendment, and he sought a preliminary injunction requiring the University to reinstate him.  In a thorough opinion, Judge Allen Winsor granted Damsky preliminary injunctive relief, prohibiting the University from "continuing to take adverse actions against" him and ordering him returned to "normal standing" at the law school.  Dist. Ct. Order, Nov. 24, 2025, at 28.

Today, this Court stays Judge Winsor's order.  I respectfully dissent.  The University hasn't shown a reasonable likelihood that it will succeed in its effort to vacate or modify the injunction, which, to my mind, correctly concludes that Damsky's post—however disgusting—enjoys constitutional protection.

## I

The University contends that Damsky's X post isn't entitled to First Amendment protection both (1) because it constitutes a "true threat" within the meaning of *Counterman v. Colorado*, 600 U.S. 66 (2023), and (2) because the "special characteristics" of the school environment permit its punishment under *Tinker v. Des*

---

[1] "X" is the social media platform previously known as Twitter.

*Moines Independent Community School District*, 393 U.S. 503 (1969). I
think the University is wrong on both counts.[2]

> Here's what Damsky's X post said:

> My position on Jews is simple: whatever Harvard
> professor Noel Ignatiev meant by his call to "abolish
> the White race by any means necessary" is what I
> think must be done with Jews. Jews must be
> abolished by any means necessary.

A Jewish UF law professor commented on Damsky's post, "Are
you saying you would murder me and my family? Is that your
position?" Damsky replied as follows:

> Did Ignatiev want Whites murdered? If so, were his
> words as objectionable as mine? If Ignatiev sought
> genocide, then surely a genocide of all Whites would
> be an even greater outrage than a genocide of all
> Jews, given the far greater number of Whites.

Let me first address the elephant in the room: Damsky's X
post and reply are repugnant and hateful, just as he seems to have
intended—I hope and pray that neither of my young-adult children
would ever say (or even think) anything so abhorrent. Worse than
abhorrent, I grant that Damsky's statements might even be
understood to sanction violence, at least in a generalized way.

---

[2] Notably, the University does not contend that if Damsky's speech enjoys full
First Amendment protection, its punishment can satisfy strict scrutiny.

Even so, I don't think that Damsky can be punished—let alone expelled—for saying what he said.[3]

Let me explain.

**A**

As an initial matter, the University hasn't made the requisite showing, and the Court today doesn't conclude, that Damsky's X post was a "true threat." *See* Maj. Op. at 5 (declining to "address whether [Damsky's] posts constituted true threats"). That is so for the reasons well explained in Judge Winsor's order. "True threats" are limited to "'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Counterman*, 600 U.S. at 74 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). Under the Supreme Court's true-threat doctrine, even advocacy of the use of force is protected unless it "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

---

[3] One detail: The Court invokes Damsky's "prior statements and actions"— in particular, things he wrote in two controversial seminar papers—as "relevant context" for its interpretation of his X post as a "call for violence." Maj. Op. at 9 n.8. But the "context" to which the Court points, even if relevant, involves expression that the University has acknowledged is constitutionally protected. *See* Dist. Ct. Order, Nov. 24, 2025, at 16–17 ("[T]he law school[] recogni[zed] months earlier that those papers were protected under the First Amendment."); Mot. for Stay at 6 (noting that the "Dean had . . . defended Damsky's right to express unpopular views" before his X post); *id.* at 7 (concluding that statements in Damsky's seminar papers "were not threatening because they were written in an academic paper").

However shocking, Damsky's post isn't a true threat. While it could reasonably be interpreted to advocate force, that's not the only—or even necessarily the most logical—interpretation. As the Court itself notes, Damsky's post "created some ambiguity by conditioning the meaning of his 'position on Jews' on the intentions of a Harvard professor." Maj. Op. at 8. In any event, the post simply isn't sufficiently specific or targeted to suggest an intention to incite or produce "imminent lawless action," nor was it likely to do so. *See Brandenburg*, 395 U.S. at 447.

## B

The real question—which the Court makes the centerpiece of its analysis—is whether *Tinker* and its progeny justify Damsky's expulsion. I don't think they do.

I should acknowledge at the outset that I've previously expressed skepticism that *Tinker*'s deferential (which is to say less speech-protective) framework should even apply in the university setting. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) ("[I]t's not at all clear that *Tinker*'s more lenient standard applies in the university—as opposed to the elementary- and secondary-school—setting."). So far as I can tell, the existing caselaw sends "mixed signals"—on the one hand affirming the "undoubted prerogative" of state universities "to enforce reasonable rules governing student conduct," *id.* (quoting *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 669–70 (1973)), while on the other hand emphatically rejecting "the view that, because of the acknowledged need for order [in state educational institutions,]

First Amendment protections should apply with less force on college campuses," *id.* (quoting *Healy v. James*, 408 U.S. 169, 180 (1972)).

But alas, it seems that both the Supreme Court and this Court have (however unreflectively) invoked *Tinker* in the university setting. *See, e.g., Healy*, 408 U.S. at 189, 191; *Doe v. Valencia College*, 903 F.3d 1220, 1229 (11th Cir. 2018). So I'm willing to stipulate that, at least as a conceptual matter, *Tinker* and its progeny apply here. For reasons I'll explain, though, I don't think that means they apply jot-for-jot.

1

First up, the law. In *Tinker*, the Supreme Court held that the First Amendment protected junior-high and high-school students' right to wear armbands to protest the Vietnam War—because, the Court said, their conduct didn't "materially and substantially disrupt the work and discipline of the school." 393 U.S. at 513. Importantly for present purposes, even in the course of ruling in the students' favor, the Court gave schools a measure of leeway to regulate otherwise protected expression on the ground that what it called the "special characteristics" of the school environment justify intervention when student speech "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at 513.

Now, exactly what those "special characteristics" are, the *Tinker* Court never really said. But in *Tinker*'s wake, we have permitted school speech restrictions on the bases, for instance, that

they (1) maintain "order and decorum within the educational system," *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 983 (11th Cir. 2007) (quoting *Burnside v. Byars*, 363 F.2d 744, 748 (5th Cir. 1966)), (2) ensure "school safety" in the "climate of increasing school violence and government oversight," *id.* at 984, and (3) protect the "teaching and learning atmosphere" from "disruption, distraction, and destruction," *Jenkins v. La. State Bd. of Educ.*, 506 F.2d 992, 1003 (5th Cir. 1975).

Very helpfully, the Supreme Court recently applied *Tinker* in *Mahanoy Area School District v. B.L.*, 594 U.S. 180 (2021). There, a high-school student who didn't make the varsity cheerleading team expressed her frustration in a profanity-laden Snapchat post: "Fuck school fuck softball fuck cheer fuck everything." *Id.* at 185. In response, the school suspended her from the JV squad. *Id.* at 185. The Supreme Court held that her suspension violated the First Amendment for a reason that turns out to matter in this case: because the "special characteristics" that might otherwise justify schools' regulation of student speech are "diminished" when the expression in question takes place off-campus. *Id.* at 190. And, the Court added—again, in a way that matters here—a school seeking to restrict off-campus expression of a *political* nature bears a particularly "heavy burden." *Id.* at 190.

The *Mahanoy* Court distinguished off-campus from on-campus speech on three grounds. First, the Court emphasized, even a high school, which otherwise "stand[s] *in loco parentis*" vis-à-vis its students, "will rarely" do so with regard to off-campus

speech. *Id.* at 189. Rather, the Court observed, "off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility." *Id.* Second, the Court said, were a school to regulate both on- and off-campus expression, its restrictions could reach "all the speech a student utters during the full 24-hour day," meaning that "the student cannot engage in that kind of speech at all." *Id.* at 189–90. Given the risks associated with that kind of sweeping assertion of authority, "courts must be more skeptical of a school's efforts to regulate off-campus speech." *Id.* And third, the Court remarked, a school actually "has an interest in *protecting* a student's unpopular expression, especially when the expression takes place off campus." *Id.* at 190 (emphasis added). The reason:

> America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas." This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas, for popular ideas have less need for protection. Thus, schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, "I disapprove of what you say, but I will defend to the death your right to say it."

*Id.*

The *Mahanoy* Court found that, taken together, these three features "diminish the strength of the unique educational characteristics" that underlie the *Tinker*-based justifications for allowing schools to curtail students' speech rights. *Id.* at 189.

**2**

On, then, to this case. Why is Damsky's odious and ignorant X post likely protected by the First Amendment? In short, because he's a 29-year-old graduate student engaged in off-campus speech of a political nature that wasn't directed at or connected to the school in any meaningful way.

***Damsky engaged in off-campus speech.*** Like the schoolgirl in *Mahanoy*, Damsky engaged in off-campus, rather than on-campus, speech. Accordingly, for the same three reasons the Court specified there, whatever interest the University might otherwise have in restricting Damsky's expression is "diminished." *Id.* at 190. First, the University doesn't stand *in loco parentis* with respect to Damsky's off-campus speech—in fact, the University doesn't stand *in loco parentis* to an adult like Damsky *at all*. *See id.* at 189. Second, if, in addition to whatever restrictions it might impose on students' on-campus expression, the University can punish Damsky for content that he posts to his own social media account on his own time, then it risks (over)broadly curtailing his speech rights. *Id.* at 189–90. And third, if secondary schools are "nurseries of democracy" and "marketplace[s] of ideas," then *a fortiori* a university—and perhaps even more so a law school—must likewise have a keen interest in protecting Damsky's unpopular

expression, even if it "disapprove[s] of what [he] say[s]." *See id.* at 190. So, for exactly the same reasons that the off-campus-ness of the young cheerleader's Snapchat rant "diminished" the strength of whatever "special characteristics" might otherwise have justified her suspension from the squad, the off-campus-ness of Damsky's X post "diminishes" the strength of the University's interest in expelling him. None of this, of course, is to say that a school—or even a university—can *never* regulate a student's off-campus speech, just that it bears a heavy burden if it wants to do so.

**Damsky's speech wasn't directed at the University.** Again, like the cheerleader's speech in *Mahanoy*, Damsky's post wasn't directed at the school or any of its constituents. *See id.* at 191. Indeed—and yet again—this case would seem to follow *a fortiori* from *Mahanoy*. Recall the girl's post: "Fuck school fuck softball fuck cheer fuck everything." *Id.* at 185. If *that* didn't "target any member of the school community"—despite its express reference to "school" and school-sanctioned extracurriculars—then it's hard to imagine how Damsky's—which didn't so much as mention UF or any of its students or faculty members—could. *Id.* at 191.

To be sure, lesser protection would attend, for instance, "serious or severe bullying or harassment *targeting* particular individuals" and "threats *aimed at* teachers or other students," with respect to which schools may continue to have "significant"

regulatory interests.  *Id.* at 188 (emphasis added).[4]  But, again, Damsky's X post *wasn't* directed at the University.  In suggesting otherwise, the Court, it seems to me, is stretching.  It appears to say, for instance, that because Damsky might have known that some UF students "perceived him as a threat," and because UF has a large Jewish community, his post *was* directed at the school and targeted its constituents.  Maj. Op. at 13.  With respect, I don't think that follows.  Surely, the sort of directedness and targeting that matters for First Amendment purposes must be of the speaker's own making.  For similar reasons, the fact that a UF professor chose to engage with and comment on Damsky's X post does *not* indicate that Damsky "target[ed]" her.  *Id.*  That professor directed her speech at Damsky, not vice versa.

---

[4] Numerous circuit court cases have likewise held that arguably violent speech *directed* at schools, students, or teachers isn't protected.  *See, e.g.*, *Doe v. Valencia Coll.*, 903 F.3d 1220 (11th Cir. 2018) (upholding the suspension of a male nursing student who sent harassing texts to a female classmate); *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765 (5th Cir. 2007) (upholding the suspension of high school student who kept a diary detailing plans to commit a "Columbine-style" attack on his high school); *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379 (5th Cir. 2015) (en banc) (holding that a student's online rap recording containing violent language against two high school teachers wasn't protected speech); *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109 (2d Cir. 2012) (holding that a fifth-grade student's drawing depicting an astronaut and expressing a desire to "[b]low up the school with the teachers in it" wasn't protected speech); *S.G. ex rel. A.G. v. Sayreville Bd. of Educ.*, 333 F.3d 417 (3d Cir. 2003) (holding that a kindergarten student saying "I'm going to shoot you" to his friends at recess wasn't protected speech).

The University relies heavily on our decision in *Boim v. Fulton County School District*, 494 F.3d 978 (11th Cir. 2007), to show that it "reasonably construed" Damsky's post as a threat of school-directed violence. *See* Mot. for Stay at 20. But *Boim* is quite different, in that the student's speech at issue there targeted a specific teacher. In that case, a high-schooler brought a notebook to class in which she had recounted in graphic detail a "dream" about shooting her teacher. 494 F.3d at 980–81. Here's an excerpt:

> Then he starts taking role [sic]. Yes, my math teacher. I lothe [sic] him with every bone in my body . . . . I stand up and pull the gun from my pocket. BANG the force blows him back and every one in the class sits there in shock. BANG he falls to the floor and some one [sic] lets out an ear piercing scream. Shaking I put the gun in my pocket and run from the room . . . . Then, the bell rings, I pick my head off my desk, shake my head and gather up my books off to my next class.

*Id.* (alterations in original) (omissions added). Unsurprisingly, we upheld the student's 10-day suspension, finding that her writing was, for *Tinker* purposes, reasonably likely to "cause a material and substantial disruption" of the "order and decorum" in her high school. *Id.* at 983. But again, Damsky's X post bears no resemblance to the speech in *Boim*, which pointedly targeted an identifiable individual at the school. For many of the same reasons that Damsky's post isn't a true threat under *Counterman*, it's not sufficiently specific or targeted to be "reasonably school-directed"

within the meaning of the *Tinker* line of cases as the University argues.[5] *See* Mot. for Stay at 23.

To be sure, Damsky replied to a UF professor's response to his initial post. Seemingly to underscore what it sees as the violent nature of Damsky's speech, the Court emphasizes that when the professor "asked if [Damsky] meant he 'would murder [her] and [her] family," Damsky "did not say no"—and thereby "left open the reasonable interpretation that he wanted to kill [the professor] and her family." Maj. Op. at 9 (second and third alterations in original). Surely, though, Damsky's non-response—his silence—also left open the equally plausible interpretation that he had no such desire or intention. *See* Dist. Ct. Order, Nov. 24, 2025, at 16 ("Damsky did not say no," "but "neither did he say yes."). He simply didn't (in the Court's estimation, adequately) clarify the meaning of his original post; he "answered the question with a question." *Id.* I agree with Judge Winsor's reading of Damsky's reply: He posed "two rhetorical questions"[6] and "a conditional statement"[7] about

---

[5] Not for nothing, *Boim* expresses its holding in terms of *on-campus* conduct. *See Boim*, 494 F.3d at 984 (holding that there "is no First Amendment right allowing a student to knowingly make comments . . . that reasonably could be perceived as a threat of school violence, whether general or specific, *while on school property during the school day*" (emphasis added)).

[6] "Did Ignatiev want Whites murdered? If so, were his words as objectionable as mine?"

[7] "If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites."

the meaning of a Harvard professor's words. *Id.* at 24. That "is far from the kind of detailed, specific" language that constitutes a "school-directed threat." *Id.*

Moreover, and in any event, for reasons already explained, in answering the professor's outreach, Damsky didn't affirmatively "direct[]" his speech toward the University in the same way that the student in *Boim sua sponte* (so to speak) directed her speech toward her teacher. And that matters.

***Damsky is a graduate student.*** Even on the assumption that *Tinker* isn't categorically inapplicable in the university setting, the fact that Damsky is a 29-year-old law student, and not a grade-school student, must surely count for something in the free-speech calculus. In fact, I think it counts double. First, for their part, universities simply don't have the same interest in maintaining "order and decorum," *Boim*, 494 F.3d at 983, or even in "protect[ing], guid[ing], and disciplin[ing]" students, *Mahanoy*, 594 U.S. at 189, that primary and secondary schools do. College is where people go to learn how to do the hard work of *adulting*. Universities can't—and shouldn't—exercise the same degree of control over their students' thoughts, statements, and actions that elementary, middle, and even high schools do.

Second, for their part, university students surely have *greater* speech interests than do their grade-school counterparts. Whether or not academic freedom is technically an "independent First Amendment right," *Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991), the Supreme Court (even in the course of applying *Tinker* in

a university setting) has expressly rejected "the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large," *Healy*, 408 U.S. at 180, and it has repeatedly emphasized the First Amendment's centrality to the university experience, *see Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (observing that "[t]he classroom is peculiarly the 'marketplace of ideas'" and that academic freedom is a "special concern of the First Amendment"); *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) ("[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'"); *cf. Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997) (emphasizing "that the dangers of viewpoint discrimination are *heightened* in the university setting").

**Damsky engaged in political speech.** However grotesquely, Damsky was engaged in political speech, which the Supreme Court has repeatedly held occupies the very "core" of the First Amendment's guarantee.  The citations for that fundamental proposition are too numerous to count.  *See, e.g.*, *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 377 (1997) (recognizing that "commenting on matters of public concern" is a "classic form[] of speech that lie[s] at the heart of the First Amendment"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("[A]dvocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression."); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988) ("At the heart of the First Amendment is the

recognition of the fundamental importance of the free flow of ideas and opinion on matters of public interest and concern."); *Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (citation modified)); *Roth v. United States*, 354 U.S. 476, 484 (1957) (observing that the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people").[8]

\* \* \*

It seems to me that Justice Alito's separate concurrence in *Mahanoy* hits the nail on the head: "[S]tudent speech that is not expressly and specifically directed at the school . . . and that addresses matters of public concern, including sensitive subjects like politics, religion, and social relations . . . lies at the heart of the First Amendment's protection." *Mahanoy*, 594 U.S. at 205 (Alito, J., concurring). Just so. For better or for worse, that *is* this case.

So, do I condone Damsky's X post? No way—not even for a minute. But that's not the question. The question is whether the First Amendment protects the right of a 29-year-old law student to engage in offensive off-campus political speech. Because I agree

---

[8] And to be clear, even if Damsky's X post could be understood to sanction political *violence*—as I think it arguably could be—that fact alone wouldn't strip it of constitutional protection. For good or ill, the "mere advocacy of illegal acts," without more, is "a kind of speech falling within the First Amendment's core." *Counterman*, 600 U.S. at 76 (citation modified).

with Judge Winsor that it does—and at the very least, that the University has failed to show that it doesn't—I must respectfully dissent from the Court's decision to stay the order preliminarily enjoining his expulsion and reinstating him to the law-school class.[9]

---

[9] To be clear, because I conclude the University hasn't shown that Damsky's speech isn't protected, no disciplinary action against him would be appropriate—including, as the University proposed in the alternative, reinstating him "solely through remote enrollment and participation." Reply Br. in Supp. of Mot. for Stay at 9.