No. 25-14171

# United States Court of Appeals for the Eleventh Circuit

PRESTON DAMSKY, A LAW STUDENT AT
THE UNIVERSITY OF FLORIDA LEVIN COLLEGE OF LAW,

*Plaintiff-Appellee,*

v.

CHRIS SUMMERLIN, IN HIS OFFICIAL CAPACITY AS
THE DEAN OF STUDENTS OF THE UNIVERSITY OF FLORIDA,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 1:25-cv-00275-AW-MAF, Hon. Allen C. Winsor

## APPELLANT'S OPENING BRIEF

BRANDE S. SMITH
  *Senior Counsel*
OFFICE OF GENERAL COUNSEL
UNIVERSITY OF FLORIDA
300 SW 13th Street
123 Tigert Hall
Gainesville, FL 32611
(352) 392-1358

H. CHRISTOPHER BARTOLOMUCCI
  *Lead Counsel*
JUSTIN A. MILLER
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com

*Counsel for Appellant*

No. 25-14171

*Damsky v. Dean of Students of the University of Florida*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 to 26.1-3, Appellant hereby certifies that the following trial judges, attorneys, persons, association of persons, firms, partnerships, or corporations have an interest in the outcome of this appeal:

1.   ACLU Foundation-New York

2.   American Civil Liberties Union

3.   Bartolomucci, H. Christopher

4.   Damsky, Preston

5.   Dean of Students of the University of Florida

6.   Fitzpatrick, Martin A.

7.   Miller, Justin A.

8.   Rollins, Gavin B.

9.   Sabatini, Anthony F.

10.  Sabatini Law Firm PA

11.  Schaerr | Jaffe LLP

12.  Smith, Brande S.

13.  Summerlin, Chris

14.  Sykes, Emerson J.

15.  University of Florida

16.  Winsor, Allen C.

No. 25-14171

*Damsky v. Dean of Students of the University of Florida*

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Eleventh Circuit Rule 26.1-2, Appellant states that no publicly traded company or corporation has an interest in the outcome of this appeal, and no non-governmental corporation is a party to this appeal.

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci
*Counsel for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant recognizes that oral argument may be unnecessary in light of this Court's Order of January 8, 2026, staying the district court's preliminary injunction pending appeal. ECF 20-2. Appellant stands ready to present oral argument should the Court deem it desirable.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ............................................................. C1

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF AUTHORITIES ....................................................................iv

JURISDICTIONAL STATEMENT ......................................................... 1

INTRODUCTION.................................................................................... 1

STATEMENT OF THE ISSUES.............................................................. 4

STATEMENT OF THE CASE ................................................................. 4

    A.    Damsky's Early Disruptions at UF Law ............................... 6

    B.    Damsky's Seminar Papers.................................................... 7

    C.    The University Upholds Free Speech ................................... 9

    D.    Damsky's Posts .................................................................. 10

    E.    Damsky Is Suspended ....................................................... 12

    F.    The Student Conduct Hearing .......................................... 14

    G.    Outcome of Student Conduct Hearing .............................. 25

    H.    Proceedings in the District Court....................................... 26

    I.    Standards of Review .......................................................... 28

SUMMARY OF ARGUMENT ............................................................... 29

ARGUMENT ......................................................................................... 31

    I.    The University Is Likely to Prevail on the Merits.................... 31

A.    UF Officials, Faculty, and Students Reasonably Viewed Damsky's Posts as Threatening Violence Against Jews at the University. ....................................... 31

B.    Damsky's Posts Significantly Disrupted the University. ...................................................................... 36

C.    The Supreme Court and This Court Have Applied *Tinker* in Undergraduate and Graduate Settings. .......... 38

D.    Damsky's Posts Were Reasonably Interpreted both as Promoting and as Threatening Violence on UF's Campus, Sparking Community Safety Concerns. ........... 42

II.    Damsky's Speech Was a True Threat. ..................................... 52

III.    Damsky Did Not Establish Irreparable Injury Absent an Injunction. ................................................................................ 55

IV.    The Balance of Equities and the Public Interest Do Not Support an Injunction. ............................................................. 58

CONCLUSION ........................................................................... 61

CERTIFICATE OF COMPLIANCE ....................................... 63

# TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
   557 F.3d 1177 (11th Cir. 2009) ............................................................. 28

*Ala. Student Party v. Student Gov't Ass'n of Univ. of Ala.*,
   867 F.2d 1344 (11th Cir. 1989) ............................................................. 45

*Bell v. Itawamba Cnty. Sch. Bd.*,
   799 F.3d 379 (5th Cir. 2015) ................................................................. 44

*Bishop v. Aronov*,
   926 F.2d 1066 (11th Cir. 1991) ............................................................. 45

*Bloedorn v. Grube*,
   631 F.3d 1218 (11th Cir. 2011) ............................................................. 59

* *Boim v. Fulton Cnty. Sch. Dist.*,
   494 F.3d 978 (11th Cir. 2007) .......................... 32, 42, 43, 45, 48, 51, 52

*Coronado v. Valleyview Pub. Sch. Dist. 365-U*,
   537 F.3d 791 (7th Cir. 2008) ................................................................. 60

* *Counterman v. Colorado*,
   600 U.S. 66 (2023) ....................................................... 32, 52, 53, 54, 55

*Doe v. Tex. A&M Univ.*,
   No. H-20-4332, 2021 WL 257059 (S.D. Tex. Jan. 26, 2021) .......... 56, 60

* *Doe v. Valencia College*,
   903 F.3d 1220 (11th Cir. 2018) ................................................. 39, 40, 50

*Faculty Senate of Fla. Int'l Univ. v. Winn*,
   477 F. Supp. 2d 1198 (S.D. Fla. 2007) ......................................... 56, 60

*Florida v. HHS*,
   19 F.4th 1271 (11th Cir. 2021) ............................................................. 58

*Authorities upon which we principally rely are marked with an asterisk.

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) ............................................................... 41

*Healy v. James*,
408 U.S. 169 (1972) .................................................. 38, 39, 40

*Kansans for Const. Freedom v. Kobach*,
789 F. Supp. 3d 1062 (D. Kan. 2025) .................................. 54

*Keefe v. Adams*,
840 F.3d 523 (8th Cir. 2016) ............................................... 41

*Keister v. Bell*,
879 F.3d 1282 (11th Cir. 2018) .......................................... 29

*King v. Frazier*,
77 F.3d 1361 (Fed. Cir. 1996) ............................................. 54

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
594 U.S. 180 (2021) ........................................................ 50, 59

*Mardis v. Hannibal Pub. Sch. Dist.*,
684 F. Supp. 2d 1114 (E.D. Mo. 2010) ............................... 37

\* *Morse v. Frederick*,
551 U.S. 393 (2007) .................................. 42, 43, 44, 48, 52

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) ............................................................. 31

*Papish v. Bd. of Curators of Univ. of Mo.*,
410 U.S. 667 (1973) ....................................................... 38, 39

*Ponce v. Socorro Indep. Sch. Dist.*,
508 F.3d 765 (5th Cir. 2007) ............................................... 44

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ............................................................. 32

*Scott v. Sch. Bd. of Alachua Cnty.*,
    324 F.3d 1246 (11th Cir. 2003) ........................................................... 46

*Sealed Pl. 1 v. Front*,
    No. 3:22-cv-00670, 2024 WL 1395477 (E.D. Va. Mar. 31, 2024).........54

*Shanley v. Ne. Indep. Sch. Dist.*,
    462 F.2d 960 (5th Cir. 1972) ...............................................................50

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) ...........................................................56

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ........................................................... 40

* *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969)...............................32, 36, 37, 38, 39, 40, 50, 51, 52

*United States v. Anwar*,
    741 F.3d 1134 (10th Cir. 2013) ...........................................................37

*United States v. Barbour*,
    70 F.3d 580 (11th Cir. 1995) ...............................................................29

*United States v. Brown*,
    479 F.2d 1170 (2d Cir. 1973) ..............................................................34

*United States v. Dudley*,
    463 F.3d 1221 (11th Cir. 2006) ...........................................................36

*United States v. Snipes*,
    466 F. App'x 800 (11th Cir. 2012) .......................................................37

*Van Arsdel v. Tex. A&M Univ.*,
    628 F.2d 344 (5th Cir. 1980) .................................................. 55, 56, 60

*Virginia v. Black*,
    538 U.S. 343 (2003) ................................................................... 52, 53

*Widmar v. Vincent*,
    454 U.S. 263 (1981) .............................................................................39

## Statutes

28 U.S.C. § 1292 ........................................................ 1

28 U.S.C. § 1331 ........................................................ 1

28 U.S.C. § 1343 ........................................................ 1

## Rules

Fed. R. App. P. 4 ...................................................... 1

Fla. R. App. P. 9.190 ................................................. 26

## Other Authorities

*Black's Law Dictionary* (12th ed. 2024) .......................... 34, 54

Preston Damsky
    (@preston_terry_), X (June 22, 2025 at 12:11 AM) ............ 47

*Oxford English Dictionary* (online ed.) .......................... 34

*Top 60 Colleges by Jewish Population*,
    Hillel International ............................................. 7

UF Regulation 4.040, Student Honor Code and Student Conduct
    Code (as amended 2023) ......................................... 13

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343 based on federal questions arising under the Constitution of the United States and Plaintiff's alleged deprivation of federal rights under color of state law. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal from an interlocutory order granting a preliminary injunction on November 24, 2025. Doc. 38 at 28. The notice of appeal was timely filed on November 25, 2025. Doc. 41. *See* Fed. R. App. P. 4(a)(1)(A).

## INTRODUCTION

The University of Florida expelled Preston Damsky from law school for threats directed at the school that disrupted its learning environment. His expulsion followed a pattern of disruptive behavior at UF Law, which began when he was a 1L and escalated until he crossed a line as a 2L. This disruptive pattern included calling for extralegal violence to preserve the United States as a White nation-state. In the Spring of 2025, Damsky's antagonistic behavior culminated in threats that significantly disrupted UF's law school near final exams, significantly harming students' rights and education during a crucial time in their studies.

Damsky published on his X account a post addressing "what I think must be done with Jews." He declared that "My position on Jews is simple: … Jews must be abolished by any means necessary." (The full post is reproduced *infra* at 11–12.) Professor Lyrissa Lidsky, a Jewish member of the UF Law faculty, replied to Damsky's post and asked, "Are you saying you would murder me and my family?" Equivocating in his response, Damsky did not say no. He instead steered the conversation to his view that "a genocide of all Jews" would not be as bad as "a genocide of all Whites[.]"

Damsky's threatening posts sparked widespread fear and alarm on campus. His posts disrupted the normal operations of UF Law in many ways. Among other disruptions, his posts

- Caused some students and faculty members to stay away from campus out of fear for their safety;

- Caused some students to skip or come late to class;

- Made it difficult for students to concentrate on their studies with final exams approaching;

- Caused some students not to register for classes that Damsky was taking;

- Caused the student who discovered Damsky's post and told the Dean about it to ask to take his finals in a locked room;

- Led the law school to restrict access to buildings and to increase police patrols on campus and the use of security cameras, at a financial cost to the school;

- Led the law school to pay for police to attend a Jewish Law Students Association event;

- Caused Professor Lidsky to cancel a class and starting sleeping with a baseball bat;

- Caused a staff member with a Jewish surname to ask that her name and picture to be removed from the UF Law website and later caused her to quit her job; and

- Distracted the Dean of UF Law from her other duties by requiring her to spend upwards of 120 hours dealing with the fallout from Damsky's posts and other issues related to him.

In this case, the district court erred by holding that Damsky's public social-media posts were not reasonably viewed as school-directed threats. The court below also erred in finding that Damsky had established the other preliminary injunction factors. For the reasons stated by this Court

3

in its Order of January 8, 2026, staying the district court's injunction pending appeal, this Court should reverse the district court's judgment and deny Damsky preliminary injunctive relief.

## STATEMENT OF THE ISSUES

(1) Did the First Amendment allow the University to expel Damsky because UF officials reasonably interpreted his posts as threatening or promoting extralegal violence against the University community and its Jewish students, and because the posts caused serious disruption to the learning environment at the law school and violated the rights of other students to pursue their education?

(2) Did Damsky satisfy the other requirements for preliminary injunctive relief?

## STATEMENT OF THE CASE

Damsky engaged in a pattern of disruptive conduct beginning during his 1L year at UF Law in Fall 2023 and culminating in his Spring 2025 posts on X that resulted in his expulsion in October 2025. At the student conduct hearing, UF Law's Interim Dean, Merritt McAlister, testified that "Damsky ha[d] been on [her] radar for a long time," and she

had "spent significant time over the last two years fielding complaints about Mr. Damsky." Doc. 37-3 at 31.[1]

Until Damsky crossed the line with his Spring 2025 posts, the University had "tolerated and navigated" Damsky's "right to speak" and to "express extreme views … despite … significant upset within the law school community." *Id.* at 52. The Spring 2025 posts, however, "elevated and escalated the conduct to an unacceptable degree." *Id.* Dean McAlister noted that Damsky's history of disruptive conduct showed Damsky's "understanding and awareness" of "how [his] speech … had been received and the real fear that members of [the UF] community had." *Id.* Instead of "backing down or holding the line," Damsky chose "escalation and … aggression" that "really exacerbated that fear" and "caused [the University] to react and have to take tangible measures to protect the [UF] community." *Id.*

---

[1] In this brief, citations to "Doc." refer to district court documents while "ECF" citations refer to documents filed in this Court. Filings that contain multiple documents within one pdf use for pincites the blue ECF filing line pagination (*e.g.*, Docs. 17-2, 17-3, 17-4, 37-3).

### A.    Damsky's Early Disruptions at UF Law

Shortly after Damsky began attending UF Law as a 1L, he had an angry and disruptive encounter with a staff member. Damsky was trying to enter a locked exterior door to a building on campus, and the staff member told him to use his ID card. Damsky "was banging, kicking, yanking the glass door" and demanded the staff member "Let [him] in the F-ing door." Damsky later approached the staff member and yelled at her: "Why didn't you let me in the F-ing door? I told you I was a F-ing student." Doc. 37-3 at 91. Because of his "aggressive behavior" toward the staff member, "multiple UF Law employees were uncomfortable and afraid and concerned about their safety because Damsky seemed enraged." ECF 20-2, at 10 (cleaned up) (hereinafter, "Stay Op.").

The next month, Damsky made disruptive comments in the 1L GroupMe chat. After another student commented about the demographic composition of the 1L class as reflected in a class photo, Damsky responded on the chat that "[t]he United States lost 19.3 million white faces on [net] over the past decade," adding "why should we [feel] anything but pure contempt for him" (the student who commented on the 1L class demographics) "and anyone else who expresses and shares such

6

naked hatred for us." Doc. 37-3 at 283–84; *see also id*. at 99–100. The resulting disruption led to the GroupMe being taken down. *Id*. at 242.

Following the October 7, 2023 terrorist attack in Israel, Damsky began wearing a t-shirt on campus with the antisemitic message, "From the river to the sea, Palestine will be free." *Id*. at 175, 200. UF Law has "very engaged Jewish faculty, students[,] and staff." *Id*. at 71. In fact, the University has the most Jewish students of any public university in the country.[2]

### B.    Damsky's Seminar Papers

"In the Fall 2024 semester, [Damsky] wrote two seminar papers which were the subject of controversy at UF Law[.]" Doc. 1 ¶7. Members of the UF community perceived the papers as involving "calls for racial violence, sort of racial overthrow and violent rhetoric." Doc. 37-3 at 41. "Some of Damsky's classmates began raising safety concerns to UF and began avoiding Damsky when possible." Stay Op. 3 (ECF 20-2). Damsky "later confirmed [his paper] was 'a call for extralegal violence' and 'a call for contemporary racial violence.'" *Id*. at 9.

---

[2] *See Top 60 Colleges by Jewish Population*, Hillel International, https://tinyurl.com/4h43w5y7 (last accessed Jan. 28, 2026).

Although the University at the time ultimately concluded that the "call to violence was abstract and academic in nature," Dean McAlister was "concerned" and "thought that the nature of the dialog and the nature of what was happening in [Damsky's] conduct, began escalating at that point in time." Doc. 37-3 at 48.

Damsky's papers argued that "the United States was founded as a race-based nation state" for the white race and must be preserved as such. Doc. 1 ¶7; *see also* Doc. 17-2 at 4–7, 9–12.[3] The first paper, titled "American Restoration: An Article V Proposal," Doc. 17-2 at 4–7, stated:

> [W]e should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle.

*Id.* at 7. When one of Damsky's classmates asked him whether the "last paragraph" quoted above was "intended to be a call for contemporary extralegal violence," Damsky agreed that it was. Doc. 37-3 at 211; *see also id.* at 14, 25–26, 206. Damsky recalled his response to be "I don't reject

---

[3] Doc. 17-2 contains excerpts of Damsky's papers.

8

that if that's what it takes." *Id.* at 212. Students told faculty members that they were worried Damsky posed "a security risk." *Id.* at 158–59.

Damsky's second paper, titled "National Constitutionalism," Doc. 17-2 at 9–12, stated:

> The Supreme Court and inferior federal courts have the power to arrest the dispossession of White America. … If the People are not granted relief from the government—which includes the judiciary—then, if they are to survive as masters in the land of their ancestors, they must exercise "their revolutionary right to dismember or overthrow" the government. And that will be a process which no deskbound jurist can gleefully look forward to; for it will be a controversy decided not by the careful balance of Justitia's scales, but by the gruesome slashing of her sword.

*Id.* at 11–12 (footnote omitted). Members of the UF Law community understood this paragraph to be "a thinly veiled threat against the federal judiciary." Doc. 37-3 at 160.

## C.    The University Upholds Free Speech

Despite these events, the University didn't take disciplinary action against Damsky "until [his] statements became threatening and caused a much more material disruption to [the University's] ongoing operations." Doc. 37-3 at 68. To this point, Dean McAlister had "taken a lot of heat at different times for protecting his speech, but his statements have real consequences," *id.* at 36, and "what happened in March [2025]"

with Damsky's posts "was different," *id.* at 31. Dean McAlister remarked that "the prior incidents are relevant to understanding the full context," but "the line [the University was] drawing" was threats and harassment and calling "for the abolition of a group of people who are part of our community" and then equivocating when asked to clarify. *Id.* at 72.

### D.    Damsky's Posts

On March 21, 2025, in the Spring of his 2L year, Damsky publicly posted on his X account "what I think must be done with Jews." Doc. 1 ¶23; Doc. 17-3 at 4. He stated that "My position on Jews is simple: … Jews must be abolished by any means necessary." *Id.* On April 1, 2025, Damsky and Professor Lidsky exchanged public messages about his post. Doc. 1 ¶¶28–29; Doc. 17-3 at 4–5. His original post and their subsequent exchanges, Doc. 17-3 at 4–5, appear below.





### E.    Damsky Is Suspended

On April 2, 2025, the University informed Damsky that, based on reports that he had disrupted UF Law's academic operations, he was being placed on interim suspension and excluded from campus. Doc. 37-3 at 5–6. Damsky appealed his interim suspension, and the University denied it. *Id.* at 11–12.

On May 29, 2025, the University informed Damsky he was being charged with violating the Student Conduct Code[4] by engaging in Disruptive Conduct and Harassment. *Id.* at 14–16.

Section 4(c) of the Code prohibits "Disruptive Conduct," defined as "Conduct that is materially or substantially disruptive to the normal operations of the University … in any of the following activities: teaching, learning, research, administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus." *Id.*

Section 4(k) of the Code prohibits "Harassment," which includes "Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively disrupts a person's daily activities, including education and employment." *Id.* Under the Code, neither Disruptive Conduct nor Harassment "include[s] conduct protected by the First Amendment." UF Regulation 4.040, §§4(c), (k); Doc. 37-3 at 28–29.

---

[4] UF Regulation 4.040, Student Honor Code and Student Conduct Code (as amended 2023), https://policy.ufl.edu/regulation/4-040/.

A student conduct hearing before a University Officials Board ("UOB") was set for July 28, 2025.

### F.    The Student Conduct Hearing

At the hearing, witnesses testified to the UOB that Damsky's posts were understood as a threat by students, faculty, and staff at UF Law, and that the posts massively disrupted the law school's operations and the rights of other students to pursue their legal education.

**1.** UF Law's Interim Dean, Merritt McAlister, testified that she had "spent significant time over the last two years fielding complaints about" Damsky from other students. Doc. 37-3 at 31. Although the Dean had to that point defended Damsky's right to express unpopular views, in March his confrontational behavior was "different" and escalated to the point that it "crossed a line." *Id.* Dean McAlister testified that Damsky "made unacceptable threats against our Jewish faculty, students, and staff, and those threats predictably created a substantial and material disruption to the operation of the law school." *Id.* The law student who first told her about the post "was shaking with tears in his eyes and emotion in his voice" and said "he was afraid to be at a law school" with Damsky. *Id.* at 32. News of Damsky's post "spread like

wildfire" through UF Law, which has "a large and engaged Jewish community[.]" *Id.*

A faculty member told the Dean that he was afraid for the "safety of his family, himself, and his students." *Id.* "Students were afraid to study on campus as we headed into finals." *Id.* "A staff member asked for her name and picture to be taken off the website because she had a Jewish surname, and she ultimately quit her job several weeks later." *Id.*

In the wake of Damsky's post, "business as usual at the law school ground to a halt. All that anyone was doing or talking about was Mr. Damsky and his X posts." *Id.* at 33. The Dean "received a request to post a police officer outside of a classroom because Mr. Damsky was enrolled in the class, which had Jewish students. We had a police officer who had to attend a Jewish Law Students Association event out of fear that Mr. Damsky might show up." *Id.* "[O]ne professor cancel[led] class out of stress from the situation[.]" *Id.* The Dean estimated she spent "around 120 hours or more dealing with issues related to Mr. Damsky" and that "70 or 80 percent of that time [was] spent" "since the tweets." *Id.* at 37.

Dean McAlister stated that "[t]his was not the first time Mr. Damsky had called for violence. When he did so in the fall in the context

of a seminar paper, I concluded that the statements in that context were not threatening because they were written in an academic paper and not put out on X to terrorize a community that he knew was looking." *Id.* at 34. But Damsky's post on X was different, in part because he understood when he posted that "some members of our community perceived him as a threat." *Id.* "At a town hall in January [2025], at least two students expressed to me their palpable fear of Mr. Damsky. One said she scanned the exits when he was in a room. Another avoided taking classes with him out of fear of what he might do." *Id.* "Damsky was aware of these comments and he discussed them with [Senior Assistant] Dean [of Students] [Janice] Shaw[.]" *Id.*

Dean McAlister noted that, in Damsky's exchange with Professor Lidsky, *see* Doc. 17-3 at 4–5, he had an opportunity to explain that he was not threatening violence, but he did not do so. Doc. 37-3 at 35, 61. Instead, "Damsky equivocated in his response and invoked the concept of genocide." *Id.* at 35. "At that point, the meaning of his words became clear. He was threatening the Jewish people on our campus. He was calling for and supportive of genocide by, 'Any means necessary.'" *Id.* "I felt in that moment that we were on notice, that there was some real

16

chance that someone could take action against our community and that terrified me." *Id*. at 39.

**2.** The next witness was Dean Janice Shaw, who testified she first learned about Damsky from a member of her staff who described an incident in the Fall of 2023. *Id*. at 91. The staff member was working in a building on campus and saw a person "trying to access the building through locked doors. She told him to use his ID card …, but that person instead was banging, kicking, yanking the glass door and yelling, 'Let me in the F-ing door.' She said she was concerned about her safety because the person seemed enraged[.]" *Id*. "A few minutes later, the person came in and yelled at her, 'Why didn't you let me in the F-ing door? I told you I was an F-ing student." *Id*. The staff member and another person in the office "both reported that this exchange made them very uncomfortable and afraid and they ultimately learned that the person was [Damsky]." *Id*.

Dean Shaw testified that, in Fall 2024, she received "complaints from students about a paper [Damsky] wrote that several students reported they interpreted as having a call for violence." *Id*. at 92.

Following the townhall in January 2025, Dean Shaw met with Damsky at Dean McAlister's direction. *Id.*

"During that meeting, I asked [Damsky] if he was aware that students were talking about him at the recent town hall[,] and that they were afraid of him." *Id.* at 92–93. "And based on that direct conversation, [Damsky] was made aware that students feared him and they thought he might do something that would negatively impact their safety." *Id.* at 93. This conversation put Damsky "on notice that students were afraid, that students were not taking classes with him because they did not want to be in the classroom with him, that they … weren't feeling safe[.]" *Id.* at 115. Two weeks after she met with Damsky, the University Ombudsman contacted her because the FBI had received a report about Damsky. *Id.* at 93.

Damsky's post on X that Jews must be abolished came "after [he was] told in our January meeting that some students were scared of him." *Id.* After Damsky posted, "several students came into my office crying about the fear they felt." *Id.* at 94. One "student was uncontrollably crying in my office about the fear and anger she felt about that the fact that she might be attacked at school and that [Damsky] wanted her or

her friends to suffer physical harm." *Id.* "In written complaints, another student said they feared that his words would become actions. And one wrote that she did not feel safe walking the halls at UF or attending Jewish Law Student Association events or even being by herself." *Id.* Another student "said she didn't feel safe studying [in a campus building] anymore because if anything happened, she would be vulnerable." *Id.* at 94–95. Dean Shaw noted that when the complaints came in, "[w]e were a few weeks away from the end of semester and with exams approaching, this was a significant disruption[.]" *Id.* at 95.

**3.** Professor Lidsky spoke next. After learning of Damsky's post, she was "particularly alarmed" by its "whatever means necessary language," which she took as "a call for genocide." *Id.* at 131. "To me, by whatever means necessary, it bespeaks Holocaust-type elimination of whole categories of people." *Id.* She "decided to engage in [her] own counter speech to try to discern [his] intent[.]" *Id.* at 118. "I want[ed] to know if I have a student in my midst who would do violence to me and my family." *Id.* at 144. She gave him "a chance to step back from the edge" but "he responded by deflecting[.]" *Id.* at 119. Lidsky "learned later that

19

[he] did know exactly who [she] was when [he] responded to [her].” *Id*. at 128–29.

"In the next couple of days … at least 15 students came to my office expressing fear for my safety and concern that Mr. Damsky might come to the law school armed. Some students asked me if I thought he had a gun. Some students said that because they feared I was a target, they were afraid to attend my class." *Id*. at 119–20.

Lidsky and her husband "slept with a baseball bat beside the bed for the next couple of weeks." *Id*. at 120. And "the toll of trying to reassure my students that they were safe and that I was safe together with the worry that I might have exposed my family to some sort of danger led me to cancel my class the following Monday." *Id*. at 122. Professor Lidsky noted that "shortly after Mr. Damsky was trespassed off campus, a white supremacist at FSU shot and killed innocent victims." *Id*.

**4.** The next witness, Professor Christopher Hampson, testified that in October 2024 he had received a draft of Damsky's seminar paper "American Restoration." *Id*. at 158. A student told Hampson that he and several classmates were concerned that the paper ended on a "call for violence against immigrants and people of color." *Id*. at 158–59. "They

expressed deep concern that Mr. Damsky was a security risk to the law school." *Id.* at 159. Hampson noted that, in the same semester, Damsky had included an "even more graphic" call to violence in his "National Constitutionalism" paper. *Id.*

"On April 1st, four law professors emailed the faculty about Mr. Damsky's tweet, noting the pattern of escalation against his previous calls for violence." *Id.* at 161. "The student community was deeply alarmed by this point. I learned that students were concerned for their personal safety and were actively avoiding registering for classes if Mr. Damsky was in them. I also know that two faculty members, both women of color, were trying to figure out whether they could safely come to campus at all and whether they should move all their classes online." *Id.* Damsky's "threats were deeply concerning to the UF Law community, disruptive to our classroom and work environment, and even extended beyond Mr. Damsky's classes to other students, faculty, and alumni of the law school." *Id.* at 162.

**5.** Professor Zachary Kaufman, the faculty advisor to the Jewish Law Students Association, testified that Damsky "threatened Jews in and beyond our law school community. In doing so, he has sowed terror

and anguish among Jewish members, students, staff, and faculty of our community, and he has massively disrupted our law school's academic community within our law school's walls and beyond, in the day-to-day lives of our students, staff, and faculty." *Id.* at 179–80.

"Awareness and discussion of [Damsky's] post spread through our law school community like wildfire. Many members of our law school community, Jews and non-Jews alike, interpreted Mr. Damsky's message to be a concrete, credible call for genocidal violence against Jews, including Jews in our law school community, as well as their families." *Id.* at 180. "Mr. Damsky's post caused many Jews in our law school community to feel immense fear and anxiety. And he wrote those posts on social media during the final month of the semester when students wanted and for their grades and careers needed to focus on their studies." *Id.* at 181. "Some students were so concerned about the potential need for self-defense against Mr. Damsky that they carried pepper spray and escorted each other to and from their cars in our law school parking lot. Several students cried from fear of Mr. Damsky and what he might do." *Id.* at 182. "Many students' studying was disrupted by participating in hours-long conversations with their parents and peers about Mr.

Damsky, what he might do, how they could protect themselves, and what the administration at the law school could or should do to protect them." *Id*. at 182–83. "Some students skipped academic events, missed classes, or were late to classes because they were focused on attending town halls or participating in conversations with each other or with faculty or administrators about their safety." *Id*. at 183.

"In direct response to Mr. Damsky's social media posts, the law school administration arranged for heightened security on campus, including cameras in the faculty parking lot and more frequent police patrols." *Id*. at 183–84. On April 4th, the Dean "announced via email that Mr. Damsky had been trespassed from campus, that police patrols and event security had recently increased, and that starting on April 7th, the law school would change its security protocols from having all doors unlocked during business hours to having most of them locked and accessible only through ID card access." *Id*. at 186. "[M]any Jewish students expressed difficulty in studying for and taking exams. They stated that their studying was disrupted by their sincerely and reasonably held fear that Mr. Damsky would stage or incite an attack against Jews at our law school and perhaps in our wider university.

23

Several students believe that the disruption Mr. Damsky caused prevented them from achieving their full academic potential and that their grades and career prospects, upon which grades in law school are so dependent, thus suffered." *Id*. at 186–87.

**6.** Also testifying at the UOB hearing were two UF Law students whose names have been redacted from the hearing transcript to protect their privacy. The first student testified he was in the seminar for which Damsky wrote his "American Restoration" paper. The student recalled that during class Damsky "explicitly stated that the essay was a call for … contemporary racial violence against Black people in America[.]" Doc. 37-3 at 206. "I personally asked him whether it was intended as a call for violence and he stated, 'Yes, it was.'" *Id*. at 207.

The second student, who had alerted the Dean to Damsky's X post, testified that he "became nervous during finals that [Damsky] might do something retaliatory and … come after me[.]" *Id*. at 231. The student, who is Jewish, "ask[ed] to take [his] finals in a locked room." *Id*. at 231–32. The student stated that "a lot of people knew about" Damsky "because of [his] GroupMe posts that got the group taken down," and that "people

24

shared [his] Twitter[.]" *Id*. at 242. The student "monitored" Damsky's account because he thought Damsky was "possibly dangerous." *Id*. at 248.

Damsky knew that the student was monitoring his posts. "I knew that [the student] was monitoring me, as he put it, for a year." *Id*. at 300; *see id*. at 292 ("I've known for a year that [the student] has screen-shotted my tweets."). He knew that other people monitored his posts as well. *Id*. at 292.

Near the hearing's end, Damsky answered "I don't know" when asked what steps he would take to avoid disrupting the campus again and what he might do differently in the future. *Id*. at 336–37. At no point during the hearing did Damsky express any regret or remorse for the fear of violence and campus disruption his posts caused. Doc. 17-1 at 458; *see*, *e.g.*, Doc. 37-3 at 337–40.

### G.    Outcome of Student Conduct Hearing

After the hearing, on August 8, 2025, UF Dean of Students Chris Summerlin informed Damsky that the UOB had recommended that he be found responsible for Disruptive Conduct and Harassment in violation of the Student Conduct Code and had proposed expulsion as a sanction.

25

Dean Summerlin accepted the UOB's recommendations. Doc. 17-1 at 455–58.[5] Damsky appealed the decision. Doc. 1 ¶53.

During the administrative appeal, Damsky remained enrolled and attended classes remotely. Tr. of Prelim. Inj. Hr'g 50 (Oct. 29, 2025) (Doc. 53) ("Hr'g Tr."). On October 9, 2025, a three-member Appeal Panel convened by the University denied Damsky's appeal. Doc. 37-3 at 461–64. Following the denial of his appeal, Damsky's enrollment and remote participation in classes ended. Hr'g Tr. 50 (Doc. 53). Although Damsky could have sought judicial review of his expulsion in state court, Fla. R. App. P. 9.190(b)(3); Doc. 17-1 at 462 (advising him of his right to review), he chose not to do so. Hr'g Tr. 38–39, 45 (Doc. 53).

## H.    Proceedings in the District Court

On September 14, 2025, Damsky filed his Complaint. Doc. 1. Two weeks later, he moved for a preliminary injunction. Doc. 6. The University moved to dismiss the Complaint. Doc. 11. The district court granted the motion to dismiss as to Damsky's damages claims but

---

[5] The UOB had been instructed that it should presume that expression using the phrase "From the river to the sea, Palestine will be free" is protected by the First Amendment. Doc. 37-3 at 29, 275–76. UF did not base its decision to discipline Damsky in any part on his wearing a shirt with that phrase on campus. Doc. 17-1 at 455–58.

otherwise denied it. Doc. 45. The parties argued the motion for preliminary injunction on October 29th. Docs. 32, 53, 54.

On November 24, 2025, the district court granted Damsky's preliminary injunction motion and directed the University to return Damsky to normal standing no later than December 1, 2025, conditioned on a $2,500 bond. Doc. 38 at 28. The Court found no evidentiary hearing was necessary and relied on affidavits and the administrative record. *Id.* at 2. Damsky paid the bond. Doc. 40. The University appealed the district court's Order granting a preliminary injunction. Doc. 41.

The University moved the district court to stay its injunction pending appeal, or in the alternative, to modify its injunction to permit Damsky's remote enrollment and participation while maintaining the exclusion of Damsky from physically visiting campus during the pendency of the appeal. Doc. 46. The district court granted a temporary stay of the injunction so that the University could move this Court for a stay, Doc. 47, which the University filed in this Court on December 2, 2025, ECF 11. The next day, this Court entered an administrative stay while it considered the University's motion. ECF 17.

This Court then granted the University's motion and stayed the district court's injunction pending appeal. *See* Stay Op. (ECF 20-2). This Court ruled that "Damsky's speech was likely not protected by the First Amendment" because "his statements were reasonably interpreted as a call for extralegal violence that caused a serious disruption to other students' educational experiences and the school's ability to provide its services." *Id.* at 2.

## I.    Standards of Review

A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion" as to each of four factors. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (cleaned up). These factors are (1) a substantial likelihood of success on the merits, (2) the movant will suffer irreparable injury without an injunction, (3) the threatened injury outweighs damage the injunction may inflict on the nonmovant, and (4) the injunction would not be adverse to public interest. *Id.* "Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits." *Id.*

This Court has held that "[w]here the First Amendment Free Speech Clause is involved," this Court's "review of the district court's findings of 'constitutional facts,' as distinguished from ordinary historical facts, is *de novo*." *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018). And whether the facts at issue "evidence an intent to carry out [a] threat is a question of law and is reviewed *de novo*." *United States v. Barbour*, 70 F.3d 580, 586 (11th Cir. 1995).

## SUMMARY OF ARGUMENT

The district court's Order granting a preliminary injunction to Damsky should be reversed because he failed to establish the required factors. First and foremost, the University is likely to succeed on the merits of Damsky's First Amendment claim. Stay Op. 2, 5–14 (ECF 20-2). His public-facing social-media posts declared that "what must be done with Jews" is that "Jews must be abolished by any means necessary." And he equivocated when asked by a UF Law professor if he were advocating murdering her and her family. Viewed in the context of Damsky's prior disruptive advocacy for extralegal violence, the posts were reasonably perceived as threatening by the UF Law community, triggering fear and operational responses. The fact that two Members of

29

this Court previously concluded that Damsky's statements "were reasonably interpreted as a call for extralegal violence that caused a serious disruption to other students' educational experiences," Stay Op. 2 (ECF 20-2), confirms the reasonableness of UF's interpretation.

The posts also caused material and substantial disruption on campus, justifying regulation even in higher education. Damsky's threatening posts were directed toward the UF Law community—the community of which he was a part. Students, faculty, and staff at the law school reasonably perceived the posts that way, as threatening violence. And when Damsky equivocated in response to a UF Law professor's question about whether he was saying he would murder her and her family, he knew that the eyes of the UF Law community were on him and that he was speaking directly to that community.

Damsky also failed to show irreparable injury, as any harm is merely a compensable delay in completing his degree, and his speech remains unchilled. The balance of equities and public interest strongly favor the University, which has a compelling interest in protecting students from violence and maintaining a safe learning environment.

Reinstatement would impose irreparable safety risks that outweigh Damsky's temporary delay. Stay Op. 14–16 (ECF 20-2).

## ARGUMENT

## I. The University Is Likely to Prevail on the Merits.

As the motions panel ruled, Damsky's First Amendment claim likely fails for two reasons. First, threats of violence by a student directed toward a school are not protected, and Damsky's original public social-media post declaring that "Jews must be abolished by any means necessary," combined with his subsequent exchange with Professor Lidsky, were reasonably perceived by UF Law's students, faculty, staff, and Dean, and other UF officials as a threat, especially when considered in the context of his long pattern of advocating extralegal violence. Second, student speech that disrupts the learning environment at school is not protected, and Damsky's speech caused material and substantial disruption at UF Law. The district court's Order failed to give due regard to these concerns and should be reversed.

### A. UF Officials, Faculty, and Students Reasonably Viewed Damsky's Posts as Threatening Violence Against Jews at the University.

"The First Amendment does not protect violence." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Nor does it protect

threats, a "historically unprotected category of communications." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) ("[T]hreats of violence are outside the First Amendment[.]").

In educational settings, "[t]he First Amendment does not protect student speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" Stay Op. 6 (ECF 20-2) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509, 513 (1969)). Likewise, threats directed by a student toward a school are not protected. "Applying *Tinker*, [this Court] ha[s] held that there 'is no First Amendment right allowing a student to knowingly make comments, whether oral or written, that reasonably could be perceived as a threat of school violence, whether general or specific, while on school property during the school day.'" *Id.* (quoting *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007)).

The motions panel correctly held that "UF is likely to show that Damsky's posts 'materially disrupt[ed] classwork' for two reasons." Stay Op. 7 (ECF 20-2). "First, UF students, faculty, and staff could reasonably interpret Damsky's posts as threatening violence on UF's campus, which

sparked community safety concerns." *Id.* "Second, the UF community could reasonably interpret Damsky's posts are promoting extralegal violence, and schools can regulate at least some speech that calls for illegal conduct." *Id.*

The record shows that Damsky's public social-media posts were reasonably regarded as a threat of violence by Dean McAlister and other members of the University community, who viewed them in the context of Damsky's calls for extralegal violence and his aggressive and disruptive behavior since he began attending UF Law. Dean McAlister had "spent significant time over the last two years fielding complaints about Mr. Damsky" from other law students who were concerned about him—and for their own safety. Doc. 37-3 at 31.

Damsky's post declaring that "Jews must be abolished by any means necessary," Doc. 17-3 at 4, came on the heels of his two seminar papers that had disrupted campus with their calls for violence, Doc. 17-2 at 4–7, 9–12. Damsky's language conveyed a willingness to use violence to achieve his aims. *See* Stay Op. 7 (ECF 20-2) ("A reasonable reader could understand Damsky's post and its use of the word 'abolish' to mean that Jews must be murdered." (citing *Abolish, Oxford English Dictionary*

(online ed.))); *id.* at 8 ("'[A]ny means necessary' can reasonably be interpreted to include violent measures."); *see also Abolish*, *Black's Law Dictionary* (12th ed. 2024) ("To annul, eliminate, or destroy"); *United States v. Brown*, 479 F.2d 1170, 1174–75 (2d Cir. 1973) (Defendant's statement that "he would protect himself from what he considered force and violence by the police or military 'by whatever means necessary' … could properly have raised a serious question in the sentencing judge's mind as to whether Brown posed a threat of violent or anti-social conduct to the community.").[6]

Before he posted, Damsky had met with Dean Shaw and was on notice that his classmates "feared him and they thought he might do

---

[6] The motions panel thought that "Damsky created some ambiguity by conditioning the meaning of his 'position on Jews' on the intentions of a Harvard professor," Noel Ignatiev. Stay Op. 8 (ECF 20-2). Nevertheless, the panel correctly found that "a reasonable reader, particularly members of the UF community who were aware of Damsky's prior statements and actions, could still understand his post as a call for violence." *Id.* at 8–9. A reasonable reader could read Damsky's post that way without having to rush to the library to bone up on the works of the late Professor Ignatiev, who is not exactly a household name. Even persons familiar with Ignatiev's writing could perceive Damsky's post as a threat. As Dean McAlister pointed out at the UOB hearing, whereas Ignatiev wanted to abolish *whiteness* as a concept, Damsky called for abolishing Jews, not Jewishness. Doc. 37-3 at 31–32.

something that would negatively impact their safety." Doc. 37-3 at 93. A UF Law student alarmed by Damsky's post was the one who first brought it to Dean McAlister's attention. *Id.* at 32.

Even though (or perhaps because) Damsky "knew that students were afraid of him," he "continued to fan the flames of fear through his tweet and his response to Professor Lidsky." *Id.* at 95–96. When Professor Lidsky asked if Damsky were calling for the murder of her and her family, Damsky equivocated and invoked the notion of Jewish genocide. "Damsky did not say no, which left open the reasonable interpretation that he did want to kill her and her family." Stay Op. 9 (ECF 20-2). And "in his X reply to the UF professor, Damsky affirmatively brought up genocide," which "confirms the reasonableness of an interpretation that Damsky was advocating for violence." *Id.* at 10.

At that moment, Dean McAlister determined that "the meaning of his words became clear. He was threatening the Jewish people on our campus. He was calling for and supportive of genocide by, 'Any means necessary.'" Doc. 37-3 at 35. With his threatening posts Damsky caused material and substantial disruption at UF Law, and for that reason his speech was not protected.

**B.    Damsky's Posts Significantly Disrupted the University.**

The University's ability to curb material disruptions to classwork and its educational mission is rooted in *Tinker*, which the district court correctly assumed determines whether the University could discipline Damsky for his disruptive conduct. The district court, however, erred in holding that Damsky's conduct was not a threat or school-directed. Doc. 38 at 23–24. As the motions panel explained, "[t]he First Amendment does not protect student speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" Stay Op. 6 (ECF 20-2) (quoting *Tinker*, 393 U.S. at 509, 513). School authorities have a right and a duty to take action when they "reasonably … forecast substantial disruption of or material interference with school activities" or when "disturbances or disorders on the school premises in fact occurred." *Tinker*, 393 U.S. at 514.

Such disturbances occurred here. Substantial disruptions include increased security measures involving operational changes rather than mere implementation of standard routine safety protocols. *See, e.g.*, *United States v. Dudley*, 463 F.3d 1221, 1226 (11th Cir. 2006) (law enforcement officers diverted from other duties to provide security);

36

*United States v. Snipes*, 466 F. App'x 800, 801–02 (11th Cir. 2012) (increased security and ID verification); *Mardis v. Hannibal Pub. Sch. Dist.*, 684 F. Supp. 2d 1114, 1123–24 (E.D. Mo. 2010) (significantly increased security and parent and student complaints that consumed majority of school official's time for a week), *aff'd,* 647 F.3d 754 (8th Cir. 2011); *United States v. Anwar*, 741 F.3d 1134, 1139–41 (10th Cir. 2013) (building shut down and evacuated, classes interrupted, school employees and police officers diverted from regular duties).

Decisions of the Supreme Court and this Court show that schools—whether K-12, undergraduate, or graduate—need not sit idly by and allow their classwork and educational mission to be disrupted. Damsky's posts caused material disruption for two reasons here. First, "the UF community could reasonably interpret Damsky's posts as promoting extralegal violence, and schools can regulate at least some speech that calls for illegal conduct." Stay Op. 7 (ECF 20-2). Second, "UF students, faculty, and staff could reasonably interpret Damsky's posts as threatening violence on UF's campus, which sparked community safety concerns." *Id.* Because UF can eliminate disruptions under *Tinker*, either of those reasons is grounds to reverse the district court here.

### C.    The Supreme Court and This Court Have Applied *Tinker* in Undergraduate and Graduate Settings.

The district court correctly assumed that *Tinker* principles apply in the higher education setting, and that applies equally to graduate and professional schools. In *Healy v. James*, 408 U.S. 169 (1972), the Supreme Court recognized that "a college has a legitimate interest in preventing disruption on the campus," *id*. at 184, and that student speech "activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education," *id*. at 189. *Healy* recognized that "[i]n the context of the 'special characteristics of the school environment,'" a school's power to "prohibit 'lawless action' is not limited to acts of a criminal nature," but includes "actions which 'materially and substantially disrupt the work and discipline of the school.'" *Id*. (quoting *Tinker*, 393 U.S. at 506, 513).

After *Healy*, the Supreme Court reiterated *Tinker* principles in the graduate school setting. *See Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 669–70 & n.6 (1973) (per curiam). In *Papish*, the Court addressed the expulsion of a 32-year-old graduate student based on the content of her speech. *Id.* at 667, 668 n.3. In reversing her expulsion, the

Court noted "the absence of any disruption of campus order or interference with the rights of others." *Id.* at 670 n.6. Even in the context of a graduate student, the Court noted it has "repeatedly approved" the "regulatory authority" described in *Healy*. *Id.* at 670.

Then, in *Widmar v. Vincent*, 454 U.S. 263 (1981), the Supreme Court again "affirm[ed] the continuing validity of cases, *e.g.*, *Healy* …, that recognize a University's right to exclude even First Amendment activities" that have such adverse effects. *Id.* at 277. "A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations [on First Amendment activities] compatible with that mission[.]" *Id.* at 267 n.5.

In *Doe v. Valencia College*, 903 F.3d 1220 (11th Cir. 2018), "this Court, in a published decision, applied *Tinker* in the higher education context." Stay Op. 6 n.4 (ECF 20-2). This Court held that, because Valencia College "reasonably concluded" that a student's conduct interfered with the rights of another student, "Valencia was free to regulate it under *Tinker* without impinging on … First Amendment rights." *Valencia College,* 903 F.3d at 1229–31. The motion panel noted that "when [this Court] applied *Tinker* in the university setting in

*Valencia College*[,] [it] did not apply a different standard" than the one applied "in the primary school context." Stay Op. 6 n.4 (ECF 20-2).[7]

That Damsky was a graduate student further justifies the University's application of *Tinker* principles to protect its students and educational mission. Damsky was not a K-12 student who might not perceive the likely disruption his actions might cause. He was a 29-year-old law student. The University could reasonably assume that he was aware of the implication of his conduct. The University in fact informed him of the effect his actions were having on the UF community. And despite that context, Damsky continued to court controversy and decided to double-down on a perceived threat instead of dispelling it. This Court and the Supreme Court have repeatedly applied *Tinker* in K-12, undergraduate, and graduate settings. Its principles govern here.

---

[7] In a prior case, this Court stated it was "not at all clear that *Tinker*'s more lenient standard applies in the university … setting." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) (Newsom, J.). Dissenting from the motion panel's decision here, Judge Newsom noted that although he "previously expressed skepticism that *Tinker*'s deferential … framework should even apply in the university setting," Stay Op. 20 (ECF 20-2) (Newsom, J., dissenting), "it seems that both the Supreme Court and this Court have … invoked *Tinker* in the university setting," *id.* at 21 (Newsom, J., dissenting) (citing *Healy*, 408 U.S. at 189, 191; *Valencia College*, 903 F.3d at 1229).

It has been suggested that being a graduate student might "count[] double" in "the free-speech calculus" because such students "surely have *greater* speech interests than do their grade-school counterparts" and because they are "learn[ing] how to do the hard work of *adulting*." Stay Op. 29 (ECF 20-2) (Newsom, J., dissenting). Provoking disruption in a professional school is not "adulting." In the adult world, disrupting your workplace with threatening behavior and rhetoric over a span of years, then posting a message that your co-workers reasonably perceive as threatening them, and equivocating when asked to clarify if you are in fact threatening them, gets that adult fired. The speech of a graduate student at a professional school is not immune to reasonable regulation by the school the student has chosen to attend.[8]

---

[8] "A student may demonstrate an unacceptable lack of professionalism off campus, as well as in the classroom, and by speech as well as conduct. Therefore, college administrators and educators in a professional school have discretion to require compliance with recognized standards of the profession, both on and off campus, 'so long as their actions are reasonably related to legitimate pedagogical concerns.'" *Keefe v. Adams*, 840 F.3d 523, 531 (8th Cir. 2016) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988); other citations omitted).

### D. Damsky's Posts Were Reasonably Interpreted both as Promoting and as Threatening Violence on UF's Campus, Sparking Community Safety Concerns.

The district court wrongly concluded that the University's *Tinker* argument would fail absent a threat and a sufficient school connection. Doc. 38 at 24. Both are present here. Because the UF community reasonably interpreted Damsky's posts as promoting and threatening violence on UF's campus, the University properly disciplined him under *Tinker*.

**1.** School authorities reasonably construed Damsky's posts as promoting and threatening extralegal violence toward a protected group in the school community, triggering the school-safety exception recognized as a grave and unique threat category in the educational setting. *See Boim*, 494 F.3d at 980–81, 983–84 & n.5; *see also Morse v. Frederick*, 551 U.S. 393, 424 (2007) ("Experience shows that schools can be places of special danger." (Alito, J., concurring)). This Court has recognized that schools have an "undisputably compelling interest in acting quickly to prevent violence on school property, especially during regular school hours." *Boim*, 494 F.3d at 984. And the motion panel recognized that this Court has "held that this Court has 'held that there 'is no First Amendment

42

right allowing a student to knowingly make comments, whether oral or written, that reasonably could be perceived as a threat of school violence, whether general or specific, while on school property during the school day.'" Stay Op. 6 (ECF 20-2) (quoting *Boim*, 494 F.3d at 984).

*Boim* relied in part on the Supreme Court's decision in *Morse*. There, a high school student displayed a banner with a message that the principal reasonably regarded as promoting illegal drug use. *Morse,* 551 U.S. at 396–97. The principal confiscated the banner and suspended the student. The Court held that school officials may, "consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Id.* at 403. In *Boim*, this Court concluded that "[t]hat same rationale applies equally, if not more strongly, to speech reasonably construed as a threat of school violence." *Boim*, 494 F.3d at 984. Here, the fact that "the UF community could reasonably interpret Damsky's posts as promoting extralegal violence"—i.e., "murdering Jews"—provides an independent reason, under *Morse*, to uphold UF's regulation of his speech. Stay Op. 7, 11 (ECF 20-2).

43

Given the horrific history of school violence in this country, "threats of an attack on a school and its students *must* be taken seriously." *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 771 (5th Cir. 2007). "School administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance." *Id.* at 772.[9] "[N]umerous[] recent examples of school violence exist in which students have signaled potential violence through speech, writings, or actions, and then carried out violence against school communities, after school administrators and parents failed to properly identify warning signs." *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 399 (5th Cir. 2015) (en banc).

Here, UF officials, including Dean McAlister and Dean Summerlin, acted promptly and responsibly to protect the safety of the UF Law

---

[9] *Ponce* noted that one of the special characteristics of the school environment is that "school attendance results in the creation of an essentially captive group of persons protected only by the limited personnel of the school itself. This environment makes it possible for a single armed student to cause massive harm to his or her fellow students with little restraint and even less forewarning." *Ponce*, 508 F.3d at 771 (citing *Morse*, 551 U.S. at 424 (Alito, J., concurring)).

community in the face of "speech reasonably construed as a threat of school violence." *Boim*, 494 F.3d at 984. Deference to their judgment about what was needed to keep students safe is appropriate. *Cf. Ala. Student Party v. Student Gov't Ass'n of Univ. of Ala.*, 867 F.2d 1344, 1347 (11th Cir. 1989) ("The University judgment on matters such as [the disruptive effect of student speech] should be given great deference by federal courts."). Educators must be free to make student safety decisions without worrying that their judgment calls will be second-guessed in subsequent litigation. As this Court has admonished, "Federal judges should not be ersatz deans or educators." *Bishop v. Aronov,* 926 F.2d 1066, 1075 (11th Cir. 1991).

It is not necessary for this Court to find that "the *only* reasonable interpretation of Damsky's speech is that it threatened violence, nor is that what [this Court's] caselaw requires for UF to regulate Damsky's speech." Stay Op. 7 n.6 (ECF 20-2). "UF students, faculty, and staff could reasonably interpret Damsky's posts as threatening violence on UF's campus," particularly those who were aware of Damsky's prior statements and actions. *Id.* at 7. The motions panel, after considering relevant events surrounding Damsky's speech, recognized that "when

read in context, his statements were reasonably interpreted as a call for extralegal violence that caused a serious disruption to other students' educational experiences and the school's ability to provide its services." *Id.* at 2; *see also id.* at 9 n.8 (citing *Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246, 1249 (11th Cir. 2003) (school permitted to suspend students who displayed Confederate flag given the context of racial tension and racially-based fights at the school)).

The facts and circumstances known to UF and its community "support a reading of Damsky's post as a call for violence against Jews that could materialize on UF's campus." *Id.* at 10. When Damsky was inadvertently locked out of a UF building during his first semester, he "began banging, kicking, yanking the glass door and yelling, 'Let me in the F-ing door,' to the point that multiple UF Law employees were uncomfortable and afraid and concerned about their safety because Damsky seemed enraged." *Id.* (cleaned up); *see also* Doc. 37-3 at 91. He disrupted the 1L GroupMe, causing it to be shut down. Doc. 37-3 at 242, 283–84; *see also id.* at 99–100. He wore a shirt that read, "From the river to the sea, Palestine will be free." *Id.* at 175, 200. A student reported that Damsky posted that "his support for Palestine was a means to an end

46

and quite often discussed how Jews are parasites, the enemies of humanity." *Id.* at 228.

Damsky then wrote two papers involving "calls for racial violence, sort of racial overthrow and violent rhetoric." Doc. 37-3 at 41; *see also* Doc. 17-2 at 3–7, 8–12.[10] And he told one of his classmates that his papers were "intended to be a call for contemporary extralegal violence." Doc. 37-3 at 211; *see also id.* at 14, 25–26, 206. In his words, "I don't reject that if that's what it takes." *Id.* at 212. These circumstances led Damsky's classmates to express worry that he posed "a security risk," *id.* at 158–59, and to "avoid[] Damsky when possible," Stay Op. 3 (ECF 20-2). In this context, "Damsky's X posts … are reasonably understood as a credible call for violence." *Id.* at 11. That fact is enough to resolve this case. *Id.* at 7. In any event, the fact that two Judges on the motions panel found that Damsky's statements "were reasonably interpreted as a call for extralegal violence that caused a serious disruption to other students'

---

[10] On June 22, 2025, Damsky pinned links to his UF Law papers to the top of his X account. Preston Damsky (@preston_terry_), X (June 22, 2025 at 12:11 AM), https://x.com/preston_terry_/status/1936638237365383579.

educational experiences," *id.* at 2, confirms that UF's interpretation of Damsky's posts was a reasonable one.

The district court's Order acknowledged the propriety of deference "as a general matter," Doc. 38 at 22, but conducted a *de novo* interpretive assessment and declined to credit the school's reasonable safety determinations notwithstanding evidence of widespread fear, significant operational responses (police presence, locked doors), and a trespass order contemporaneous with safety concerns, *id.* at 23–24.

The district court equated the deference due the University for assessing potential threats of extralegal and school violence with interpreting whether a message advocated for illegal drug use, as in *Morse*. Doc. 38 at 21–24 (citing *Morse*, 551 U.S. at 401–03). But these situations are not remotely similar. The consequences of a school making a wrong call on the former are fatal. And such decisions are made under time constraints and pressure that are not present in situations like those in *Morse. See*, *e.g.*, *Boim*, 494 F.3d at 984. The University should thus be given meaningful deference in deciding whether a speaker was reasonably interpreted as threatening school violence. And in any event,

48

the University reasonably acted on Damsky's posts because they were promoting and threatening extralegal violence.

**2.** The school connection exists, at minimum, from Damsky's equivocation when he responded to a UF Law professor about whether he was advocating for the murder of her family. As the motions panel found, "Damsky's posts were sufficiently connected to UF." Stay Op. 13 (ECF 20-2). He knew when he posted "that some members of the UF community perceived him as a threat," "that community members viewed his tweets," and, in addition, his "speech involved a direct conversation with a UF law professor." *Id.* (first quotation cleaned up). "[H]is speech could be reasonably perceived as targeting members of the school community," including the "large and engaged Jewish community at UF and the professor Damsky exchanged posts with [who] was Jewish." *Id.* (second quotation cleaned up). Damsky's public declaration that "'Jews must be abolished by any means necessary' necessarily encompassed members of the UF community." *Id.*

Nor does it matter here that Damsky posted while off campus. *See* Stay Op. 6 n.5, 12 (ECF 20-2) ("The fact that Damsky's speech occurred online instead of on campus does not mean that UF cannot regulate the

49

speech, particularly because there was a connection between his posts and UF."). This Court has recognized that "*Tinker* does not foreclose a school from regulating all off-campus conduct." *Valencia College*, 903 F.3d at 1231. Even if a university's ability to regulate off-campus speech may in some regards be "diminished" in "some off-campus circumstances," the "school's regulatory interests remain significant." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 188–90 (2021). No off-campus circumstance could be more significant than potential school violence. *See id*. at 188 (identifying threats aimed at schools as a type of "off-campus behavior that may call for school regulation"). Accordingly, this Court considers whether speech "violates the rights of another student" and has held that schools are not "powerless to do anything about his misbehavior," even if "he did it all while he was off campus" during "the break between summer and fall classes." *Valencia College*, 903 F.3d at 1231; *see also Shanley v. Ne. Indep. Sch. Dist*., 462 F.2d 960, 974 (5th Cir. 1972) (declining "to hold that *any* attempt by a school district to regulate conduct that takes place off the school ground and outside of school hours can never pass constitutional muster").

The direct, immediate, and predictable impact on campus operations and participants—including professors and students—makes Damsky's posts reasonably school-directed in effect, consistent with the recognition that off-campus threats aimed at school actors may be regulated. The administrative record showed that faculty and students reported fear for physical safety tied to Damsky's rhetoric,[11] prompting heightened security and policing. That nexus suffices under the relevant standards. *See Tinker*, 393 U.S. at 509; *Boim*, 494 F.3d at 983–84 & n.5. Damsky's threatening speech disrupted the education of other students of UF Law, as the record shows, and the University's decision should be upheld under *Tinker* principles. In sum, the motions panel got it right when it found that "there is strong evidence that Damsky's speech created a substantial disruption of the school's activities. And the disruption in this case—a credible fear of targeted violence—is one of the most severe disruptions imaginable." Stay Op. 13 (ECF 20-2).

---

[11] Professor Lidsky testified that she and her husband "slept with a baseball bat beside the bed" for a "couple of weeks" after her exchange with Damsky. Doc. 37-3 at 120.

## II.    Damsky's Speech Was a True Threat.

Although the Court need not reach the issue, the University was also allowed to regulate Damsky's speech because his speech was a true threat and, thus, unprotected.[12]

"True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection." *Counterman*, 600 U.S. at 72. "True threats are serious expressions conveying that a speaker means to commit an act of unlawful violence." *Id*. at 74 (cleaned up). A true threat may be conveyed "to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "And a statement can count as such a threat based solely on its objective content." *Counterman*, 600 U.S. at 72. "The speaker need not actually intend to carry out the threat." *Black*, 538 U.S. at 359–60.

"Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat[.]" *Counterman*, 600 U.S. at 74. "The existence of a threat

---

[12] The motions panel did not reach the question whether Damsky's speech was a true threat. Stay Op. 5 (ECF 20-2). Nor need the Court do so here if it rules that the University was allowed to regulate Damsky's speech under *Tinker*, *Morse,* and *Boim*.

depends not on the mental state of the author, but on what the statement conveys to the person on the other end." *Id.* (cleaned up). The focus is on the person receiving the threat because "a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Black*, 538 U.S. at 360 (cleaned up).

Damsky published on social media his "simple" "position" on "what [he] think[s] must be done with Jews," namely, that "Jews must be abolished by any means necessary." Doc. 17-3 at 4. He made that declaration not in jest or in an unserious way. It was objectively a "serious expression" that conveyed to many in the UF Law community that he meant to "commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (cleaned up). It makes no difference whether he intended his post to be seen as a threat. *Id.*

Any doubt that Damsky's post was a true threat was dispelled by his exchange with Professor Lidsky. When she asked him, publicly, "Are you saying you would murder me and my family? Is that your position?," he dodged her questions and offered the chilling comment that "surely a genocide of all Whites" would be worse than "a genocide of all Jews." Doc.

17-3 at 4. It is remarkable that Damsky, a law student, would respond to such questions from a faculty member at his law school in this way with talk of genocide and without making it clear that he was not threatening to kill Jews. His reply to Professor Lidsky speaks volumes about the true threat communicated by him.

True threats in a civil case do not require a showing of *mens rea*. *Cf.* Doc. 29 at 4. *Counterman* required such a showing because it was a criminal case. But courts have recognized that no *mens rea* requirement exists for civil cases involving true threats. *See Kansans for Const. Freedom v. Kobach*, 789 F. Supp. 3d 1062, 1081 (D. Kan. 2025) ("*Counterman*—a criminal liability case—never holds that proof of mental state is required for civil liability."); *Sealed Pl. 1 v. Front*, No. 3:22-cv-00670, 2024 WL 1395477, at *29 (E.D. Va. Mar. 31, 2024) ("*Counterman* [is] inapplicable in this civil lawsuit with no criminal statute at issue."); *see also Mens Rea*, *Black's Law Dictionary* (12th ed. 2024) ("The state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime"); *King v. Frazier*, 77 F.3d 1361, 1363 (Fed. Cir. 1996) (holding that a *mens rea*

requirement was "improperly borrowed … from criminal law and interjected it into" a civil proceeding).

In any event, as a matter of law, Damsky demonstrated the requisite *mens rea* of recklessness. He "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman*, 600 U.S. at 69. The message from Professor Lidsky put him on notice that his posts were perceived as a threat, yet he failed to disclaim violence. And even before he posted, Dean Shaw had told Damsky that other students were fearful of him.

## III. Damsky Did Not Establish Irreparable Injury Absent an Injunction.

Damsky failed to carry his burden to show irreparable harm with respect to his expulsion. If he ultimately prevails in this case, Damsky may resume his studies at UF Law. His only harm will have been the delay in completing law school. But such a delay is not irreparable harm. *See Van Arsdel v. Tex. A&M Univ.*, 628 F.2d 344, 346 (5th Cir. 1980) (vacating preliminary injunction that reinstated plaintiff as a tenured professor because "reinstatement after trial, coupled with back pay, would suffice to redress [his] alleged wrong"); Stay Op. 15 & n.11 (ECF 20-2) (citing *Van Arsdel* as binding authority); *see also Faculty Senate of*

*Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) (relying on "particularly instructive" *Van Arsdel* decision in finding "it is unlikely that delay in completing [academic] research or obtaining a degree is irreparable harm"). As many courts have held, delayed education is not irreparable harm because it can be compensated with damages. *See Doe v. Tex. A&M Univ.*, No. H-20-4332, 2021 WL 257059, at *8 & n.1 (S.D. Tex. Jan. 26, 2021) (collecting cases). "[I]f Damsky ultimately prevails, his harm—a delay in completing his legal education and obtaining a professional degree—can be remedied monetarily." Stay Op. 14–15 (ECF 20-2).

Meanwhile, this Court has rejected the notion that a "violation of constitutional rights always constitutes irreparable harm." *Siegel v. LePore,* 234 F.3d 1163, 1177 (11th Cir. 2000) (en banc). In First Amendment cases, *Siegel* explained, irreparable harm is presumed only if there is "an imminent likelihood that pure speech will be chilled or prevented altogether." *Id*. at 1178. Here, Damsky has not carried his burden of showing he will be chilled or prevented from speaking unless he is granted a preliminary injunction. In fact, available evidence points the other way.

In June 2025, after his interim suspension, an unchilled Damsky gave a frank interview to the *New York Times*. Doc. 17-4 at 4–10. The *Times* reported that Damsky had agreed "it would not be wrong to refer to him as a Nazi." Stay Op. 10 (ECF 20-2); *see also* Doc. 17-4 at 4. And even after his suspension and expulsion Damsky has frequently used his X account to express his unvarnished views on Jews and Israel (to him, "the Jewish gangster entity" (*see* Doc. 17-4 at 18–20, 22, 26)) and discuss his White Nationalism. A small sample of his recent posts, some employing violent rhetoric, were submitted to the district court. *Id.* at 12–28. For example, on September 9, 2025, Damsky posted that North Carolina Governor "Josh Stein (J)[13] thinks DeCarlos Brown should be treated with kid gloves. And because you can't say 'No, Jew,' they will continue to get their way. If we do not toss these repugnant, anti-social gangsters out of our governments, all of our necks may very well end up getting slashed." *Id.* at 24.

Even a quick perusal of Damsky's X account confirms that his speech has not been chilled. Damsky posted on June 28, 2025: "This

---

[13] By putting a "(J)" after Governor Stein's name, Damsky apparently was marking him as Jewish.

process was meant to punish and silence me. But that has backfired. … I have not been silenced, both my resolve and my ideas have been amplified. And I will never be silent until there is no further need to speak." *Id.* at 16. And Damsky's post calling for Jews to be abolished by any means necessary is still on his X account. He even reposted it on June 25, 2025, after his suspension. *Id.* at 15.

If Damsky eventually prevails on the merits, he will not be subject to irreparable harm, merely a delay. And meanwhile, Damsky cannot show that his speech will be chilled absent a preliminary injunction.

## IV.    The Balance of Equities and the Public Interest Do Not Support an Injunction.

"The last two requirements for a preliminary injunction involve a balancing of the equities between the parties and the public. Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest." *Florida v. HHS*, 19 F.4th 1271, 1293 (11th Cir. 2021). The district court's finding of irreparable harm to Damsky rests on the merits of his claims. But those claims are likely to, and indeed do, fail.

Unlike Damsky, "UF will face irreparable harm" from the district court's injunction "because reinstating Damsky will create a safety and

security risk that will disrupt other students' educational experiences—a non-compensable harm that cannot be remedied post-appeal." Stay Op. 14 (ECF 20-2). "If Damsky is reinstated, there is a high likelihood that UF and its students will suffer the serious impact of continued disruptions to its educational environment." *Id*. at 15. After all, "it is reasonable to interpret Damsky's posts as a call to murder Jews, including his Jewish classmates and the Jewish UF Law professor he responded to." *Id*. at 14.

UF and the public have a compelling interest in protecting students from violence and from threats that disrupt the educational process. The Order acknowledged the University's interest in maintaining order but discounted it based on the First Amendment merits conclusion. Doc. 38 at 28. The Supreme Court has recognized that "schools have a special interest in regulating speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Mahanoy*, 594 U.S. at 188 (cleaned up). And this Court has held that a "University … has a significant interest in ensuring safety and order on campus." *Bloedorn v. Grube*, 631 F.3d 1218, 1238 (11th Cir. 2011). This compelling public interest in student safety and maintaining an

educational environment conducive to learning far outweighs any interest Damsky may have.

Being forced to reverse those measures during litigation of Damsky's case imposes non-compensable harms to public safety and to the University's mission. These harms are irreparable because they implicate safety and institutional autonomy interests that cannot be remedied post-appeal. Damsky's "proposed injunction would harm the public interest by undermining the authority of school officials and threatening the safety of students." *Coronado v. Valleyview Pub. Sch. Dist. 365-U*, 537 F.3d 791, 797–98 (7th Cir. 2008). If Damsky were to be reinstated, the University would be forced to undertake substantial security measures and risk community disruption.

And if Damsky ultimately prevails, he will be able to resume his studies with no effect to him beyond a delay in completing his education. This delay is not an irreparable harm. *See* Stay Op. 14–15 (ECF 20-2); *Van Arsdel*, 628 F.2d at 346; *Faculty Senate of Fla. Int'l Univ.*, 477 F. Supp. 2d at 1208; *Doe*, 2021 WL 257059, at *8 & n.1. The balance of harms and the public interest favor a stay of the Order. In the end, the motions panel correctly concluded that "weigh[ing] heavily" in UF's favor

was the "strong public interest in avoiding disruptions to UF students' education and mitigating the threat of violence on campus." Stay Op. 16 (ECF 20-2).

## CONCLUSION

For the foregoing reasons, the Order of the district court should be reversed. The University properly safeguarded its students and other community members in response to Damsky's threats and the resulting substantial disruption at UF Law. Student safety, campus order, and the right of students to a campus environment conducive to learning all decisively outweigh any temporary educational delay. The equities and public interest also support upholding Damsky's expulsion pending this case's disposition on the merits.

Respectfully submitted,

*/s/ H. Christopher Bartolomucci*
H. CHRISTOPHER BARTOLOMUCCI
  *Lead Counsel*
JUSTIN A. MILLER
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com

BRANDE S. SMITH
  *Senior Counsel*
OFFICE OF GENERAL COUNSEL
UNIVERSITY OF FLORIDA
300 SW 13th Street
123 Tigert Hall
Gainesville, FL 32611-3125
(352) 392-1358

*Counsel for Appellant*

Dated: February 2, 2026

## CERTIFICATE OF COMPLIANCE

The foregoing Appellant's Opening Brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,143 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci

Dated: February 2, 2026